**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Etopia Evans, as the Representative of the** | ) |
| **Estate of Charles Evans** | ) |
| 5533 Loring Drive | ) |
| Baton Rouge, Louisiana 70812 | ) |
| | ) |
| **Robert Massey** | ) |
| 5100 Brookstone Drive | ) |
| Durham, North Carolina 27713 | ) |
| | ) |
| **Troy Sadowski** | ) |
| 1406 Meadow Brook Way | ) |
| Woodstock, Georgia 30189 | ) |
| | ) |
| **Christopher Goode** | ) |
| 1428 Egret Lane | ) |
| Birmingham, Alabama 35214 | ) |
| | ) |
| **Darryl Ashmore** | ) |
| 8695 Thornbrook Terrace | ) |
| Boynton Beach, Florida 33473 | ) |
| | ) |
| **Jerry Wunsch** | ) Case No. |
| 1037 Dartmouth Drive | ) |
| Holiday, Florida 34691 | ) **JURY TRIAL DEMANDED** |
| | ) |
| **Eric King** | ) |
| 19119 Nordhoff St., # 523 | ) |
| Northridge, CA 91324 | ) |
| | ) |
| **Alphonso Carreker** | ) |
| 5599 Asheforde Lane | ) |
| Marietta, Georgia 30068 | ) |
| | ) |
| **Steven Lofton** | ) |
| 2213 Aristocrat Drive | ) |
| Irving, Texas 75063 | ) |
| | ) |
| **Duriel Harris** | ) |
| 4545 Boyt Road | ) |
| Beaumont, Texas 77713 | ) |
| | ) |

**Jeffrey Graham**                       )
P.O. Box 10771                           )
Dayton, Ohio 45402                       )
                                         )
**Mel Renfro**                           )
8211 Hunnicut Road                       )
Dallas, Texas 75228                      )
                                         )
**Cedric Killings**                      )
19397 NW 13th St.             )
Pembroke Pines, FL 33029                 )
                                         )
   **Plaintiffs,**        )
                                         )
  **v.**                       )
                                         )
**Arizona Cardinals Football Club, LLC** )
8701 S. Hardy Drive                      )
Tempe, AZ 85284                          )
  Serve On:                    )
  CT Corporation System        )
  2390 E. Camelback Road       )
  Phoenix, AZ 85016            )
                                         )
**Atlanta Falcons Football Club, LLC**   )
4400 Falcon Parkway                      )
Flowery Branch, GA 30542                 )
  Serve On:                    )
  Corporation Service Company  )
  40 Technology Parkway South  )
  Suite 300                    )
  Norcross, GA 30092           )
                                         )
**Baltimore Ravens Limited Partnership** )
1 Winning Drive                          )
Owings Mills, MD 21117                   )
  Serve On:                    )
  Richard M. Cass              )
  1101 Russell Street          )
  Baltimore, MD 21230          )
                                         )
**Buffalo Bills, Inc.**                  )
1 Bills Drive                            )
Orchard Park, NY 14127                   )
  Serve On:                    )
  Buffalo Bills LLC            )

2

7777 NW Beacon Square Blvd.          )
Boca Raton, FL 33487                 )
                                     )
**Panthers Football, LLC**           )
d/b/a Carolina Panthers              )
800 South Mint Street                )
Charlotte, NC 28202                  )
    Serve On:     )
    Richard M. Thigpen    )
    800 South Mint Street )
    Charlotte, NC 28202-1518  )
                                     )
**The Chicago Bears Football Club, Inc.**  )
Halas Hall at Conway Park            )
1920 Football Drive                  )
Lake Forest, IL 60045                )
    Serve On:     )
    United States Corporation Co.  )
    801 Adlai Stevenson Drive  )
    Springfield, IL 62703  )
                                     )
**Cincinnati Bengals, Inc.**         )
One Paul Brown Stadium               )
Cincinnati, OH 45202                 )
    Serve On:     )
    Michael Brown )
    One Paul Brown Stadium  )
    Cincinnati, OH 45202  )
                                     )
**Cleveland Browns Football Company, LLC**  )
76 Lou Groza Boulevard               )
Berea, OH 44017                      )
    Serve On:     )
    CT Corporation System  )
    1300 East 9th St.  )
    Cleveland, OH 44114  )
                                     )
**Dallas Cowboys Football Club, Ltd.**  )
Cowboys Center                       )
One Cowboys Parkway                  )
Irving, TX 75063                     )
    Serve On:     )
    CT Corporation System  )
    1999 Bryan Street, Suite 900  )
    Dallas, TX 75201  )
                                     )
                                     )

**PDB Sports, Ltd.** )
d/b/a Denver Broncos )
13655 Broncos Parkway )
Englewood, CO 80112 )
    Serve On: )
    Richard P. Slivka )
    13655 Broncos Parkway )
    Englewood, CO 80112 )
  )
**The Detroit Lions, Inc.** )
222 Republic Drive )
Allen Park, MI 48101 )
    Serve On: )
    Jay B. Colvin )
    1901 St. Antoine Street )
    6th Floor at Ford Field )
    Detroit, MI 48226 )
  )
**Green Bay Packers, Inc.** )
Lambeau Field Atrium )
1265 Lombardi Avenue )
Green Bay, WI 54304 )
    Serve On: )
    Edward R. Policy )
    1265 Lombardi Avenue )
    P.O. Box 10628 )
    Green Bay, WI 54307 )
  )
**Houston Holdings, LP** )
d/b/a Houston Texans )
Two NRG Park )
Houston, TX 77054 )
    Serve On: )
    Capitol Corporate Services Inc. )
    800 Brazos Street, Suite 400 )
    Austin, TX 78701 )
  )
**Indianapolis Colts, Inc.** )
7001 West 56th Street )
Indianapolis, IN 46254 )
    Serve On: )
    Tina McKnight )
    7001 West 56th Street )
    Indianapolis, IN 46254 )
  )

**Jacksonville Jaguars, LLC**                )
1 EverBank Field Drive                       )
Jacksonville, FL 32202                       )
     Serve On:                                )
     CT Corporation System                    )
     1200 South Pine Island Road              )
     Plantation, FL 33324                     )
                                              )

**Kansas City Chiefs Football Club, Inc.**   )
One Arrowhead Drive                          )
Kansas City, MO 64129                        )
     Serve On:                                )
     Seigfreid, Bingham, Levy, Selzer         )
     & Gee, P.C.                              )
     2323 Grand Blvd., Suite 1000             )
     Kansas City, MO 64108                    )
                                              )

**Miami Dolphins, Ltd.**                     )
Sun Life Stadium                             )
347 Don Shula Drive                          )
Miami Gardens, FL 33056                      )
     Serve On:                                )
     Corporation Creations Network            )
     11380 Prosperity Farms Road              )
     #221E                                    )
     Palm Beach Gardens, FL 33410             )
                                              )

**Minnesota Vikings Football Club, LLC**     )
100 S. 5th Street, #1075                     )
Minneapolis, MN 55402                        )
     Serve On:                                )
     CT Corporation System                    )
     100 S. 5th Street, # 1075                )
     Minneapolis, MN 55402                    )
                                              )

**New England Patriots, LLC**                )
One Patriot Place                            )
Foxborough, MA 02035                         )
     Serve On:                                )
     Corporation Service Company              )
     84 State Street                          )
     Boston, MA 02109                         )
                                              )

**New Orleans Louisiana Saints, LLC**        )
5800 Airline Drive                           )
Metairie, LA 70003

Serve On:                                      )
Dennis P. Lauscha                              )
5800 Airline Drive                             )
Metairie, LA 70003                             )
                                               )
**New York Football Giants, Inc.**             )
1925 Giants Drive                              )
Timex Performance Center                       )
East Rutherford, NJ 07073                      )
   Serve On:                    )
   CT Corporation System        )
   111 8th Avenue               )
   New York, NY 10011           )
                                               )
**New York Jets, LLC**                         )
50 W. 57th Street                              )
New York, NY 10019                             )
   Serve On:                    )
   New York Jets, LLC           )
   Attn: VP-Finance             )
   50 W. 57th Street, 2nd Floor )
   New York, NY 10019           )
                                               )
**The Oakland Raiders, LLP**                   )
1220 Harbor Bay Parkway                        )
Alameda, CA 94502                              )
   Serve On:                    )
   Jeffrey E. Birren            )
   1220 Harbor Bay Parkway      )
   Alameda, CA 94502            )
                                               )
**Philadelphia Eagles, LLC**                   )
1 Novacare Way                                 )
Philadelphia, PA 19145                         )
   Serve On:                    )
   Aileen DeGrosa               )
   1 Novacare Way               )
   Philadelphia, PA 19145       )
                                               )
**Pittsburgh Steelers, LLC**                   )
3400 South Water Street                        )
Pittsburgh, PA 15203                           )
   Serve On:                    )
   Bob Tyler                    )
   3400 South Water Street      )
   Pittsburgh, PA 15203         )

**The St. Louis Rams LLC**  )
One Rams Way  )
St. Louis, MO 63045  )
    Serve On:  )
    Alan Bornstein  )
    One Metropolitan Square, Ste. 3000  )
    St. Louis, MO 63102  )
      )
**Chargers Football Company, LLC**  )
4020 Murphy Canyon Road  )
San Diego, CA 92123  )
    Serve On:  )
    Jeanne M. Bonk  )
    4020 Murphy Canyon Road  )
    San Diego, CA 92123-4407  )
      )
**Forty Niners Football Company, LLC**  )
4949 Marie P. Debartolo Way  )
Santa Clara, CA 95054  )
    Serve On:  )
    Corporation Service Company  )
    2710 Gateway Oaks Drive  )
    Suite 150N  )
    Sacramento, CA 95837  )
      )
**Football Northwest, LLC**  )
d/b/a Seattle Seahawks  )
12 Seahawks Way  )
Renton, WA 98056  )
    Serve On:  )
    Ed Goines  )
    Virginia Mason Athletic Center  )
    12 Seahawks Way  )
    Renton, WA 98056-1572  )
      )
**Buccaneers Limited Partnership**  )
One Buccaneer Place  )
Tampa, FL 33607  )
    Serve On:  )
    David S. Cohen  )
    One Buccaneer Place  )
    Tampa, FL 33607  )
      )

7

**Tennessee Football, Inc.**                    )
460 Great Circle Road                           )
Nashville, TN 37228                             )
      Serve On:                          )
      CT Corp. System                    )
      800 S. Gay St., Suite 2021         )
      Knoxville, TN 37929                )
                                         )
**Pro-Football, Inc.**                          )
d/b/a Washington Redskins                       )
21300 Redskin Park Drive                        )
Ashburn, VA 20147                               )
      Serve On:                          )
      CSC - Lawyers Incorporation Service )
      7 St. Paul Street, Suite 1660      )
      Baltimore, MD 21202                )
                                         )
        **Defendants.**                 )

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, by and through undersigned counsel, file this Complaint against the above-named Defendants and in support thereof allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action for redress of injuries resulting from a conspiracy perpetrated by the 32 clubs ("Clubs") that comprise the National Football League ("NFL").

2.      Beginning in the 1960s, professional football began to rival baseball as the country's national game.  Football is far-better suited for television – a veritable match made in heaven.  And once the profits flowed from television, the Clubs began to realize the seemingly limitless revenues they could achieve.

3.      At the same time, the individuals running the Clubs began to realize the necessity of keeping their best players on the field to ensure not only attendance at games but also the best

possible TV ratings.  That realization resulted in the creation of a return to play culture by the Clubs that prioritized profit over players' health and safety.

4.      Given the injuries inherent in the game, concern for the players' health should include giving them adequate rest, having fewer games, and keeping more players on the roster. But all of that would cut into profit.  So the Clubs chose a different method to keep their players on the field.

5.      As far back as the mid-1960s, Club doctors and trainers were providing players with pain killers, anti-inflammatories, and sleep aids ("Medications") to get them back in the game as soon as possible, despite being injured, and keep them there.  Though the Medications have changed over the ensuing decades, the manner in which they have been distributed has not.

6.      Players from every decade since the 1960s describe the same thing – Club doctors and trainers providing injections or pills, often not telling the players what they were receiving, misstating the effects of the Medications (if they addressed the effects at all), and rarely if ever talking about the need for informed consent or the long-term effects of what they were taking. These doctors and trainers dispensed the Medications to their football patients in an amount and manner they would never do with their non-football patients.

7.      These actions are illegal, violating the Federal Controlled Substances Act and/or Food Drug & Cosmetic Act and analogous State laws.

8.      These illegal acts, and the intentional misrepresentations made by Clubs to players related to these illegal acts, have taken place on every Club since at least the mid-1960s and the named Plaintiffs, as a group, have played for every Club in the NFL from 1964 to 2010.

9.      The purpose of this Complaint is to hold the Clubs responsible for the illegal actions set forth herein.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the proposed class consists of more than one hundred persons, the overall amount in controversy exceeds $5,000,000 exclusive of interest, costs, and attorney's fees, and at least one Plaintiff is a citizen of a State different from one Defendant.  The claims can be tried jointly in that they involve common questions of law and fact that predominate over individual issues.

11.     This Court has personal jurisdiction over Defendants because they do business in this District, derive substantial revenue from their contacts with this District, and because two of the Defendants, the Baltimore Ravens Limited Partnership and Pro-Football, Inc. d/b/a Washington Redskins, operate within this District.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are entities with the capacity to sue and be sued and reside, as that term is defined at 28 U.S.C. §§ 1391(c)(2) and (d), in this District.

## THE PARTIES

### I.      PLAINTIFFS DID NOT LEARN OF THEIR INJURIES UNTIL MARCH 2014.

13.     Plaintiffs suffer from two discrete sets of injuries directly caused by Defendants' intentional misrepresentations: (1) internal organ injuries, and (2) muscular/skeletal injuries suffered while playing in the NFL and which were exacerbated by the Clubs' administration of Medications to keep players on the field or in practice.

14.     Plaintiff Etopia Evans is the widow, and Personal Representative of the Estate, of Charles Evans, a representative member of the putative class.  As of the commencement of this action, Ms. Evans is a resident of Louisiana.  Mr. Evans died while a resident of the State of

Maryland.  Mr. Evans played 107 games as a fullback for the Minnesota Vikings from 1993 – 1998 and the Baltimore Ravens from 1999 – 2000.

15.     Based on the information currently available to Ms. Evans – which is greatly limited because: (a) she does not know all of the Medications that Defendants provided Mr. Evans, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – she is aware that her husband suffered from damage to internal organs and the muscular/skeletal injuries discussed above.  Ms. Evans did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.  Mr. Evans was not aware that Defendants caused those injuries at the time of his death.

16.     Plaintiff Eric King is a representative member of the putative class.  As of the commencement of this action, he is a resident of California.  Mr. King played 63 games as a defensive back for the Buffalo Bills in 2005; the Tennessee Titans from 2006 – 2008; the Detroit Lions from 2009 – 2010; and the Cleveland Browns in 2010.

17.     Based on the information currently available to Mr. King – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are the muscular/skeletal injuries discussed above.  Mr. King did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

18.     Plaintiff Robert Massey is a representative member of the putative class.  As of the commencement of this action, he is a resident of North Carolina.  Mr. Massey played 140 games as a defensive back for the New Orleans Saints from 1989 – 1990; the Phoenix Cardinals

from 1991 – 1993; the Detroit Lions from 1994 – 1995; the Jacksonville Jaguars in 1996; and the New York Giants in 1997.  He was selected to the Pro Bowl in 1992.

19.     Based on the information currently available to Mr. Massey – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are the muscular/skeletal injuries discussed above.  Mr. Massey did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

20.     Plaintiff Troy Sadowski is a representative member of the putative class.  As of the commencement of this action, he is a resident of Georgia.  Mr. Sadowski played 104 games as a tight end for the Atlanta Falcons in 1990; the Kansas City Chiefs in 1991; the New York Jets from 1992 – 1993; the Cincinnati Bengals from 1994 – 1996; the Pittsburgh Steelers from 1997 – 1998; and the Jacksonville Jaguars in 1998.

21.     Based on the information currently available to Mr. Sadowski – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are the muscular/skeletal injuries discussed above.  Mr. Sadowski did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

22.     Plaintiff Chris Goode is a representative member of the putative class.  As of the commencement of this action, he is a resident of Alabama.  Mr. Goode played 97 games as a defensive back for the Indianapolis Colts from 1987 – 1993.

23.     Based on the information currently available to Mr. Goode – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Goode did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

24.     Plaintiff Darryl Ashmore is a representative member of the putative class.  As of the commencement of this action, he is a resident of Florida.  Mr. Ashmore played 123 games as an offensive lineman for the Los Angeles and St. Louis Rams from 1993 – 1996; the Washington Redskins from 1996 – 1997; and the Oakland Raiders from 1998 – 2001.

25.     Based on the information currently available to Mr. Ashmore – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Ashmore did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

26.     Plaintiff Jerry Wunsch is a representative member of the putative class.  As of the commencement of this action, he is a resident of Florida.  Mr. Wunsch played 120 games as an offensive lineman for the Tampa Bay Buccaneers from 1997 – 2001 and the Seattle Seahawks from 2002 – 2004.

27.     Based on the information currently available to Mr. Wunsch – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Wunsch did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

28.     Plaintiff Alphonso Carreker is a representative member of the putative class.  As of the commencement of this action, he is a resident of Georgia.  Mr. Carreker played 97 games as a defensive end for the Green Bay Packers from 1984 – 1988 and the Denver Broncos in 1989 and 1991.

29.     Based on the information currently available to Mr. Carreker – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Carreker did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

30.     Plaintiff Steve Lofton is a representative member of the putative class.  As of the commencement of this action, he is a resident of Texas.  Mr. Lofton played 74 games as a defensive back for the Phoenix Cardinals from 1993 –1995, the Carolina Panthers from 1995 – 1996 and in 1998 and 1999, and the New England Patriots from 1997 –1998.  Mr. Lofton was injured for the 1994 season.

31.     Based on the information currently available to Mr. Lofton – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are damage to his internal organs and the muscular/skeletal injuries discussed above.  Mr. Lofton did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

32.     Plaintiff Duriel Harris is a representative member of the putative class.  As of the commencement of this action, he is a resident of Texas.  Mr. Harris played 135 games as a wide receiver for the Miami Dolphins from 1976 – 1983 and 1985 and the Cleveland Browns and Dallas Cowboys in 1984.  He was a first team All-Conference and All-NFL selection in 1976.

33.     Based on the information available to Mr. Harris – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are damage to his internal organs and the muscular/skeletal injuries discussed above.  Mr. Harris did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

34.     Plaintiff Jeffery Graham is a representative member of the putative class.  As of the commencement of this action, he is a resident of Ohio.  He played 163 games for the Pittsburgh Steelers from 1991 – 1993, the Chicago Bears from 1994 – 1995, the New York Jets from 1996 – 1997, the Philadelphia Eagles in 1998 and the San Diego Chargers from 1999 – 2001.

35.    Based on the information available to Mr. Graham – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are damage to his internal organs and the muscular/skeletal injuries discussed above.  Mr. Graham did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

36.    Plaintiff Mel Renfro is a representative member of the putative class.  As of the commencement of this action, he is a resident of Texas.  Mr. Renfro played 195 games as a defensive back for the Dallas Cowboys from 1964 to 1977.  He was a ten-time Pro Bowl selection and co-MVP of the 1970 Pro Bowl Game, five-time All-Pro selection, and two-time Super Bowl Champion and, since retiring, has been inducted into the Professional Football Hall of Fame and the Dallas Cowboys' Ring of Honor.

37.    Based on the information currently available to Mr. Renfro – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the only injuries of which he is aware are the muscular/skeletal injuries discussed above.  Mr. Renfro did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

38.    Plaintiff Cedric Killings ("Mr. Killings") is a representative member of the putative class.  As of the commencement of this action, he is a resident of Florida.  Mr. Killings played 34 games as a defensive tackle/special team player for the San Francisco 49ers in 2000;

16

the Cleveland Browns and Carolina Panthers in 2001; the Minnesota Vikings in 2002-2003; the Washington Redskins in 2004-2005 and the Houston Texans in 2006-2007.

39.     Based on the information currently available to Mr. Killings – which is greatly limited because (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects – at this time, the injuries of which he is aware are damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Killings did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

## II.     DEFENDANTS ARE RESIDENTS OF, OR HAVE THE REQUISITE MINIMUM CONTACTS WITH, THIS DISTRICT.

40.     Defendant Arizona Cardinals Club, LLC, individually and as successor to the Phoenix Cardinals, St. Louis Cardinals, and Chicago Cardinals (collectively "Cardinals"), is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Cardinals have played 11 games in Maryland.  As such, and as the Cardinals derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over the Cardinals.

41.     Defendant Atlanta Falcons Football Club, LLC ("Falcons") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Falcons have played four games in Maryland.  As

such, and as the Falcons derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Falcons.

42.     Defendant Baltimore Ravens LP ("Ravens") maintains its offices in Owings Mills, Maryland. The Ravens are a resident of this District.

43.     Defendant Buffalo Bills, Inc. ("Bills") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Bills have played six games in Maryland. As such, and as the Bills derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Bills.

44.     Defendant Panthers Football, LLC ("Panthers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Panthers have played seven games in Maryland. As such, and as the Panthers derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over them.

45.     Defendant The Chicago Bears Football Club, Inc. ("Bears") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland

Browns became the Baltimore Ravens, the Bears have played seven games in Maryland. As such, and as the Bears derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Bears.

46.     Defendant Cincinnati Bengals, Inc. ("Bengals") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Bengals have played 21 games in Maryland. As such, and as the Bengals derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Bengals.

47.     Defendant Cleveland Browns Football Club, LLC ("Browns") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the former Cleveland Browns became the Baltimore Ravens, this incarnation of the Browns have played 17 games in Maryland. As such, and as the Browns derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Browns.

48.     Defendant Dallas Cowboys Football Club, Ltd. ("Cowboys") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland

Browns became the Baltimore Ravens, the Cowboys have played 21 games in Maryland. As such, and as the Cowboys derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Cowboys.

49.     Defendant PDB Sports, Ltd. ("Broncos") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Broncos have played seven games in Maryland. As such, and as the Broncos derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over them.

50.     Defendant Detroit Lions, Inc. ("Lions") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Lions have played six games in Maryland. As such, and as the Lions derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Lions.

51.     Defendant Green Bay Packers, Inc. ("Packers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Packers have played four games in Maryland. As such, and as the

Packers derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over them.

52.    Defendant Houston Holdings LP ("Texans") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Texans have played six games in Maryland.  As such, and as the Texans derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over the Texans.

53.    Defendant Indianapolis Colts, Inc., individually and as successor to the Baltimore Colts, which were a resident of the State of Maryland until 1983 ("Colts"), is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Colts have played ten games in Maryland.  As such, and as the Colts derive substantial revenue from and are taxed by State and Local authorities for those games, and once resided in the State of Maryland, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Colts.

54.    Defendant Jacksonville Jaguars, LLC ("Jaguars") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Jaguars have played 13 games in Maryland.  As such, and as

21

the Jaguars derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over them.

55.     Defendant Kansas City Chiefs Football Club, Inc. ("Chiefs") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Chiefs have played seven games in Maryland.  As such, and as the Chiefs derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over the Chiefs.

56.     Defendant Miami Dolphins, Ltd. ("Dolphins") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Dolphins have played four games in Maryland.  As such, and as the Dolphins derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over them.

57.     Defendant Minnesota Vikings Football Club, LLC ("Vikings") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Vikings have played nine games in Maryland.  As such, and as the Vikings derive substantial revenue from and are taxed by State and Local

authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over the Vikings.

58.     Defendant New England Patriots, LLC ("Patriots") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Patriots have played six games in Maryland.  As such, and as the Patriots derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over them.

59.     Defendant New Orleans Saints, LLC ("Saints") is engaged in interstate commerce in the business of, among other things, promoting, operating and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Saints have played eight games in Maryland.  As such, and as the Saints derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over the Saints.

60.     Defendant New York Football Giants, Inc. ("Giants") is engaged in interstate commerce in the business of, among other things, promoting, operating and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Giants have played 20 games in Maryland.  As such, and as the Giants derive substantial revenue from and are taxed by State and Local authorities for those

games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over them.

61.   Defendant New York Jets, LLC ("Jets") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Jets have played seven games in Maryland.  As such, and as the Jets derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over the Jets.

62.   Defendant The Oakland Raiders, LLP, individually and as successor in interest to the Los Angeles Raiders ("Raiders"), is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Raiders have played six games in Maryland.  As such, and as the Raiders derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over the Raiders.

63.   Defendant Philadelphia Eagles, LLC ("Eagles) is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Eagles have played 20 games in Maryland.  As such, and as the Eagles derive substantial revenue from and are taxed by State and Local authorities for those games,

they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Eagles.

64.    Defendant Pittsburgh Steelers, LLC ("Steelers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Steelers have played 20 games in Maryland. As such, and as the Steelers derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Steelers.

65.    Defendant The St. Louis Rams, LLC, individually and as successor in interest to the Los Angeles Rams ("Rams"), is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Rams have played seven games in Maryland. As such, and as the Rams derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Rams.

66.    Defendant Chargers Football Company, LLC ("Chargers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Chargers have played six games in Maryland. As such, and as the Chargers derive substantial revenue from and are taxed by State and Local authorities for

those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over the Chargers.

67.     Defendant Forty Niners Football Company ("49ers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the 49ers have played six games in Maryland.  As such, and as the 49ers derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over them.

68.     Defendant Football Northwest, LLC ("Seahawks") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Seahawks have played seven games in Maryland.  As such, and as the Seahawks derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over the Seahawks.

69.     Defendant Buccaneers LP ("Buccaneers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Buccaneers have played nine games in Maryland.  As such, and as the Buccaneers derive substantial revenue from and are taxed by State and Local authorities for

those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland.  This Court therefore has personal jurisdiction over them.

70.     Defendant Tennessee Football, Inc., individually and as successor in interest to the Houston Oilers ("Titans"), is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  Since the Washington Redskins moved to Landover, Maryland and the Cleveland Browns became the Baltimore Ravens, the Titans have played 13 games in Maryland.  As such, and as the Titans derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Maryland and can reasonably anticipate being brought into Court in Maryland. This Court therefore has personal jurisdiction over the Titans.

71.     Defendant Pro-Football, Inc. ("Redskins") has, since 1997, played all their homes games in Landover, Maryland.  They are a resident of this District.

72.     Since every Club shares equally the television revenue generated by each regular and post-season game, each Club derives income from every such game played in Maryland.

## FACTS COMMON TO ALL COUNTS

## I.     THE RELEVANT HISTORY OF THE RELATIONSHIP BETWEEN THE CLUB DEFENDANTS  AND THEIR PLAYERS.

### A.     Labor Relations Between the Clubs and Players.

73.     Clubs playing American professional football first organized themselves as a league in 1920, calling the organization the American Professional Football Association.  The Clubs renamed the league the National Football League in 1923 and have conducted joint activities under that name until the present day.

74.     From 1923 until 1968, players had no bargaining rights and were subject to unilateral rules imposed jointly by the Clubs.  No collective bargaining agreement ("CBA") was in existence for the first 45 seasons of professional football.  The National Football League Players Association ("NFLPA"), even though it had been in existence since 1956, was not recognized as a union or the sole and exclusive bargaining representative for the Clubs' players until 1968.  The NFLPA negotiated the first CBA with the Clubs that year.  A second CBA between the Clubs and players was signed in 1970.

75.     The 1970 CBA expired after the 1973 season and no CBA was in existence for the 1973 – 1976 seasons.  During that period, the NFLPA filed an antitrust suit against the NFL and the Clubs: *Mackey v NFL*, 543 F.2d 606 (8th Cir. 1976).  In ruling for the players, the appeals court affirmed the District Court's holding that the restrictions on player movement contained in the 1968 and 1970 CBAs were not the product of *bona fide* arm's-length bargaining.  The Eighth Circuit further noted that "in part due to its recent formation and inadequate finances, the NFLPA, at least prior to 1974, stood in a relatively weak bargaining position *vis-à-vis* the clubs." *Id.* at 615.

76.     In 1977, after the *Mackey* decision, the Clubs and players resolved their legal differences in part through a new CBA, the first such agreement that was the product of good faith, *bona fide* arm's-length bargaining.

77.     Upon the expiration of the 1977 CBA, the Clubs and players negotiated a new CBA in 1982 that expired after the 1986 season.  No CBA was in existence for the 1987 – 1992 seasons.  As part of the settlement of another antitrust lawsuit filed by the players, a new CBA was executed in 1993.  From that date until present, every football season has been played pursuant to a CBA.

78.     The football seasons from 1923 through 1967, 1973 through 1976 and 1987 through 1992 were not subject to any CBA.  The seasons from 1968 through 1972 were subject to CBAs that were not the product of *bona fide*, arm's-length bargaining.  Therefore, only the 1977 through the 1986 and 1993 through the 2014 seasons were governed by valid CBAs.

79.     No CBA has addressed, let alone regulated, the administration or dispensation of Medications.  In public filings, the NFLPA has endorsed the statement that "[n]o CBA provision addresses the NFL's responsibilities *vis a vis* the illicit provision of the Medications.  Not one of the hundreds of NFL-selected pages of CBAs going back to 1968 mention[s] the Medications or protocols for their provision."

**B.     The Clubs Provide Doctors and Trainers for Players.**

80.     Alvah Andrew "Doc" Young was a founder of the NFL and owned the Hammond Pros, an early Club.  He was also the first professional football team doctor, serving from 1920 – 1926.  On information and belief, the Clubs have provided doctors for their players continuously since the inception of the NFL.

81.     The Clubs provided doctors and trainers for the 1923 through 1967, 1973 through 1976, and 1987 through 1992 seasons during which time no CBA was in effect.  The Clubs provided doctors and trainers for the 1968 through 1972 seasons during which the CBAs in effect were not the product of *bona fide*, arm's-length bargaining.  Since their inception, the Clubs have recognized that they maintain a hazardous workplace.

82.     The NFL Physicians Society (the "Society") was founded in 1966 by a group of long-time Club doctors and exists today.  Its mission is "to provide excellence in the medical and surgical care of the athletes in the NFL and to provide direction and support for the athletic

trainers in charge of the care of these athletes." *See* http://nflps.org/ (last visited April 20, 2015). The Society has 134 members, including all physicians from all 32 Clubs.

83.     Although one would think that teams truly competing against each other would want to maintain a propriety interest in their medical treatments, the opposite is the case with the NFL.   For example, in 1985, the Clubs decided they would participate in future national invitational camps, commonly known as the Combine, and share costs for medical examinations of draft-eligible players.   The Combine continues to this day and at each annual event, doctors from all 32 Clubs meet to discuss issues common to the member Clubs.

84.     According to the NFL Physicians Society, its goals are "to constantly work toward improving the care of the professional football players and prevention and treatment of injuries." *See* http://nflps.org/ (last visited April 20, 2015).  Their stated purpose is to "manage injuries once they occur to allow players … highest level of potential." *Id.*

85.     On information and belief, the Clubs have provided trainers continuously since the early years of the NFL.  The NFL Athletic Trainers Society was founded in the mid-1960's by a number of long time Club trainers.[1]  According to the PFATS web site, that group came together because it "saw an opportunity to share knowledge and techniques on injury prevention and rehabilitation at the National Athletic Trainers Association … Annual Meeting and Clinical Symposium." *See* http://www.pfats.com/about/history/ (last visited April 20, 2015).

86.     After the AFL-NFL merger, AFL trainers "began attending" that annual meeting as well and "team physicians soon followed." *Id.*  "[In 1969], a league official began attending, and by the end of the decade, then-NFL commissioner Pete Rozelle required all teams to send their head athletic trainers to the annual NFL Athletic Trainers Meetings." *Id.*

---

[1] That organization was succeeded in 1982 by the Professional Football Athletic Trainers Society ("PFATS").

87.    According to PFATS, it was founded because NFL Clubs "are always trying to gain an edge.  [Clubs] need to provide the best and most complete care for their product – the players."  *Id.*  Today, PFATS is in partnership with the NFL Physicians Society and the NFL and states that its mission is to serve the players of the NFL, the member Clubs.

## II.    THE CLUBS HAVE CREATED A RETURN TO PLAY CULTURE THAT PERMEATES PROFESSIONAL FOOTBALL.

88.    The Clubs have recognized the appeal of violence associated with football since the inception of the sport.  But the Clubs have also recognized that, to give the public the best product possible, marquee players need to play, even if they are injured and in pain.  One solution to this inherent conflict – violence sells but it also puts players on the sidelines who bring fans to the game – would be to play fewer games, give players more time to rest between games, and have larger rosters.  But that would cut into the Clubs' profit margins.

89.    Instead, the Clubs have resolved this inherent conflict in favor of profit over safety with more games, less rest (*e.g.*, Thursday night football), and smaller rosters that save payroll expenses.  And they achieve their ends through a business plan in which every Club employee – general managers, coaches, doctors, trainers and players – has a financial interest in returning players to the game as soon as possible.  Everyone's job and salary depend on this simple fact.  The return to play culture was based on four cornerstone concepts: profit, media, non-guaranteed contracts, and drugs.  As professional football entered the 1960's, these bedrock concepts of the return to play culture would become the driving force behind every business decision made by the Clubs.

90.    While professional football has been a popular spectator sport since its inception, with the widespread availability of television in the 1960's, the Clubs realized that the

31

opportunity for profits would greatly increase as income would no longer be dependent solely on attendance at the games.  As the television networks began competing for the rights to televise games, the Clubs sought to further capitalize on the public's demand for the violence of the sport.  But the ever-escalating profitability of the Clubs was dependent on keeping the players on the field, even when games and practices spawned increasing numbers of injuries as the result of bigger, stronger players having less time between games to recover.  The health interests of the players were increasingly subordinated and forgotten as the Clubs evolved into multi-billion dollar businesses.

91.     The Clubs also manipulated the media to increase revenue and reinforce the culture of return to play.  In 1965, the Clubs created NFL Films to market video of the Clubs' games, coaches, and players.  NFL Films highlighted the violence of the game and the "toughness" of its players.  Dramatic collisions between players were highlighted in slow motion.  Players who returned to the game with severe injuries were lauded as courageous heroes.  These same themes were repeated by the broadcast networks.  American folklore regarding professional football players was indelibly established – the players were super human warriors who played through pain for the integrity of the game they loved.   The return to play culture became an accepted fact of doing business by the Clubs as profits soared.

92.     One need only examine the 1987 season to understand the importance of keeping the best players out on the field at all costs.  That year, the players went on strike and the Clubs played a number of regular season games with so-called "replacement players."  Television ratings for these games dropped by more than 20%.  The networks agreed to continue broadcasting them only when the Clubs agreed to reduce prices to enable the networks to recoup

the losses.  The Clubs never used replacement players again.  On information and belief, this experience reinforced to the Clubs the importance of having "star" NFL players on the field.

### A.   <u>Increasing Revenue Fuels the Return to Play Culture.</u>

93.   Since 1965, Defendants' total annual revenue has skyrocketed.  Indeed, between 1990 and 2013 alone, the number jumped from $1.5 billion to over $9 billion.  And Defendants' commissioner, Roger Goodell, has set a target of $27 billion by 2027.

94.   In its thirst for constantly-growing revenue, over that same period the Defendants expanded from 24 to 32 Clubs, added two more regular season games (and are looking to add two more), expanded the number of Clubs participating in post-season play, and increasingly scheduled more games during the week (particularly on Thursday nights), leaving players with less recovery time and greater chances for new injuries or worsening of existing injuries.

95.   Indeed, professional football is such an omnipresent force in 2015, with off-season camps starting in April, the draft in May, practices and pre-season games through August, the regular season through December, and post-season often carrying over into February, that an entire TV channel, the NFL Network, devotes all day, every day to the game.

96.   During this same time, players have gotten bigger and stronger.  Mel Kiper, one of ESPN's senior football analysts, noted that in 2011, offensive lineman were on average 24 percent heavier than they were in 1979 and an average of 31 percent stronger than they were in 1991.  In the 1960s, the Colts' Hall of Fame defensive tackle Art Donovan was considered a giant at 263 pounds.  In recent years, the NFL has seen the likes of Aaron Gibson at 440 pounds, Albert Haynsworth and Shaun Rogers at 350 pounds, and King Dunlap, who stands 6 feet 9 inches and weighs 330 pounds.

97.     More games, longer seasons, shorter recovery between games, plus bigger and stronger players, equals more frequent and debilitating injuries.  These injuries pose a serious business problem for Defendants, which need star players on the field any given Sunday – and Monday and Thursday – so the money can keep rolling in.

98.     In a survey by the Washington Post, nearly nine out of 10 former players reported playing while hurt.  Fifty-six percent said they did this "frequently."  An overwhelming number – 68 percent – said they did not feel like they had a choice as to whether to play injured.

99.     Those players are right – Defendants gave them no choice.  From the beginnings of professional football to the present day, the Clubs have created a coercive economic environment in which all of the players have non-guaranteed contracts.  The current standard player contract states that the player's salary is game to game and a player's contract can be terminated for lack of skill at any time (referred to as being "cut").  Players are constantly reminded by general managers, coaches and the media of the competitive nature of the game and the importance of playing.  If a player is injured, coaches advise him to return to play as soon as possible to prevent a replacement from taking his spot on a Club.  Rookie players are immediately told of the decades' long adage promulgated by the Clubs – "You can't make the Club in the tub."  The Clubs exert enormous economic pressure on the players to return to play as soon as possible and play through the pain.  This financial reality is reinforced by the Club-created image of the professional football player as heroic warrior.

100.    From at least the 1960's, the means by which the Clubs facilitated the return to play culture was the widespread availability of the Medications.  Club doctors and trainers have distributed these controlled substances and prescription medications with little to no regard for the law or the players' health.  Club doctors and trainers know that, if players are given adequate

34

rest and do not return to the game, the doctor or trainer will be replaced.  As the position of Club doctor and trainer have become increasingly lucrative, the pressures on the medical personnel to return players to the field have only increased.  The Clubs have established a business culture in which everyone's financial interest depends on doctors and trainers supplying Medications to players to keep them in the game.

101.    That culture has so permeated the NFL that today, it is almost unshakeable.  Although there are too many incidents of such behavior to list, two highly publicized, recent incidents make the point.  In a 2013 playoff game, Washington Redskins quarterback Robert Griffin III re-injured his knee severely in the first quarter but still returned to the game despite a clear inability to run or even walk normally.  He tore a ligament in his knee during the fourth quarter and was finally removed from the game.  And in a game against the Washington Redskins on October 27, 2014, Dallas Cowboys' quarterback Tony Romo experienced a hard tackle that resulted in two vertebrae in his back being chipped and fractured.  Romo returned to the game after taking a painkilling injection.  He then missed the next week's game.  Such injuries take six to eight weeks to heal.  However, less than two weeks after the injury, the Cowboys were playing a game in London, an important showpiece for the Clubs trying to increase football's international popularity.  Cowboys' owner Jerry Jones stated "[Romo's] going on the trip to London and logic tells you that we wouldn't have him make that trip to London and back if we didn't think he was going to play."  Romo played in the game in London and the rest of the games the Cowboys played that year.  On information and belief, Romo would have been unable to play through such acute pain without frequent use of painkilling pills and injections.

102.    The Clubs maintain the return to play culture by ensuring that players are not told of the health risks associated with taking Medications.  Players are not informed of the long-term

health effects of taking controlled substances and prescription medications in the amounts given to them by the Clubs.  Players are not counseled that inadequate rest will result in permanent harm to joints and muscles.  Players are frequently not told the name of the Medication they are being given.  Players are only told that, by taking the Medications offered by the Clubs, they will be able to continue playing or return to play sooner.

**B.      Manifestations of the Return to Play Culture.**

103.    People trust doctors.  Patients intuitively believe that doctors – who are bound by the Hippocratic Oath to put patient interests first – and other medical personnel prioritize the patient's best interests and would not intentionally advise a procedure or prescribe or distribute a medication that would injure their health.  Professional football players are no different.

**1.      Affirmative Misrepresentations**

104.    The Clubs have consistently and publicly maintained that they provide players with the best health care available.  The Clubs also insist that their medical professionals prioritize the players' health.  For example, in response to a lawsuit, Dr. Michael Matava, President of the NFL Physicians Society and the Rams' doctor, stated in May of 2014 that "[a]s an NFL team doctor for the past 14 years, I have seen firsthand the outstanding medical care that team doctors provide to players on and off the field.  I will leave it to others to respond to the specific allegations of the lawsuit, but as doctors we put our players first."

105.    This intentional, affirmative representation, like most if not every other intentional, affirmative representation that Club doctors and trainers make about the quality of health care they provide to players, flies in the face of what actually happens on and off the field.

106.    Such intentional misrepresentations also manifest in the form of responses to questions that players ask about the side effects of taking controlled substances or prescribed

medications. The most frequent responses are "none," "don't worry about them," "not much," "they are good for you" or, in the case of injections, "maybe some bruising," all of which misrepresent the actual health dangers posed by these drugs, including the kidneys' inability to process the vast quantities ingested.

107. Doctors and trainers also frequently misrepresent the extent of a player's injury to get him to return to play sooner. Players frequently report that doctors and trainers refer to everything as a "sprain" to convince the player that the injury is not serious and the player can play through it. The player may not find out that the "sprain" is a break or tear until years later.

### 2. Omissions Constitute Intentional Misrepresentations.

108. Club doctors and trainers do not inform players of the risks posed by the use of Medications, especially in the volume players are instructed to consume. Given the trust placed in the doctors and trainers by players and the affirmative misrepresentations noted above, failure to provide a player with a legally-required warning about a drug's side effects constitutes an intentional misrepresentation.

109. Club doctors and trainers do not inform players that they are distributing Medications in an amount, dosage and manner they know is illegal. Doctors and trainers provide Medications to professional football players in amounts and distribution procedures they would never do in their regular practice with non-football player patients. Failure to inform players of known illegalities constitutes an intentional misrepresentation that the practices are, in fact, legal.

110. Club doctors and trainers do not inform players of the health risks associated with mixing Medications in the volume and manner they are doing (referred to as "cocktailing"). These dangers are increased when the doctors and trainers know the Medications are often being mixed with Club-provided alcohol. Failure to inform players of the known dangers from mixing

the Medications being distributed by the Club to them constitutes an intentional misrepresentation.

111. Club doctors and trainers frequently do not inform players of the names of the Medications they are being given and often these Medications are provided without a prescription, legally referred to as misbranding. Players and trainers frequently tell players to simply "take this" and they will feel better. Players frequently report that they were never told all of the drugs they were being given. Failure to disclose the name of a controlled substance or prescribed medication to a player constitutes an intentional misrepresentation.

112. Club doctors and trainers frequently fail to document properly in a player's medical records the usage of Medications. In a review of the medical records of 745 former players provided by the Clubs for purposes of Workmen's Compensation claims, 164 (22%) players had no records at all, 196 (26.3%) did not mention any drugs at all, 64 (8.6%) mentioned drugs without dosages, and 321 (43%) mentioned only some dosages. These failures highlight the omissions that occur as doctors and trainers fail to document the Medications they are providing the players.

### 3. The Clubs Engage in Concerted Activity to Keep Players on the Field, Regardless of the Cost.

113. The Clubs have conspired to put profit over player safety since at least the 1960s.

114. As an initial matter, the Clubs have had ample opportunity to share information about revenue and how best to achieve high profit levels. The NFL executive committee has a member from each Club and they meet on an annual basis at a minimum. Moreover, general managers for the Clubs meet on a regular basis and the Clubs come together at other functions during the year, including the yearly Combine. And as described above, the trainers are mandated to meet on at least a yearly basis while the doctors meet at least annually at the

Combine.  These regular meetings, which have been taking place for decades, provide the Clubs with the chance to share information to which the public is not privy.

115.    From a structural perspective, it is not difficult for the Clubs to collude.  There are high barriers to entry in the League, which has no competition in the world and serious economic incentives to maintain the *status quo*.  The limited number of Clubs – there are only 32 – is exactly the sort of highly-concentrated market that fosters the creation, and permits the maintenance, of illicit agreements like those detailed herein.  It is (obviously) against one's self-interest to violate Federal drug laws unless you know that everyone else is doing so and they all have the same reason not to reveal what the others are doing.  Put another way, the usual incentives – increased market share and revenue – are not there for one Club to flip on the others because if they do so, the whole structure will come crashing down and all of them will pay the price.  Accordingly, even with the movement of players from Club to Club, the Clubs know that so long as they present a united front, they face little chance of detection.

116.    But simply because one has the means does not necessarily mean they have the motive to collude.  The Clubs have ample reason to do so.  As detailed herein, the NFL juggernaut has exploded in terms of revenue over the past 50 years and it intends to get even bigger.  The Clubs share the same economic interest in keeping each other's stars on the field and playing more games to keep TV revenues high, along with jersey sales and all the other means by which the Clubs profit off their players, while at the same time keeping rosters small and overhead low.  Indeed, the revenue-sharing that takes place among the Clubs – they all share equally from their TV deal – means they have little if any interest in maximizing their own profit at the expense of competitors and, to the contrary, will protect each other in mutually-advancing their interests.

117.    And as detailed herein, the Clubs decided to keep their players on the field, and the profits high, by feeding drugs to their players in dangerous quantities and the manner in which they have done so shows brazen disregard for Federal and State drugs laws.  The ubiquity of their illegal conduct, which comes in several forms and has been ongoing for decades, negates any inference that the Clubs have been acting independently.  Such conduct includes in particular the manner in which the Clubs have distributed Medications to players, who have consistently reported that since the mid-1960s, Medications have been distributed as if they were candy.  The Medications have changed, but decade to decade, the players report a similarity in the manner in which they are distributed by the Clubs: Quaaludes and amphetamines beginning in the mid-1960's, Vioxx and OxyContin beginning in the 1970's, Percocet and Indocin in the 1980's and, beginning in the 1990's, Toradol.

118.    The introduction of Toradol by all the Clubs elevated the return to play culture to new heights.  From the mid-1990's until the present day, the Clubs have given Toradol to players as both a painkiller and a prophylactic.  Players from multiple Clubs report lines of 30 – 35 players lined up for Toradol shots before games.  Indeed, Hall of Fame Coach and media analyst John Madden, commenting on the widespread availability of Toradol, noted "I know an announcer that goes down to the locker room to get a Toradol shot before a game."  In the last three seasons, the Clubs have reduced the number of injections and increased the usage of Toradol pills.  The Clubs use Toradol for practice but its extensive use is reserved primarily for games.  As the Clubs have scheduled more mid-week games, Toradol has become an even more important component of the return to play culture.  The Clubs continue to use other painkillers and anti-inflammatories during the practice week.

119.    The Clubs imposed a uniform Toradol waiver beginning with the 2010 season, a sample copy of which is attached hereto as **Exhibit A**.  Every player on each Club was asked to sign the waiver, which is identical for each Club.

120.    Since the mid-1960's, the Clubs have provided players with sleep aids.  Ambien, a controlled substance, has been the drug of choice for multiple decades.

121.    Since doctors are only present with the players on home game days, away game weekends and one (occasionally a second) day during the week, trainers and their assistants had to be folded into the loop of distributing Medications.  Players from at least the 1960's to the present consistently state that trainers routinely gave them Medications without examination, diagnosis, or warnings – all outside the presence of a licensed physician.

122.    As public awareness of the prevalence of drugs has increased, the Clubs have jointly imposed a number of mandated procedures to control the drug distribution system while keeping the flow as high as possible.  The Clubs required that all drugs be locked in a closet or similar locked storage facility.  The Clubs also required that Club doctors register the Clubs' facility as a storage facility for controlled substances and prescription medication.  The Clubs finally required that all Clubs purchase and utilize tracking software created by a firm called SportPharm.  SportPharm collects the data and retains it in the event the Clubs are questioned about their drug distribution by the DEA or an appropriate state agency.  The Clubs' plan to have all Clubs buy their drugs through SportPharm was abandoned when SportPharm voluntarily surrendered its pharmaceutical license to California regulators after they charged SportPharm with illegally distributing prescription drugs.

123.    On information and belief, the Clubs created a committee decades ago – the Committee on Performance Enhancing and Prescription Drugs – to oversee the administration of

controlled substances and prescription drugs to players. The person in charge of the committee is a Dr. Brown of Brooklyn. The committee meets at least twice a year at the annual NFL combine and at the summer League meetings.

124. The Clubs also exert control over, and constant monitoring of, the storage and administration of controlled substances and prescription drugs through their agent, the NFL Security Office. Security Office personnel regularly meet and consult with Club officials, including doctors and trainers, and conduct regular audits of Club record keeping and facilities.

125. In the fifty one football seasons played from 1964 to 2014, every Club has had a doctor and trainer distribute controlled substances and prescription medication to players in a manner that violates federal and state law. Therefore, hundreds of doctors and trainers are treating their professional football patients differently from any other patient they treat, have treated or will treat. The only plausible explanation for this uniform, systematic, decades-long practice is that every Club is following an agreed-upon program of mandating that their doctors and trainers distribute drugs to get players back on the field at all costs.

### C. Defendants' Actions Violate Federal Drug Laws.

126. United States law imposes a sophisticated statutory regime that regulates the dispensation of certain medications that carry a greatly-enhanced risk of abuse ("controlled substances") and other medications too dangerous to be sold over the counter ("prescription medications"). Federal law also criminalizes violations of such regulations. This regime protects against the dangers of abuse inherent in the use of controlled substances such as opioids and other powerful prescription painkillers. This regulatory regime applies to anyone involved in the dispensation of these substances, from a physician operating a solo medical practice to a multibillion-dollar machine such as professional football.

1.   **The Controlled Substances Act Criminalizes the Dispensation and Possession of Medications that the Clubs Routinely Give Players.**

127.   In 1970, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act (the "Act").  Title II of this Act, codified as 21 U.S.C. § 801, *et seq.*, is known as the Controlled Substances Act or the "CSA."

128.   Regulation and enforcement of the CSA is delegated to the Food and Drug Administration ("FDA"), the Drug Enforcement Administration (the "DEA"), and the Federal Bureau of Investigation ("FBI").

129.   The CSA[2] organizes controlled substances into five categories, or schedules, that the DEA and FDA publish annually and update on an as-needed basis.  The controlled substances in each schedule are grouped according to accepted medical use, potential risk for abuse, and psychological/physical effects.

130.   Under authority provided by the CSA at 21 U.S.C. § 821, the United States Attorney General can promulgate (and has promulgated) regulations implementing the CSA.

a.   **The CSA's Regulatory Regime.**

131.   The CSA contains a number of provisions governing the dispensation,[3] use, distribution, and possession of controlled substances.  Under the CSA, "[e]very person who manufactures or distributes any controlled substance[,]" or "who proposes to engage in the manufacture or distribution of any controlled substance[,] … [or] who dispenses, or who proposes to dispense, any controlled substance," shall obtain from the Attorney General a

---

[2] Medications regulated by the CSA also constitute prescription medications under the Food, Drug and Cosmetic Act, thereby requiring a prescription before they can be dispensed.

[3] The CSA defines the dispensation of a controlled substance as the delivery of a controlled substance "to an ultimate user … by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance[.]"  21 U.S.C. § 802(10).

registration "issued in accordance with the rules and regulations promulgated by [the Attorney General]." *Id.* at § 822(a)(1)-(2).

132.   To distribute Schedule II or III controlled substances, applicants must establish that they: (a) maintain "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels;" (b) comply "with applicable State and local law;" and (c) satisfy other public health and safety considerations, including past experience and the presence of any prior convictions related to the manufacture, distribution, or dispensation of controlled substances.  *Id.* at § 823(b).

133.   The CSA mandates that controlled substances may be legally dispensed only by a practitioner or pursuant to a practitioner's prescription (as similarly established by 21 U.S.C. § 353(b)(1)) and within the purview of the practitioner's registered location. *Id.* at § 829.

134.   Moreover, Schedule II substances cannot be re-filled, *see id.* at § 829(a), while Schedule III and IV substances cannot be re-filled more than six months after the initial dispensation or more than five times "unless renewed by the practitioner."  21 U.S.C. § 829(b). Relevant examples of Schedule II substances include OxyContin and Percocet. Morphine, Codeine and Opium are also Schedule II substances.   Ambien is a Schedule IV controlled substance.

135.   Only those prescriptions "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice" may be used to legally dispense a controlled substance under § 829(b).  21 C.F.R. § 1306.04(a) (2013).

136.   The CSA also establishes specific recordkeeping requirements for those registered to dispense controlled substances scheduled thereunder.  For example, except for practitioners prescribing controlled substances within the lawful course of their practices, the CSA requires

the maintenance and availability of "a complete and accurate record of each substance manufactured, received, sold, delivered, or otherwise disposed[.]" 21 U.S.C. § 827(a)(3).

137.    The CSA's recordkeeping regulations require a person registered and authorized to dispense controlled substances to maintain records regarding both the substances' prior manufacturing and the subsequent dispensing of the substance. Such records must include the name and amount of the substances distributed and dispensed, the date of acquisition and dispensing, certain information about the person from whom the substances were acquired and dispensed to, and the identity of any individual who dispensed or administered the substance on behalf of the dispenser. 21 C.F.R. § 1304(22)(c) (2013).

138.    Beyond specific recordkeeping, all registrants "shall [also] provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a) (2013). Depending on the schedule assigned to a particular controlled substance, such substances must be securely locked within a safe or cabinet or other approved enclosures or areas. *Id.* at §§ .72(b) & .75(b) (2013). Any theft or significant loss of controlled substances must be reported to the DEA upon discovery of the theft or loss. *Id.* at § .74(c) (2013).

**b.    The CSA's Criminal Regime.**

139.    The CSA enacted a comprehensive criminal regime to penalize violations of its rules and regulations.

140.    Specifically, Part D of the CSA proscribes a series of "Prohibited Acts" that run the gamut from trafficking of controlled substances to their unlawful possession.

141.    For example, it is unlawful for any person to knowingly or intentionally "distribute, or dispense, or possess with intent to … distribute, or dispense, a controlled substance[]" in violation of the CSA. 21 U.S.C. § 841(a)(1).

142.    Each and every single violation of this section that involves a "Schedule III" controlled substance is a Federal felony subject to a variety of penalties, including but not limited to a term of imprisonment of up to ten years (15 years if the violation results in death or serious bodily injury) and a fine of $500,000 if the violator is an individual to $2,500,000 if the violator is not an individual (for first offenses).  *Id*. at § 841(b)(1)(E)(i).  These penalties are doubled if the violator has a prior conviction for a felony drug offense.  *Id*. at §841(b)(1)(E)(ii).

143.    It is also unlawful for anyone with a CSA registration to:

- "distribute or dispense a controlled substance" without a prescription or in a fashion that exceeds that person's registered authority.  *Id*. at § 842(a)(1)-(2);

- distribute a controlled substance in a commercial container that does not contain the appropriate identifying symbol or label, as provided under 21 U.S.C. § 321(k), or to "remove, alter, or obliterate" such an identifying symbol or label.  *Id*. at §§ 825, 842(a)(3)-(4); or

- "refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required" under the CSA.  *Id*. at § 842(a)(5).

A person who violates any of these provisions is subject to a minimum civil penalty up to $25,000.  *Id.* at § 842(c)(1)(A).

144.    It is also unlawful for a person "knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized" under the CSA.  *Id*. at § 844(a).

145.    A violation of this provision is subject to a term of imprisonment of up to one year and a fine of up to $1,000 for a first offense.  *Id.*  Multiple violations of this provision result in a term of imprisonment of up to three years and a fine of at least $5,000.  *Id*.

146.    Furthermore, "[a]ny person who attempts or conspires to commit any offense" described above "shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  *Id*. at § 846.

147.    Except as authorized by the CSA, it is unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of distributing or using controlled substance" or to "manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."  *Id.* at § 856(a)(1) – (2).  A violation of this section results in a term of imprisonment of up to 20 years and a fine of $500,000 if the violator is an individual or up to $2,000,000 if the violator is not an individual.  *Id*. at § 856(b).

148.    For decades, the Clubs' lack of appropriate prescriptions, failure to keep proper records, refusal to explain side effects, lack of individual patient evaluation, proper diagnosis and attention, dispensing of controlled substances outside of a practitioner's registered location, and use of trainers to distribute Schedule II and III controlled substances to its players, including Plaintiffs, individually and collectively violate the foregoing criminal and regulatory regime.  In doing so, the Clubs not only left their former players injured, damaged and/or addicted, but also committed innumerable violations of the CSA.

2.      **The Food, Drug, and Cosmetic Act Prohibits the Dispensation of Certain Medications Without a Prescription, Label, or Side Effects <u>Warnings</u>.**

149.    A significant complement to the foregoing statutory regime is the Food, Drug, and Cosmetic Act (the "FDCA").  Enacted by Congress in 1938 to supplant the Pure Food and Drug Act of 1906, the FDCA prohibits the marketing or sale of medications in interstate commerce without prior approval from the FDA, the agency to which Congress has delegated regulatory and enforcement authority.  *See* 21 U.S.C. § 331(d).

150.    The FDCA has been regularly amended since its enactment.  Most notably, changes in 1951 established the first comprehensive scheme governing the public sale of prescription pharmaceuticals as opposed to "over-the-counter" medications.  The purpose of this regulatory regime was to ensure that the public was protected from abuses related to the sale of powerful prescription medications.

151.    Pursuant to this amendment, the FDCA provides that if a covered drug has "toxicity or other potentiality for harmful effect" that makes its use unsafe unless "under the supervision of a practitioner licensed by law to administer such drug[,]" it can be dispensed only through a written prescription from "a practitioner licensed by law to administer such drug."  21 U.S.C. § 353(b)(1).   Any oral prescription must be "reduced promptly to writing and filed by the pharmacist" and any refill of such a prescription must similarly be authorized.  *Id.*  Failure to do so is frequently referred to as "misbranding."  *Id.*

152.    Jurisprudence interpreting the FDCA establishes that a proper "prescription" under the FDCA shall include directions for the preparation and administration of any medicine, remedy, or drug for an actual patient deemed to require such medicine, remedy, or drug

following some sort of examination or consultation with a licensed doctor.  Conversely, a "prescription" does not mean any mere scrap of paper signed by a doctor for medications.

153.   As a result, a key element in determining whether or not § 353(b)(1) has been violated is the existence (or non-existence) of a doctor-patient relationship from which the "prescription" was issued.

154.   The FDCA further provides that the prescribing medical professional shall be the patient's primary contact and information source on such prescription medications and their effects.  *Id*. at §§ 352, 353.  As such, regulations promulgated by the FDA require medical professionals to provide warnings to patients about such effects.

155.   Dispensers violate the FDCA if they knowingly and in bad faith dispense medications without a prescription or with the intent to mislead or defraud.  21 U.S.C. §§ 331(a).

156.   Dispensing a drug without a prescription, as the Clubs' doctors and trainers regularly did and do, results in the drug being considered "misbranded" while it is held for sale. *Id*. at § 353(b)(1).   The FDCA prohibits: (a) introducing, or delivering for introduction, a misbranded drug into interstate commerce; (b) misbranding a drug already in interstate commerce; or (c) receiving a misbranded drug "in interstate commerce, or the delivery or proffered delivery thereof for pay or otherwise[.]"  21 U.S.C. §§ 331(a) – (c).

157.   It is also an FDCA violation to provide, as the Clubs' doctors and trainers routinely did and do, a prescription drug without the proper FDA-approved label.  *Id.* at § 352; 21 C.F.R. §§ 201.50 –201.57 (2013).  Stringent regulations dictate specific information that must be provided on a prescription drug's labeling, the order in which such information is to be provided, and even specific "verbatim statements" that must be provided in certain

circumstances, such as the reporting of "suspected adverse reactions." *See generally* 21 C.F.R. §§ 201.56, .57, .80 (2013).

158.    For instance, labeling for any covered medication approved by the FDA prior to June 30, 2001 must include information regarding its description, clinical pharmacology, indications and usage, contraindications, warnings, precautions, adverse reactions, drug abuse and dependence, overdosage, dosage and administration, and how it was supplied, to be labeled in this specific order. *See* 21 C.F.R. § 201.56(e)(1) (2013).

159.    Such information must be provided under the foregoing headings in accordance with 21 C.F.R. §§ 201.80(a)-(k) (2013). For example, labeling regarding a covered drug's tendency for abuse and dependence "shall state the types of abuse [based primarily on human data and human experience] that can occur with the drug and the adverse reactions pertinent to them." *See id.* at § 201.80(h)(2) (2013).

160.    Covered medications approved by the FDA after June 30, 2001 are subject to even more stringent labeling requirements. *See generally* 21 C.F.R. §§ 201.56(d)(1); .57(a) – (c) (2013). For instance, labeling for such covered drugs must provide: (a) if the covered drug is a controlled substance, the applicable schedule; (b) "the types of abuse that can occur with the drug and the adverse reactions pertinent to them[;]" and (c) the "characteristic effects resulting from both psychological and physical dependence that occur with the drug and must identify the quantity of the drug over a period of time that may lead to tolerance or dependence, or both." *See* 21 C.F.R. § 201.57(c)(10)(iii) (2013).

161.    The Clubs' use of trainers to distribute medications, lack of appropriate prescriptions, failure to keep records, refusal to explain side effects, and lack of individual patient care, individually and collectively, violate the FDCA.

162.    The Act expressly contemplates that the States will implement their own laws regulating controlled substances and prescription medications.  All States do have such laws. Many States' laws are stricter than the Act.

**D.    Defendants' Actions Have Long-Term Health Consequences for Players.**

163.    The constant pain that Plaintiffs and other players experience from their injuries while playing for the Clubs leads directly to a host of health problems.

164.    Leading experts recognize that former professional football players who suffer from permanent musculoskeletal injuries often cannot exercise due to pain or other physical limitations, leading to a more sedentary lifestyle and higher rates of obesity.

165.    According to the Centers for Disease Control and Prevention, obesity is linked to: coronary heart disease, type-2 diabetes, endometrial cancer, colon cancer, hypertension, dyslipidemia, liver disease, gallbladder disease, sleep apnea, respiratory problems and osteoarthritis.

166.    Surveys of former NFL players confirm that they suffer from significantly higher rates of all these disorders when compared to the general population.

167.    In addition, it is well-established that long-term use of opioids is directly correlated with respiratory problems and these problems are made worse by use of alcohol together with opioids.

168.    Long-term opioid use has also been tied to increased rates of certain types of infections, narcotic bowel syndrome, decreased liver and kidney function and to potentially fatal inflammation of the heart.  Opioid use coupled with acetaminophen use has been linked to hepatic (liver) failure.

169.    Long-term use of opioids has also been linked directly to sleep disorders and significantly-decreased social, occupational and recreational function.

170.    Given the foregoing potential damage that opioids can inflict, nonsteroidal anti-inflammatory drugs ("NSAIDs") are often viewed as a safer alternative to narcotics.

171.    Despite that popular notion, NSAIDs are associated with a host of adverse health consequences.

172.    The two main adverse reactions associated with NSAIDs relate to their effect on the gastrointestinal ("GI") and renal systems.  Medical studies have shown that high doses of prescription NSAIDs were associated with serious upper GI events, including bleeding and ulcers.  Additionally, GI symptoms such as heartburn, nausea, diarrhea, and fecal blood loss are among the most common side effects of NSAIDs.  Medical reports have also noted that 10-30% of prescription NSAID users develop dyspepsia, 30% endoscopic abnormalities, 1-3% symptomatic gastrouodenal ulcers, and 1-3% GI bleeding that requires hospitalization.  Studies also indicate that the risk of GI side effects increases in a linear fashion with the daily dose and duration of use of NSAIDs.

173.    NSAIDs are also associated with a relatively high incidence of adverse effects to the renal system.  Medical journal articles note that "[p]rostaglandin inhibition by NSAIDs may result in sodium retention, hypertension, edema, and hyperkalemia."  One study showed the risk of renal failure was significantly higher with use of either Toradol or other NSAIDs and, as a result, the FDA prohibits Toradol for more than five continuous days.

174.    Patients at risk for adverse renal events should be carefully monitored when using NSAIDs.  As the NFLPS Task Force stated, such patients include those with "congestive heart failure, renal disease, or hepatic disease[, and] also include patients with a decrease in actual or

effective circulating blood volume (*e.g.*, dehydrated athletes with or without sickle cell trait), hypertensives, or patients on renin-angiotensis, aldosterone-system inhibitors (formerly ACE inhibitor) or other agents that affect potassium homeostasis."

175.   Additionally, the anti-coagulatory effect of certain NSAIDs, including Toradol, can lead to an increased risk of hemorrhage and internal bleeding.  The *Physician's Desk Reference* specifically states that Toradol is "contraindicated as a prophylactic analgesic before any major surgery, and is contraindicated intra-operatively when hemostasis is critical because of the increased risk of bleeding."

176.   Moreover, certain NSAIDs can adversely affect the cardiovascular system by increasing the risk of heart attack.  Studies have shown that patients with a history of cardiac disease who use certain NSAIDs may increase their risk for heart failure up to ten times.

177.   Finally, other systemic side effects associated with the use of NSAIDs include headaches, vasodilatation, asthma, weight gain related to fluid retention and increased risk for erectile dysfunction.  Medical reports have also noted that "[i]ncreasing evidence suggests that regular use of NSAIDs may interfere with fracture healing" and that "[l]ong-term use of NSAIDs … has also been associated with accelerated progression of hip and knee osteoarthritis."

## III.   THE DEFENDANTS AND THE NFL HAVE RECOGNIZED THAT ITS DOCTORS/TRAINERS HAVE VIOLATED THE FOREGOING LAWS.

178.   The Defendants and the League have recognized the problem of painkiller abuse for decades.  In 1997, one General Manager said that painkiller abuse was "one of the biggest problems facing the league right now."  He said the League was trying to fix the problem, but described painkiller use among players as "the climate of the sport."

179.     And while the NFL has acknowledged that "[t]he deaths of several NFL players have demonstrated the potentially tragic consequences of substance abuse," over the ensuing decade, little changed.

180.     But a growing public disapproval of the NFL's lack of care for its players and treatment of them as disposable assets is finally forcing the League to acknowledge the looming crisis.  A large part of the shifting sentiment stems from players' use of medications to fight injury and stay on the field at great cost to their future health and wellbeing.  As described further below, the crisis is also fueled by coaches and executives.  Moreover, recent medical studies have illuminated the grave health risks to which players are exposed through overuse of the weekday and game day prescription painkillers.

181.     In 2012, Dr. Mathew Matava, team doctor for the St. Louis Rams and then president-elect of the NFL Physician Society ("NFLPS"), formed a task force to examine the use of Toradol and provide recommendations regarding the future use of the substance in the NFL. Matthew Matava *et al.*, "Recommendations of the National Football League Physician Society Task Force on the Use of Toradol Ketorolac in the National Football League," 4 *Sports Health* 5: 377-83 (2012) (hereinafter "Task Force Recommendations").

182.     The task force recognized that a decade had passed since the only other study to look at Toradol in professional sports took place.  JM Tokish, *et al.*, "Ketorolac Use in the National Football League:  Prevalence, Efficacy, and Adverse Effects," *Phys Sportsmed* 30(9): 19-24 (2002) (hereinafter the "Tokish Study").

1.     The Tokish Study sent questionnaires to the head team physician and the head athletic trainer of each of the NFL's 32 teams, with 30 of them responding.  In addition to

finding that 28 of those 30 teams administered Toradol injections during the 2000 season, the Tokish Study also found the following:

- Of the 28 teams that used the drug, an average of 15 players were given injections (this answer ranged from 2 players to 35 players); and

- Twenty-six of the 28 teams used Toradol on game day.

183.    One team had a policy of no use within 48 hours of games, and another team had a policy of no use within 12 hours of games.

184.    Toradol has the potential for severe complications such as bleeding and renal damage.  In fact, the two teams that did not use Toradol injections had strong policies against its use, citing potential complications, including renal failure and increased risk of bleeding.

185.    Some players did experience Toradol complications; six teams reported at least one adverse outcome relating to Toradol use.  Specifically, four teams noted muscle injury, one documented a case of gastrointestinal symptoms that resolved with cessation of Toradol use, and one reported that a player had increased generalized soreness one day after injection.

186.    The Tokish Study concluded that "given that bleeding times are prolonged by 50% 4 hours after a single [shot of Toradol, use] on game day may deserve reconsideration in contact sports."  The study then called for additional investigation and sought the development of standardized guidelines for Toradol use in athletes.

187.    Over a decade later, the Matava task force determined that standardized guidelines still had not been implemented, and that Toradol use had increased in the NFL during the intervening period.

188.    Therefore, the purpose of the task force was to "[p]rovide NFL physicians with therapeutic guidelines on the use of [Toradol] to decrease the potential risk of severe

complications associated with NSAIDs – in particular, the increased risk of hemorrhage resulting from a significant collision or trauma."

2.      The task force recommended that:

- Toradol should not be administered prophylactically "prior to collision sports such as football, where the risk of internal hemorrhage may be serious" in light of the FDA's admonition "that [the drug] not be used as a prophylactic medication prior to major surgery or where significant bleeding may occur."

- Toradol should not be used "to reduce the anticipated pain, during, as well as after competition" because "[t]he perception of NFL players getting 'shot up' before competition has shed an unfavorable light on the NFL as well as on team physicians who are perceived as being complicit with the players' desire to play at all costs, irrespective of the medical consequences."

- If Toradol is to be administered, it should be given orally and not through the more aggressive injections/intramuscularly. The Task Force found that the greater risks associated with injections – infections, bleeding, and injury to adjacent structures – combined with quicker onset of the drug when taken orally "favors the oral route of administration."

189.    Notwithstanding recommendations from the NFLPS that condemn many of the current practices regarding the administration of Toradol on game days, the Matava task force granted the NFL a reprieve given the "unique clinical challenges of the NFL," allowing that "each team physician is ultimately free to practice medicine as he or she feels is in the best interest of the patient."

190.    Finally, despite the clear cut recommendations not to use Toradol prophylactically or intramuscularly, the task force gave itself an out by claiming that the medical literature is "deficient in terms of the ethical considerations implicit with the administration of injectable medications in the athletic setting solely for the athlete to return to competition."

## IV.    PLAINTIFFS ARE REPRESENTATIVE MEMBERS OF THE PUTATIVE CLASS.

191.    Each of the Clubs, through an agent or employee, made intentional misrepresentations of the kind documented herein to each of the named Plaintiffs.  While it would be too burdensome to describe all of the misrepresentations herein, set forth below are some examples.

192.    Etopia Evans remembers that, while her husband Charles Evans was playing for the Minnesota Vikings and Baltimore Ravens, he received hundreds of pills from trainers and injections from doctors of Medications.  Mr. Evans specifically mentioned to her that he was receiving 800 milligram tablets of Vicodin and Percocet from Club trainers.  Mr. Evans was also receiving what he referred to as "happy shots" (on information and belief, the drug Toradol) from Club doctors before games and at halftime.  Mrs. Evans recalls her husband's evenings of pain on game nights when the effects of the "happy shots" began to wear off.  He was never told of the side effects of any of these drugs.  He never used Medications before signing his first contract.  Mr. Evans' experience with these Medications was substantially similar with each Club for whom he played.

193.    Mr. Evans was addicted to painkillers after his retirement from professional football.  He became a person Mrs. Evans no longer recognized – constantly in pain and searching for relief.  Eventually, Mrs. Evans and their child moved back to her home in Baton Rouge because daily life with Mr. Evans had become too difficult, thereafter seeing him on

57

family vacations and frequent visits.   In 2008, eight years after retiring from professional football, Mr. Evans died of heart failure due to an enlarged heart.   His family had no history of heart problems and his parents are alive today.   Mr. Evans died alone in a jail cell – he had been incarcerated two days before his death for failure to pay support for a child from college.   He had spent his money on painkillers instead.

194.     While playing in the NFL, Robert Massey received hundreds of pills from trainers and injections from doctors of Medications.   He does not remember all the drugs he was given by the trainers but he did receive Indocin, Percocet and Vicodin.   The trainers would either hand him the pills or give them to him in brown envelopes.   Club doctors gave Mr. Massey numerous injections of Toradol and Cortisone for both games and practices.   Mr. Massey was never informed of the possible side effects of any of these drugs.   He had seven different surgeries while playing.   Mr. Massey never used painkillers, anti-inflammatories or sleep aids before he signed his first contract with a Club.   His experience regarding these Medications was substantially similar with each Club for whom he played.

195.     On September 4, 1994, the Detroit Lions were playing the Atlanta Falcons in the first game of the season.   Mr. Massey had just signed his first large contract, coming to the Lions as a free agent.   He hurt his right ankle early in the game and the Club doctor injected him with Toradol on the sideline while the game was being played.   He finished playing the game.

196.     After the game, he was lying on the training table as the ankle ballooned.   Head Coach Wayne Fonts entered the training room, saw Mr. Massey and the swollen ankle and then said to him "Congratulations, you played a great game today.   But you know we didn't pay you that kind of money to miss games."   He didn't practice much during the next week because he couldn't run.   The Lions' next game was away against the Minnesota Vikings on September 11,

1994.  On the evening before the game, a trainer approached Mr. Massey, gave him some pills of Indocin and told him they would help his ankle.  Two hours before the game, the Club doctor gave him a Toradol shot and the trainer wrapped his ankle extensively.  Mr. Massey played the entire game and intercepted a pass.  He played the remainder of the season with a swollen ankle.

197.    Mr. Massey lives in constant pain.  His shoulders, knees and ankles bother him on a daily basis.  He is unable to exercise properly due to the pain and this has resulted in significant weight gain.  Mr. Massey has not been able to go to a doctor in years because of the cost.

198.    While playing in the NFL, Troy Sadowski received hundreds of pills from trainers and injections from doctors of Medications.  During his time with each of his Clubs, pills were available from trainers and assistant trainers upon request.  He was either handed the pills or received them in envelopes.  He also received injections of Toradol and Cortisone from Club doctors.  The Toradol injections were given prophylactically before every game.  In Pittsburgh, syringes full of Toradol were lined up in the locker room labelled with the player's number.  Mr. Sadowski was never told of the side effects of any of these drugs.  In fact, he was told by a number of trainers that Toradol was good for his long-term health – it cleaned out his organs.  He never used a painkiller, anti-inflammatory or sleep aid before signing his first contract with a Club.  Mr. Sadowski's experience with these Medications was substantially similar with each Club for whom he played.

199.    Mr. Sadowski lives with constant pain in his back, hips, wrists, knees, ankles and shoulders.  He still needs to take daily painkillers to get through the day and to sleep.  He can no longer run and, when he walks, he feels as if his joints lack sufficient lubrication.  He cannot lift his daughter nor have her sit on his lap without excruciating pain.  His weight is increasing due to his inability to exercise.

200.    While playing in the NFL, Christopher Goode received hundreds of pills from trainers and injections from doctors of Medications, all of which took place either on the sideline of a game/practice or in a locker room.  He does not remember all the drugs he was given by the trainers but he did receive Tylenol 3 and Indocin.  On many occasions, the trainers did not tell him the names of the drugs he was being given.  The trainers gave him the pills by hand or in small packages or clear bottles.  Mr. Goode received Cortisone injections to alleviate specific pain from an injury, specifically when he hurt his knee, his ankle and when he was paralyzed on the field for 15 minutes.  Following each of these injuries, the doctors gave him additional Cortisone shots for weeks.  Mr. Goode was never informed of the possible side effects of any of these drugs.  He never used painkillers, anti-inflammatories or sleep aids before signing his first contract with a Club.

201.    Mr. Goode was diagnosed as having renal cancer in 2014.  He had surgery to remove the malignant mass on his kidney in the same year.  He has no family history of any kidney problems.   He also suffers from numbness in his arms and legs and constant pain in his knee and ankle.

202.    While playing in the NFL, Darryl Ashmore received hundreds of pills from trainers and injections from doctors of Medications.  Trainers visited his room the evening before away games dispensing these pills.  The pills were frequently double the dosage of the same pills prescribed for him after his retirement.  In many instances, Mr. Ashmore was never told the name of the drug he was being given – he was simply told the pill would get him back on the field or help him sleep.  Mr. Ashmore took Vioxx frequently, particularly while he was with the Raiders, along with sleeping aids.  The Rams, including trainer Jim Anderson, frequently

provided Celebrex, Percocet, and Vicodin, along with other pills whose names he cannot remember or which were never told to him.

203.    Every Club on which he played provided these pills to him before games and practices.  Pills were handed to him or given in envelopes.  After the final game of the 2002 season, the Raiders gave him boxes of these pills to get him through the off season.  He also received injections from doctors to alleviate pain and swelling from particular injuries.  He was never advised of any side effects from these drugs.  While in college, he received anti-inflammatories for a knee injury in 1989 but did not otherwise receive anti-inflammatories and he did not receive painkillers or sleep aids.  Mr. Ashmore's experience with these Medications was substantially similar with each Club for which he played.

204.    While with the Raiders, Mr. Ashmore believed he had broken his wrist at practice on or about October 25, 1998.  Between that date and November 1, when the Raiders had an important Sunday night game against the Seattle Seahawks, he was told by the Club's doctor, Dr. Warren King, that the injury was only a sprain and that he would be fine with painkillers and anti-inflammatories.  He played the Sunday night game without a cast and the next morning, Dr. King told him that his wrist was in fact broken and needed a cast.  He played with a cast for the rest of the season and used painkillers and anti-inflammatories for the remainder of his career to numb the pain in his wrist.  His wrist is now permanently damaged.

205.    Also with the Raiders, Mr. Ashmore received multiple injections in his knee with a medication that he later learned should only be provided a maximum of two times during the entirety of a person's life.

206.    While with the Redskins, Mr. Ashmore had a bad back injury that was treated with muscle relaxers and pain pills and he played three days after sustaining the injury.  He has disc problems and advanced degeneration because of that injury.

207.    While with the Rams, Mr. Ashmore was kept on the field, despite suffering from what he would later learn was a career-ending neck injury, through Medications and he was not told of their side effects.  He ultimately herniated a disc in his neck, lost 70% of his strength in his right shoulder, and suffered from numbness and weeks of sleepless nights.

208.    Mr. Ashmore is also in constant pain in his shoulders and knees.  He has also been told that his kidneys may be damaged because a blood test revealed that his kidneys were leaking creatinine.  His life insurance company raised his premiums due to the elevated creatinine levels in his body.  He has no family history of kidney problems.

209.    While playing in the NFL, Alphonso Carreker received hundreds of pills from trainers and injections from doctors of Medications.  The Medications included Motrin 800, Tylenol 3 and Percocet.  He was taking three or four pills during the week and the nights before and after every game.  The trainers had the pills in bags and handed them to Mr. Carreker for his use.  Any player who asked to get a pill always received one and the trainers frequently volunteered pill availability.  He also received frequent Cortisone injections in his knees and shoulders.  Mr. Carreker was never informed of the possible side effects of any of these drugs.  He never used any painkillers, anti-inflammatories or sleep aids before he signed his first contract with a Club.  His experience with these Medications was substantially similar with each Club for whom he played.

210.    Mr. Carreker discovered he had a virus in his heart in 2012.  The anti-inflammatories he was given for that malady were ineffective due to the resistance he had built

up to such drugs from the enormous quantities taken during his playing career.  He suffers from gout as a result of liver problems.  His doctors have advised him not to eat beef or pork because of his heart and stomach problems.  Mr. Carreker has constant pain in his knees and shoulders. He has had surgeries on his knees and has not yet decided on whether to have a recommended rotator cuff surgery.

211.    While playing in the NFL, Jerry Wunsch received hundreds of pills from trainers and injections from doctors of Medications, including Vicodin, Indocin and Toradol.  He normally received a dosage of 1500 milligrams for such drugs each time he took a pill.  He was taking at least one of these drugs every day in-season.  The trainers either handed the pills directly to Mr. Wunsch or put them in an envelope.  On flights home, trainers for both organizations would walk up and down the aisles of the plane, handing out anti-inflammatories and pain killers to anyone who needed them, no questions asked.

212.    Mr. Wunsch also received Toradol shots from the Club doctor before every game and occasionally for practice.  At one point, Mr. Wunsch was shot up with Hyalgin in his ankle, instead of being rested, and was told that the Hyalgin would act like oil to lubricate his gears because it was bone on bone in his ankle.  Mr. Wunsch was never informed of the possible side effects of any of these drugs.  He never used painkillers, anti-inflammatories or sleep aids before he signed his first contract with a Club.  Mr. Wunsch's experience with these Medications was substantially similar with each Club for whom he played.

213.    On November 23, 2003, the Seattle Seahawks were playing the Baltimore Ravens in Baltimore.  Before the game, Coach Holmgren asked Mr. Wunsch if he could play, to which Mr. Wunsch replied "I do not think so."  Coach Holmgren then called for Sam Ramsden, the Seahawks' trainer, and asked "what can we do to help Mr. Wunsch play today."  Mr. Ramsden

brought the doctors over, who gave him a Toradol shot and 750 mg of Vicodin, saying they would help, even though Mr. Wunsch was already taking anti-inflammatories as prescribed by his doctors.  He played feeling high and after half time the Medications wore off and he told anyone who would listen that he could not play anymore but Mr. Ramsden gave him another 750 mg of Vicodin for the second half.  In short, on top of the Indocin he was already taking, Mr. Wunsch was also given 1500 mg of Vicodin and a Toradol shot, within a three hour span, so he could play football.

214.    Mr. Wunsch currently suffers from an enlarged liver, a damaged pituitary gland, a damaged kidney and stomach problems.  He has no family history of medical problems with any of these organs.  He is also in constant pain from all of his joints.  Mr. Wunsch once was told by a Club doctor that he had torn his labrum.  The doctor stated that, if he had surgery, his career would be over and recommended that he continue playing and manage the problem with Medications.  Mr. Wunsch followed his doctor's advice.  He also received pills and injections to play through various injuries to his ankles.  After the last such injury, the Club doctor informed him that his ankles were so damaged he didn't think he could return him to play immediately with injections and pills.  The Club cut him that afternoon and he never played again.

215.    While playing in the NFL, Eric King received hundreds of pills from trainers and injections from doctors of Medications.  Mr. King received many drugs from trainers, including Toradol, Celebrex, Percocet and OxyContin.  The trainers frequently didn't tell him the name of the drug, just that he should take it to numb the pain and play.  The trainers also gave him Ambien for sleeping before games.  The trainers usually gave him the pills in an envelope, mostly blank but occasionally with his name.  He also received injections of Toradol by Club doctors before several games.  Mr. King also received injections in his left forearm, left shoulder

and lower back.  He was never informed of the possible side effects of using these Medications. He never used painkillers, anti-inflammatories or sleep aids before he signed his first contract with a Club.  Mr. King's experience with these Medications was substantially similar with each Club for whom he played.

216.    Mr. King lives with constant pain.  During his career, he had two surgeries on his left forearm and one on his left shoulder.  He also hurt his lower left back.  In addition to the surgeries and injections, he was taking pills at least twice a week.  The same left forearm and shoulder and back that were "fixed" by Club doctors bring pain to Mr. King's daily life.

217.    While playing in the NFL, Steve Lofton received hundreds of pills from trainers and injections from doctors of Medications.  He cannot remember that names of any of the drugs he was given.  Trainers would simply hand him pills and tell him that he needed to take them. The doctors who injected him never said the name of the drug he was being given.  Mr. Lofton does remember that the drugs were being given out like M and M's, the candy.  On the plane home from away games, a doctor would walk down the aisle, take pills from zip-lock bags and hand them to the players.  Mr. Lofton remembers those flights as being strangely quiet as 53 players were numbed to sleep by the power of the drugs.  He was never told by anyone of the side effects of the drugs.  Mr. Lofton never used painkillers, anti-inflammatories or sleep aids before he signed his first contract with a Club.  His experience with these Medications was substantially similar with each Club for whom he played.

218.    Mr. Lofton knows that his kidneys have a high level of creatinine.  He is not currently on dialysis but his doctor is monitoring his kidneys.  He has no family history of any medical problems with kidneys.  Mr. Lofton lives with intense pain every day.  His back and his hips constantly hurt.  He is unable to exercise and his weight has increased from 185 to 226

pounds.  He has recently developed pain in his knees and the lower part of his legs. Mr. Lofton has no family history of back or hip pain.  He needs to sleep on a board or similar hard surface to get any rest.  After his family leaves in the morning, he faces a day in which he simply tries to find ways to forget the pain for just a few hours.  His doctor told him that, even though he was in his mid-40's, he had the body of someone in his mid-80's.

219.    While playing in the NFL, Duriel Harris received hundreds of pills from trainers and injections from doctors of Medications.  He also received numerous Cortisone injections. He only remembers being given Vicodin but the trainers frequently didn't tell him the names of the drugs they gave him.  Doctors were available once a week and at games.  Trainers were always available. Trainers would simply hand pills out in unmarked envelopes.  The training room was like a pharmacy with drugs sitting on shelves in a large locker.  On the plane home from away games, trainers handed out Medications and alcohol.  Mr. Harris was frequently told by trainers to take pills so he could play or he would be cut.  He was never given any warnings or information about side effects.  Mr. Harris never used any painkillers, anti-inflammatories or sleep aids before he signed his first contract with a Club.  His experience with these Medications was substantially similar with every Club for which he played.

220.    On December 5, 1976, the Miami Dolphins were playing a home game against the Buffalo Bills.  Mr. Harris was a 20-year-old rookie.  He injured his ankle at the end of that game and practiced very little during the following week.

221.    The Dolphins' final game of the year was on December 11, 1976 at home against the Minnesota Vikings.  Mr.  Harris limped on to the field for pre-game warmups, not expecting to play.  Head Coach Don Shula and Wide Receivers Coach Howard Shellenberger approached Mr. Harris and Coach Shula said "We need you – you need to play.  We've talked to the doctors

and they will give you a shot and you can play."   Mr. Harris recalls the exchange as not presenting a choice and he was afraid he would be cut if he objected.   He limped back to the training room and the trainer pulled off his shoe and cut the tape from his ankle.   The Club doctor then gave him a Cortisone shot in the ankle and the trainer re-taped it.   He played the game even though the shot wore off in the fourth quarter and he was hurt and visibly limping.

222.   After the game, the trainer cut the tape off and the ankle ballooned up.   Mr. Harris returned home and couldn't run for three months.   The Dolphins then flew him to a California specialist who recommended more rest.   Mr. Harris couldn't run or workout until June of 1977. The Dolphins finished with six wins and eight losses that year so the game had no meaning *vis a vis* playoffs.

223.   Mr. Harris' kidney is currently at 57% of normal kidney function.   He is not on dialysis at this time, but his doctor is monitoring his kidney for any signs of additional failure. His heart also has an irregular beat due to an enlarged chamber.   He takes daily pills to help the heart pump.   While with the Browns, Mr. Harris' heart started racing and he needed pills to slow it down.   Even though he still played after the incident, he was never the same player.   When he first arrived in Dallas, the player personnel director told him that if he didn't sign a medical waiver for his heart, the Club would cut him right then.   Mr. Harris has also required surgery for a hyper thyroid condition to lower his production of calcium.   He does not smoke or drink alcohol and he has no family history of kidney, heart or thyroid problems.   Mr. Harris is also in constant pain from all of his joints.   He has arthritis in his fingers and remembers a doctor stitching up the webbing of his hand at half time of a game.   He also has pain from football injuries in his shoulders, knees and ankles.

224.   While playing in the NFL, Mr. Graham received hundreds of pills from trainers and injections from doctors of Medications.  He recalls taking in pill form Celebrex, Indocin, Toradol, Tylenol 3, Prednezone and Catepham.  Trainers also gave him pills without telling him the name of the drug he was receiving.  These pills were handed to him by Club trainers or placed in envelopes or vials.  For approximately the last seven years of his career, he received injections of Toradol twice a week – once for practice and before every game.  He also received many injections of Cortisone in various injured body parts.  Mr. Graham was frequently provided with alcohol by his Clubs during the return flight from away games.  While playing for the San Diego Chargers, he suffered a break in the transverse process in his back.  He missed one or two games and then played the remainder of the season with the break.  The Club doctors and trainers allowed him to play while managing the pain with Medications.  He was never told of the side effects of any of these drugs.  Mr. Graham did not use painkillers, anti-inflammatories or sleep aides before he signed his first contract with a Club.  His experience regarding these Medications was substantially similar with each Club for whom he played.

225.   Mr. Graham now lives in constant pain.  He has pain in both shoulders, lower back, both elbows, both hamstrings, his fingers, wrists, left toe and right knee.  He cannot stand for long periods and needs special shoes to lessen the pain.  He is stiff and sore all day.  He cannot sleep at night, moving from bed to floor to couch throughout the night.  Mr. Graham struggles to control his weight due to his limited ability to exercise.  He believes his current pain is completely attributable to various injuries suffered during his NFL career.  Many were areas of painkiller injections and all were masked by the numerous drugs mentioned above as being given in pill form.

226.    While playing in the NFL, Mel Renfro received hundreds of pills from trainers and injections from doctors of Medications.  Mr. Renfro received Empirin 3 (a drug containing codeine) throughout his career to alleviate the pain from playing and Percodan after his 1977 surgery.  He received other painkillers and anti-inflammatories but cannot recall their names. Trainers would give him the pills before every game and, if needed, at halftime.  Mr. Renfro had three different surgeries on his foot during his career and the pain was constant.  He was never told of the side effects of any of these drugs.  Mr. Renfro did not use painkillers, anti-inflammatories or sleep aids before he signed his first contract with a Club.

227.    Mr. Renfro also believed that he had torn cartilage in his knee in a game during the 1973 season.  The Club medical staff told him his knee was merely sprained.  For four seasons, Mr. Renfro played on a knee that was swollen and causing pain.  The Club continued to give him Medications so that he could play and practice with the "sprain."  After playing for four years with a swollen knee, Mr. Renfro went to an orthopedic surgeon not affiliated with the Cowboys.  He then discovered that his knee had no cartilage left.  The Club had hidden the extent of his injury from him for four years.  Today, Mr. Renfro lives in pain.  His left hip was replaced approximately ten years ago.  He had surgery in January 2014 in an attempt to alleviate the pain from the vertebrae in his back.  Mr. Renfro has peripheral neuropathy and cannot walk properly.  He also has hand – bone displacement.

228.    While playing in the NFL, Cedric Killings received hundreds of pills from trainers and injections from doctors of Medications.  Mr. Killings remembers receiving a handful of Toradol injections from the Club doctor following an injury to his ankle.  He did receive pills from trainers frequently during the regular season for his entire career for both games and practices.  He also received them during the off season.  Mr. Killings was occasionally told the

name of the drug he was being given and can remember receiving Percocet and Vicodin from the trainers. In many instances, he was never told the name of the drug he was being given – he was simply told the pill would get him back on the field or alleviate the pain he was feeling. He can also recall being given drugs the trainers would refer to as "muscle relaxers." The pills were either given to Mr. Killings by hand or in an aluminum strip which allowed Mr. Killings to push the pills out as he needed them. He never had any conversations with and was never given any warnings by any Club doctor or trainer about the possible side effects of taking the Medications. Mr. Killings experience with these Medications was substantially similar with each Club for which he played.

229.   Mr. Killings does recall that, during the 2003 season with the Minnesota Vikings, he sprained his right ankle in practice. The next morning, Head Coach Mike Tice told him that, if he was not able to practice that day, he would be released from the Club. Mr. Killings took Mediations given by the Club to ensure that he could practice in spite of the pain in his right ankle. He wanted to keep his job.

230.   Mr. Killings has recently been placed on medication for High Blood Pressure. After retiring from professional football, he also experienced an inflamed Gall Bladder which necessitated the removal of the entire organ in an emergency surgery. Mr. Killings also has constant pain in his back, shoulders, knees, ankles and hands. He was taking pills and/or injections for pain in all of these areas during his playing career. Mr. Killings has no family history of high blood pressure, gall bladder problems or chronic pain in any of the joints mentioned herein. Prior to playing professional football, he has no recollection of taking any painkillers or anti-inflammatories.

## CLASS ACTION ALLEGATIONS

231.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth herein.

232.    The Class and Subclasses consist of the following:

1.    **Class.**  All retired  football players of the Clubs ("Retirees"), including without limitation all the Named Plaintiffs ("Named Plaintiffs") and their respective spouses, dependent children, and all persons and entities, heirs, successors and assigns who would have rights under applicable state law to sue Defendants independently or derivatively as a result of their relationship with a retired player ("Successors") (collectively the Retirees, Named Plaintiffs and Successors are the "Class Members") who, at any time during their professional football careers, including without limitation pre-season, in-season and post-season drills, conditioning sessions, walk-throughs, practices, and games,

**received or were administered**:

(i)    Prescription pain killers including, without limitation, opioids such as  Percodan, Oxycodone (Percocet), Hydrocodone (Vicodin), Valium, Librium and Codeine and their pharmaceutical analogues; or

(ii)    Other anti-inflammatory agents and analgesics, such as NSAIDs, including without limitation Aspirin, Ibuprofen, Naproxen and Ketorolac (brand name "Toradol") and other pain relievers of similar chemical composition and function; or

(iii)    Local anesthetics, including, without limitation, Lidocaine and its pharmaceutical analogues; or

(iv)    Sleeping aids, whether prescription-required or over-the-counter; or

(v)     Other Schedule I - IV controlled substances, 21 U.S.C. § 801, *et seq.* (collectively "Medications")

**from**

(i)     Any person or entity on, employed by, affiliated or associated with any Club training staff; or

(ii)    Any person or entity on, employed by, affiliated or associated with any Club medical staff; or

(iii)   Any non-player person or entity otherwise employed by, or associated or affiliated with any Club; or

(iv)    Any non-player person or entity otherwise employed by, or associated with, a Club or any of the Clubs' associated or affiliated companies, corporations

**without**

(i)     A valid prescription; or

(ii)    An objective and neutral medical examination and diagnosis; or

(iii)   Continuing medical supervision including evaluation of therapeutic value, drug interactions and toxicity; or

(iv)     Proper and clear explanation of the possible side effects and long-term health consequences

**or**

(i)     In amounts exceeding recommended dosages; or

(ii)    For periods exceeding recommended dosage periods; or

(iii)   In combination with other drugs in a contraindicated combination; or

72

(iv)    In combination with alcoholic beverages in a contraindicated combination; or

(v)    Without a pre-administration warning of possible side effects, toxicity, dangerous drug interactions or other risks.

2.    **Subclass 1**.  All Class Members who have received a medical diagnosis of physical limitation, injury or other harm causally related, in whole or in part, to the provision or administration of any Medication(s).

3.    **Subclass 2**.  All Class Members who have not received a medical diagnosis of physical limitation, injury or other harm causally related, in whole or in part, to the provision or administration of any Medication(s) but who are currently experiencing symptoms that are or may be caused by the administration of such Medication(s).

4.    **Subclass 3**.  All Class Members who have not received a medical diagnoses of physical limitation, injury or other harm causally related, in whole or in part, to the provision or administration of any Medication(s) and who are not currently experiencing symptoms that are or may be caused by the administration of such Medication(s).

5.    **Subclass 4.** All Persons who are the surviving heirs or personal representatives of Class Members whose deaths were causally related in whole or in part to the provision and or administration of Medications.

The Class Period includes all times during which Class Members participated in pre-season, in-season and post-season drills, conditioning sessions, walk-throughs, practices and games.

233.    Plaintiffs bring this action on behalf of themselves and all other similarly-situated individuals pursuant to Fed. R. Civ. P. 23.

234.    The Class and Subclasses contain a sufficiently-large number of persons that joining all of their claims is impractical.  Named Plaintiffs are but a few of the approximately 17,000 retired NFL players, most if not all of who are within the Class and Subclass definitions. Named Plaintiffs are but 13 of the over 200 retired NFL players who have signed Retention Agreements with undersigned counsel.  Adding Retirees and Successors greatly increases the number of Class and Subclass Members.

235.    Numerous common questions of law and fact exist.  They include, for example:

- Did Defendants conspire or otherwise agree, expressly or tacitly, to engage in the illegal procurement, storage, and/or administration of, and secrecy concerning, the Medications identified herein?

- Did Defendants provide or administer Medications to the Class Members as described above?

- Did Defendants intentionally provide or administer Medications to the Class Members as described above?

- Did Defendants violate the Controlled Substances Act's requirements governing acquisition of controlled substances?

- Did Defendants violate the Controlled Substances Act's requirements governing storage of controlled substances?

- Did Defendants violate the Controlled Substances Act's requirements governing distribution of controlled substances?

- Did Defendants violate the Food and Drug Act's requirements governing distribution of prescribed medications?

- Did the provision or administration of Medications to Class Members, as described above, violate state pharmaceutical laws regulating the acquisition, storage and dispensing of Medications?

- Did the Class Members provide informed consent authorizing the provision or administration of Medications?

- Did Defendants intentionally and affirmatively mislead Class Members about the dangers of health risks associated with provision and administration of Medications as described above?

- Did Defendants intentionally fail to disclose to Class Members the dangers of the health risks associated with provision and administration of Medications as described above?

- Did the Defendants' provision or administration of Medications as described above cause, in whole or in part, other injuries, illnesses, or disabilities of the Class Members?

- Did the Defendants' provision or administration of Medications as described above increase Class Member's risk of developing physical and mental health problems, injuries, disabilities, limitations and other problems in the future?

- Did the Defendants' provision or administration of Medications as described above proximately cause Class Members' economic losses, harms, lost earning potential, reduced earning capacity and other economic damages?

236. Plaintiffs and their claims are typical of the absent Class Members and their claims. Plaintiffs have the same incentives as the absent Class Members in this case, ensuring the proper representation of and advocacy for the absent Class Members' interests. Plaintiffs' claims arise from the same wrongful conduct the Defendants engaged in toward the absent Class Members.

237. Plaintiffs will adequately represent the Class Members. Plaintiffs have no conflicts of interest with the absent Class Members who Plaintiffs seek to represent. To the contrary, Plaintiffs' interests are fully aligned with the absent Class Members' interests in this action, in seeking redress for the Clubs' common wrongful conduct to both Plaintiffs and absent Class Members. Plaintiffs will fairly and adequately protect the interests of the absent Class Members.

238. Plaintiffs' counsel will properly and vigorously represent the Class Members. Plaintiffs' counsel have no conflicts of interest with the Plaintiffs and Class Members. Plaintiffs' counsel are experienced trial lawyers and litigators, with substantial experience in complex and class action litigation. Reflecting their commitment to this case and the protection of the absent

Class Members, Plaintiffs' counsel have invested a great deal of time, money, legal research and factual investigative effort in developing and understanding the facts set forth in this Complaint and analyzing the best expression of those facts in legal theories and causes of action. Further underscoring Plaintiffs' counsel's qualifications and satisfaction of the adequacy of representation requirements, Plaintiffs' counsel have met with and received signed Retainer Agreements from over 200 Class Members.

239.    The Class and Subclasses are clearly defined, and can be identified and notified effectively. The members of the Class and Subclasses are readily ascertainable and identifiable from reference to existing, objective criteria that are administratively practical, including records maintained by Defendants. Defendants have and maintain records reflecting the names of all of the Clubs' players, their games played, injuries sustained, medical and injury reports on the Class Members and certain reports and records of the provision of medical, pharmacological, and other therapeutic treatments to the Class Members.

240.    Common questions, such as those listed above, predominate over any questions affecting only individual members. As described above, and in light of the Defendants' common misconduct toward all of the Class Members, the Class and Subclasses are sufficiently cohesive to warrant class treatment. Plaintiffs, on behalf of the Class, allege a common body of operative facts and common legal claims relevant to each Class Member's condition and claims. Moreover, if necessary, Due Process compliant trial plans can be developed, at the appropriate time, to ensure the most efficient, practical and just resolution of the claims alleged herein.

241.    A class action here is superior to other adjudicatory methods possibly available for resolving the Class's claim. First, Defendants are a $9 billion business annually and continuously growing, with virtually limitless resources to litigate against individual plaintiffs

who have nowhere near the financial and legal firepower that Defendants can immediately muster.  Second, those vast financial and economic resource disparities between individual Class Members and the stupendously rich Defendants mean that many, if not most, of the claims of individual Class Members would languish un-redressed absent class action treatment.  Third, the Class Members have not expressed interest in individually controlling the prosecution of separate actions.  Judicial economy, economic efficiency, and the goal of avoiding inconsistent rulings and conflicting adjudications reflect the desirability of concentrating the litigation of the claims in this Complaint in the single forum this Court provides.  With an appropriate trial plan, adjudicating the claims of the clearly defined Class and Sub-Classes above will not present undue difficulties for case management.

242.    This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(1)(A).  Separate litigations by individual Class Members against Defendants would create the risk of conflicting, inconsistent or otherwise varying rulings and resolutions concerning those individual Class Members that would create conflicting or otherwise incompatible standards of conduct for Defendants.

243.    This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(1)(B).  Separate litigations by individual Class Members against Defendants would create the risk of adjudications concerning the claims of individual Class Members that, as a practical matter, would be dispositive, through preclusion, law of the case, or other doctrines, of the interests of other Class Members not parties to the individual adjudications or would otherwise substantially impair or impede their ability to protect their own interests.

244.    This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(2).  As described above, Defendants have acted or refused to act on grounds generally

applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

245.    This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(3).  As described above, Defendants have acted or refused to act on grounds generally applicable to the Class such that questions of law or fact common to the Class predominate over any questions affecting only individual members, making a class action superior to other available methods for fairly and efficiently adjudicating the controversy.

246.    This action is also properly maintainable as a class action under Fed. R. Civ. P. 23(c)(4) in light of the nature and extent of the predominant common particular issues, exemplified in the common questions set forth above, generated by Defendants' consistent agreement, and consequent consistent policy, of promoting and facilitating the use of the Medications.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I – INTENTIONAL MISREPRESENTATION**</u>

**(Against All Defendants)**

247.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth herein.

248.    The Clubs continuously and systematically made intentional misrepresentations to Class Members as documented herein about the Medications that they provided.

249.    The Clubs continuously and systematically misrepresented the increased risk of latent injuries resulting from the Medications.

250.    The Clubs continuously and systematically misrepresented to the Class Members the dangers of playing while the pain of injuries was masked by the Medications, including the risk of further and permanent damage to affected body parts.

251.    The Clubs misrepresented material facts, extremely important to understanding the dangers of the Medications, to the Class Members.

252.    The Clubs knew that the representations were false or made the representations with such reckless disregard for the truth that knowledge of the falsity of the statement can be imputed to the Clubs.

253.    The Clubs intended to deceive the Class Members through its knowing and intentional misrepresentations.

254.    The Clubs knew that Class Members would rely on what they said about the Medications that kept the Class Members on the field.

255.    The Class Members reasonably relied on what the Clubs did say – "here you go, take this and get out there." That message did not include: disclosure of the numerous and serious risks associated with the Medications; the need for informed consent; the need for independent medical evaluation, diagnoses and prescription; the need for monitoring for toxicity, potentially serious or even fatal drug interactions; and any recognition of, let alone adherence to, limitations on frequency and duration of the Class Member's exposure to these Medications.

256.    The Class Members reasonably believed the Clubs were taking their best interests into consideration when they provided and administered Medications.

257.    The atmosphere of trust inherent in locker rooms, in which players become friendly with their Clubs' medical and training staffs, inured the Class Members to any suspicion that the Medications they were given and administered might be dangerous.

258.    The Class Members reasonably believed the Clubs would not act illegally and, in doing so, injure the Class Members and put them at risk of substantial and continuing future injuries.

259.    The Class Members were in fact deceived by the Club's misrepresentations, and justifiably acted and detrimentally relied on those intentional misrepresentations.

260.    The Clubs are liable for their intentional misrepresentations to the Class Members.

261.    The Clubs' intentional misrepresentations were a cause in fact of the Class Members' damages, injuries and losses, both economic and otherwise, alleged in this Complaint.

262.    The Clubs' intentional misrepresentations proximately caused the Class Members' damages, injuries and losses, both economic and otherwise, alleged in this Complaint, all of which are ongoing and will continue for the foreseeable future.

263.    The Class Members suffered damages and losses factually and proximately caused by their reasonable and justifiable reliance on the Clubs' intentional misrepresentations and omissions about the Medications.

264.    The Clubs are liable to the Class Members for all categories of damages, in the greatest amounts permissible under applicable law.

265.    As a result of the foregoing uniform, agreement-based misrepresentations, Plaintiffs and the Class Members ingested vast amounts of opioids, anti-inflammatories and other analgesics, and local anesthetics during their NFL careers that they otherwise would not have, all of which occurred without proper medical diagnosis, supervision and monitoring; in quantities exceeding recommended dosages; and for periods far longer than recommended treatment intervals.

266.   As a result of Defendants' provision and administration of Medications, the Class Members are currently suffering from, or at a substantially-increased risk of developing, physical and/or internal injuries resulting from the provision and administration of the Medications.

267.   Such injuries, and the substantially-increased risks thereof, are latent injuries. They develop over time, often undetected at first because the absence, paucity or modest nature of early symptoms are readily explained away as "old age" or caused by some other factor independent of Defendants' provision and administration of Medications.

268.   Such latent injuries include, without limitation, musculoskeletal deterioration, arthritic and osteoarthritic progression, and damage to internal organs.

269.   Defendants had superior knowledge to that of the Class Members concerning the current use, and latent injuries, associated with the provision and administration of the Medications to the Class Members.

270.   Despite that knowledge, Defendants systematically misrepresented to the Class Members that Defendants' administration of the Medications would have no adverse impact on their health or concealed the scope of injuries from which the Class Members might suffer.

271.   The Class Members' latent injuries, and substantially increased risks of developing physical maladies later in their lives, necessitate specialized medical investigation, monitoring, testing and treatment not generally required by or given to the public at large.

272.   The testing and medical monitoring regime required for the Class Members is specific to their experience with the Clubs' provision and administration of the Medications.

273.   Persons not exposed to the Medications that the Clubs provided and administered to the Class Members would not require a testing and medical monitoring regime like that necessary to protect the Class Members.

274.     The testing and medical monitoring regime will include baseline testing of each Class Member, with diagnostic examinations, to determine whether the Class Member is currently suffering from any of the physical injuries associated with the Medications.

275.     This testing and medical monitoring regime will also include evaluations of the non-currently symptomatic Class Members to determine whether, and, if so, by how much, they are at increased risk for developing the injuries at issue in the future.

276.     This testing and medical monitoring regime will help to prevent, or mitigate, the numerous adverse health effects the Class Members suffered and will suffer from Defendants' provision and administration of the Medications.

277.     Scientifically-sound and well-recognized medical and scientific principles and observations support the efficacy of the testing and medical monitoring regime the Class Members require.

278.     Testing and monitoring the Class Members will help prevent or mitigate the development of the injuries at issue.

279.     Testing and monitoring the Class Members will help to ensure that they do not go without adequate treatment that could either prevent, or mitigate, the occurrence of the injuries at issue.

280.     In addition to compensatory and punitive damages against Defendants, Plaintiffs seek a mandatory continuing injunction creating and imposing a Court-ordered, Defendants-funded testing and medical monitoring program to help prevent the occurrence of Medication-caused injuries and disabilities, to help ensure the prompt diagnosis and early treatment necessary to reduce the degree or slow the progression of such Medication-caused problems, and otherwise to facilitate the treatment of such problems.

281.    This testing and medical monitoring program should include a trust fund, under the supervision of the Court or Court-appointed Special Master who makes regular reports to the Court about the fund.

282.    This trust fund is required to pay for the testing and medical monitoring and treatment the Class Members require as a matter of sound medical practice, regardless of the frequency, cost or duration of such testing, monitoring and treatments.

283.    Plaintiffs have no adequate legal remedy with regard to the latent injuries described herein.   Money damages are by themselves insufficient to compensate the Plaintiffs and Class Members for the continuing risks associated with such injuries.

284.    Absent the testing and medical monitoring program described in the preceding paragraphs, the Plaintiffs will remain unprotected against the continuing risk, created by Defendants' misconduct, of subsequent development and manifestation of physical injuries that are now latent.

## COUNT II – CIVIL CONSPIRACY

### (Against All Defendants)

285.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth herein.

286.    Since at least the mid-1960s, the Clubs, by agreement or understanding, created a culture that places an emphasis on returning players to the field as soon as possible with little if any consideration for the short or long-term effects such return to play will have on the players' health.   They have done so in part by violating Federal and State laws as detailed herein.

287.    The Clubs have acted on their agreement or understanding through intentional misrepresentations that they have made to players about the Medications and their health as

detailed herein.  Through these intentional misrepresentations, the Clubs have coerced players to return to play far sooner than they should have, to the Clubs' benefit and the players' detriment.

288.   The Clubs' intentional misrepresentations were a cause in fact of the Class Members' damages, injuries and losses, both economic and otherwise, alleged in this Complaint.

289.   The Clubs' intentional misrepresentations proximately caused the Class Members' damages, injuries and losses, both economic and otherwise, alleged in this Complaint, all of which are ongoing and will continue for the foreseeable future.

290.   The Class Members suffered damages and losses factually and proximately caused by their reasonable and justifiable reliance on the Clubs' intentional misrepresentations and omissions about the Medications.

291.   The Clubs are liable to the Class Members for all categories of damages, in the greatest amounts, permissible under applicable law.

## PRAYER FOR RELIEF

292.   WHEREFORE, Plaintiffs pray for judgment as follows:

a.   Granting an injunction and/or other equitable relief against Defendants and in favor of Plaintiffs for medical monitoring;

b.   Awarding Plaintiffs compensatory damages against Defendants;

c.   Awarding Plaintiffs punitive damages against Defendants;

d.   Awarding Plaintiffs such other relief as may be appropriate; and

e.   Granting Plaintiffs their prejudgment interest, costs and attorneys' fees.

Dated:  May 21, 2015                    Respectfully submitted,

_/s/William N. Sinclair_
Steven D. Silverman (Bar No. 22887)
ssilverman@mdattorney.com

Alexander Williams, Jr. (Bar No. 01767)
awilliams@mdattorney.com
Joseph F. Murphy, Jr. (Bar No. 00659)
jmurphy@mdattorney.com
Phillip J. Closius (*Pro Hac Vice* Pending)
pclosius@mdattorney.com
Stephen G. Grygiel (Bar No. 09169)
sgrygiel@mdattorney.com
William N. Sinclair (Bar No. 28833)
bsinclair@mdattorney.com
**SILVERMAN THOMPSON SLUTKIN & WHITE, LLC**
201 N. Charles St., Suite 2600
Baltimore, MD 21201
Tel.:      (410) 385-2225
Fax.:     (410) 547-2432

Stuart A. Davidson (*Pro Hac Vice* Pending)
sdavidson@rgrdlaw.com
Mark J. Dearman (*Pro Hac Vice* Pending)
mdearman@rgrdlaw.com
**ROBBINS GELLER RUDMAN & DOWD LLP**
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel.:      (561) 750-3000
Fax:      (561) 750-3364

Thomas J. Byrne (*Pro Hac Vice* Pending)
tbyrne@nbolaw.com
Mel T. Owens (*Pro Hac Vice* Pending)
mowens@nbolaw.com
**NAMANNY BYRNE AND OWENS**
2 South Pointe Dr., Suite 245
Lake Forest, CA 92630
Tel.:      (949) 452-0700
Fax:      (949) 452-0707

*Attorneys for Plaintiffs*