IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ETOPIA EVANS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ARIZONA CARDINALS FOOTBALL CLUB, LLC, *et al.*, <br><br> Defendants. | No. C 16-01030 WHA <br><br> **ORDER GRANTING IN PART MOTION TO DISMISS** |

### INTRODUCTION

Defendants in this putative class action move to dismiss plaintiffs' amended complaint, which asserts RICO and concealment claims in addition to previously asserted claims for intentional misrepresentation and conspiracy. Defendants' motion is **GRANTED IN PART**.

### STATEMENT

Defendants are the thirty-two member clubs of the National Football League. Plaintiffs are the estate of a former NFL player and twelve retired players. Between them, the thirteen plaintiffs played for all thirty-two defendant clubs (Dkt. No. 136 at 3–12). The following facts are taken from the amended complaint.

Since its inception in the 1920s, the NFL has risen in both popularity and profitability. The clubs' dedication to keeping professional players on the field even when injured or in pain, dubbed "return to play," became a driving force behind this success. According to the amended complaint, "return to play" manifested in several ways. *First*, general managers, coaches, and

media attention allegedly pressured players to return to play as soon as possible despite injury or pain. *Second*, the clubs allegedly pressured players to return to play through non-guaranteed contracts that could be terminated at any time (also known as being "cut") if players failed to perform. *Third*, club doctors and trainers allegedly provided injured players with prescription medications in lieu of adequate rest to return them to play as soon as possible (*id.* at 19).

The provision of prescription medications to injured players headlines as the major component of plaintiffs' case. The amended complaint specifically claims the clubs represented "that their medical professionals prioritize the players' health," and that plaintiffs believed "that doctors . . . and other medical personnel prioritize [their] best interests and would not intentionally advise a procedure or prescribe or distribute a medication that would injure their health" (*id.* at 21). Contrary to these representations, however, club doctors and trainers frequently gave plaintiffs medications without writing prescriptions, revealing the names of the drugs used, informing plaintiffs of "the long-term health effects of taking controlled substances and prescription medications in the amounts given," or counseling plaintiffs that "inadequate rest [would] result in permanent harm to joints and muscles" (*id.* at 20). Nor did they inform plaintiffs of health risks associated with mixing certain medications (also known as "cocktailing"), or with mixing medications with alcohol provided by the clubs (*id.* at 22).

When plaintiffs asked about the side effects of their medications, they were most frequently given responses like "none," "don't worry about them," "not much," "they are good for you," or for injections, "maybe some bruising." Club doctors and trainers also downplayed the seriousness of injuries — *e.g.*, referring to musculoskeletal breaks and tears as "sprains" — to convince plaintiffs to return to play despite said injuries (*id.* at 21–22). Club trainers also routinely gave plaintiffs medications without any physician present. These practices, which consistently subordinated plaintiffs' health to the drive to return to play, have allegedly been ongoing since the 1960s.

The amended complaint further alleges that, at a higher level, the clubs coordinated with each other in a number of ways. *First*, members of each club made up the NFL executive committee, which met on at least an annual basis. General managers, trainers, and doctors also

2

met at regular functions. *Second*, the clubs equally shared revenue from their television deals. *Third*, the clubs jointly mandated certain procedures to control drug storage and distribution, including via the NFL Security Office. The clubs also created the NFL Prescription Drug Advisory Committee to oversee administration of controlled substances and prescription drugs to players (*id.* at 33–37).

The complaint also cites medical sources indicating that musculoskeletal injuries lead to obesity and associated disorders, and that long-term opioid use and non-steroidal anti-inflammatory drugs are associated with a host of adverse health consequences (*id.* at 49–51). The complaint further details how plaintiffs, who used medications during their NFL careers, have suffered and continue to suffer from various health problems (*id.* at 56–70).

According to the amended complaint, the length of an average NFL career is about 3.3 years. Players thus "need to stay as healthy as possible not only to earn as much as they can while they play but to best position themselves for later careers," *e.g.*, in coaching and broadcasting (*id.* at 51, 89).

Plaintiffs filed the instant action on May 21, 2015, in the United States District Court for the District of Maryland asserting claims for intentional misrepresentation and conspiracy. The clubs successfully moved to transfer venue here, and then unsuccessfully moved to dismiss the complaint on preemption and statute of limitations grounds (*see* Dkt. No. 89). A prior order granted plaintiffs leave to file an amended complaint to add RICO and concealment claims, modify the class definition, and change named plaintiffs (*see* Dkt. No. 122).

The clubs now move to dismiss the amended complaint. Their motion both targets the newly added RICO and concealment claims and attacks (again) the previously asserted intentional misrepresentation and conspiracy claims (Dkt. No. 139). Additional allegations in the amended complaint and relevant to this motion are discussed in the following analysis.

**ANALYSIS**

The clubs contend the amended complaint should be dismissed with prejudice because (1) plaintiffs cannot state a RICO claim, (2) plaintiffs' conspiracy claim fails as a matter of law,

3

1  and (3) plaintiffs' intentional misrepresentation and concealment claims are not pled with the
2  requisite particularity (*ibid.*).

**1.   RICO CLAIM.**

To establish a civil RICO claim against a club, plaintiffs must show the club (1) conducted or conspired to conduct (2) an enterprise (3) through a pattern (4) of racketeering activity (known as "predicate acts") (5) causing injury to plaintiffs' "business or property." 18 U.S.C. 1962(c)–(d), 1964(c); *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). The limitations period for civil RICO claims is four years. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). It begins to run when a plaintiff knows or should know of their underlying injury. *Rotella v. Wood*, 528 U.S. 549, 553–55 (2000); *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001).

The amended complaint here alleges that seven of the thirteen plaintiffs in this action — Charles Evans, Chris Goode, Darryl Ashmore, Jerry Wunsch, Alphonso Carreker, Steve Lofton, and Duriel Harris — suffered injuries to business or property (the other six plaintiffs do not assert a RICO claim) (Dkt. No. 136 at 3–9, 51–52). Plaintiffs' theory seems to be that, while players "need to stay as healthy as possible not only to earn as much as they can while they play but to best position themselves for later careers," clubs "have a never-ending supply of players." Thus, the clubs pressured plaintiffs to keep playing with non-guaranteed contracts and the constant threat of being cut, and "conspired to prevent their players from fully healing from their injuries, which would best allow the players to maximize their long-term output, by illegally supplying them with Medications." These actions, plaintiffs claim, "unnecessarily shortened" their NFL careers and diminished their post-NFL prospects (*id.* at 51–52).[1]

Assuming for present purposes that such injuries even qualify as injuries to "business or property" within the meaning of RICO, plaintiffs' claim is plainly barred by the statute of limitations. For civil RICO claims, "discovery of the injury, not discovery of the other elements

---

[1] Ironically, each of the seven RICO plaintiffs enjoyed longer NFL careers than the 3.3-year average alleged in the amended complaint (*see* Dkt. No. 136 at 51). Lofton played from 1993 to 1999; Goode played from 1987 to 1993; Evans played from 1993 to 2000; Wunsch played from 1997 to 2004; Carreker played from 1984 to 1991; Ashmore played from 1993 to 2001; and Harris played from 1976 to 1985 (*id.* at 3–8).

4

1  of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555. Thus, the limitations period
2  begins to run when a plaintiff knows or should know of the injury that underlies their cause of
3  action. This "injury discovery" rule is a "disjunctive two-prong test of actual or constructive
4  notice, under which the statute begins running under either prong." *Pincay*, 238 F.3d at 1109.

5  Turning, first, to plaintiffs' allegations that "their playing careers were unnecessarily
6  shortened," the NFL careers of the seven RICO plaintiffs ended in 1985 (Harris), 1991
7  (Carreker), 1993 (Goode), 1999 (Lofton), 2000 (Evans), 2001 (Ashmore), and 2004 (Wunsch).
8  The last "unnecessarily shortened" NFL career alleged by plaintiffs thus ended over a decade
9  prior to the filing of this action. Plaintiffs' specific allegations — that the clubs pressured them
10 to play and gave them medications to continue playing, that they thus did not fully heal from
11 injuries, and that the toll thereof on their health "shortened" their NFL careers — are all of facts
12 plaintiffs knew or should have known as soon as they occurred. The statute of limitations thus
13 prevents them from asserting a RICO claim over a decade later. *See Rotella*, 528 U.S. at 555;
14 *Pincay*, 238 F.3d at 1109.

15 Similarly, plaintiffs knew or should have known that both shortened NFL careers and
16 career-ending injuries would diminish their post-NFL prospects. This is particularly true since,
17 based on plaintiffs' own allegations, the brevity of NFL careers, the importance of post-NFL
18 career trajectories, and even the widespread practice of substance abuse to the detriment of
19 players' health in the NFL were well-known realities of the profession (*see* Dkt. No. 136 at
20 51–56). When plaintiffs sustained injuries that prematurely ended their NFL careers, they had,
21 at minimum, constructive knowledge of the alleged injury to their post-NFL prospects because
22 they "had enough information to warrant an investigation which, if reasonably diligent, would
23 have led to discovery of the [injury]." *See Pincay*, 238 F.3d at 1110 (also citing *Volk v. D.A.*
24 *Davidson & Co.*, 816 F.2d 1406 (9th Cir. 1987), for the holding that "receiving written
25 disclosure of the possibility of injury was sufficient to put a civil RICO plaintiff on constructive
26 notice of his injury").

27 Plaintiffs cite *Ward v. Chanana*, No. C 07–06290 JW, 2008 WL 5383582 (N.D. Cal.
28 Dec. 23, 2008) (Judge James Ware), for the proposition that the limitations period on their

5

1  RICO claim could not start running until they knew their injuries were caused by the clubs'
2  conduct (Dkt. No. 153 at 4).  In *Ward*, the plaintiff worked for a company based on the
3  defendants' representations that they would sell the company in an initial public offering.  The
4  plaintiff suffered a financial loss when the defendants instead sold the company to another
5  business in 1999, but did not learn until 2006 that the defendants never had any intention of
6  taking the company public in the first place.  *Ward*, 2008 WL 5383582, at *1–2.  Judge Ware
7  cited the legal standards described in *Pincay*, including that a plaintiff's constructive knowledge
8  of their injury suffices to start the limitations period.  *Id.* at *3–4.  He declined, however, to
9  dismiss the complaint in *Ward* as time-barred, reasoning that such dismissal would penalize the
10 plaintiff for failing to "distinguish between financial injury as a result of Defendants'
11 wrongdoing, and financial loss arising out of potentially legitimate business decisions," and
12 that, at the very least, further factual development was required to conclusively determine that
13 the plaintiff's RICO claim was untimely on grounds of constructive notice.  *Id.* at *4.

14        *Ward* is unhelpful to plaintiffs' position for two reasons.  *First*, although plaintiffs allege
15 fraudulent conduct by the clubs within the context of their intentional misrepresentation and
16 concealment claims (discussed below), their RICO claim contains no allegations of any
17 deception comparable to that in *Ward*.  As stated, the clubs' role in plaintiffs' theory of injuries
18 to business or property amounted to (1) pressuring plaintiffs to keep playing and (2) giving
19 them medications so they could do so despite unhealed injuries.  Both types of conduct would
20 have been readily apparent to plaintiffs — who felt the pressure to play, sustained the injuries,
21 and took the medications — as soon as they occurred (*see, e.g.*, Dkt. No. 136 at 19–21).
22 Plaintiffs do not and cannot plausibly allege that the clubs somehow concealed from them the
23 factual linchpins of their alleged injuries to business or property.  Thus, unlike in *Ward*, no
24 further factual development is required here to conclude that plaintiffs' RICO claim is untimely.

25        *Second*, plaintiffs cite *Ward* for its conclusion that, "As a predicate for dismissing
26 Plaintiff's RICO claim on the grounds that Plaintiff had constructive notice of his RICO injury,
27 the Court requires that Plaintiff have had the ability to connect his nominal 'injury' to an actual
28 violation of the RICO statute" (Dkt. No. 153 at 4).  *Ward*, 2008 WL 5383582, at *4.  This

conclusion, however, seems inconsistent with the Supreme Court's instruction in *Rotella* that "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock" for RICO claims. *Rotella*, 528 U.S. at 555. Comparing RICO claims to medical malpractice claims, the *Rotella* decision reiterated:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. . . . We see no good reason for accepting a lesser degree of responsibility on the part of a RICO plaintiff.

*Id.* at 555–56 (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979)). Here, plaintiffs knew or should have known "the critical facts that [they had] been hurt and who [had] inflicted the injury" over a decade prior to this action. The limitations period required nothing more to start running. To the extent that *Ward* held to the contrary, this order declines to follow it.

In short, plaintiffs' suggestion that they could not have known the clubs' alleged conduct shortened their NFL careers and diminished their post-NFL prospects beggars belief. Besides, if such injuries were not reasonably discoverable when plaintiffs' NFL careers ended, then there is no reason why they would have become discoverable only in the four years preceding this action. At best, plaintiffs' position boils down to arguing that the limitations period could not start running until they not only discovered that they had suffered injuries to business or property due to the clubs' alleged conduct, but also stumbled onto a legal theory fitting those facts (*see* Dkt. No. 153 at 7). As such, plaintiffs' argument is rejected as contrary to controlling law. *See Rotella*, 528 U.S. at 555–57.

Plaintiffs contend that, although the last "unnecessarily shortened" NFL career in their ranks ended over a decade prior to this action, subsequent injuries to their business or property accrued more recently. They point to the prior order denying the clubs' first motion to dismiss as proof positive that their post-NFL injuries accrued within four years prior to this action. In

7

1    brief, that order declined to bar plaintiffs' intentional misrepresentation and conspiracy claims
2    as untimely because at least some of the alleged underlying injuries were "latent and slow in
3    developing" and "discovered as recently as 2014" (Dkt. No. 89 at 3, 7). Specifically, the order
4    referred to plaintiffs' allegations that, in 2014, one plaintiff was diagnosed with renal cancer
5    and another underwent surgery to treat back pain (*see* Dkt. No. 1 at 60, 69).

6    Personal injuries, however, are not injuries to "business or property" compensable under
7    RICO. *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc),
8    *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005). Thus, the alleged
9    recently discovered health problems preserved the timeliness of plaintiffs' previously asserted
10   state law claims but cannot similarly salvage plaintiffs' untimely RICO claim. Even if plaintiffs
11   suggest they recently lost employment opportunities or earning capacity wholly as a result of
12   recently discovered health problems, such losses, while economic, nonetheless derive from
13   fundamentally personal injuries and thus cannot give rise to a RICO claim. *Oscar*, 965 F.2d at
14   787–88; *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990).

15   Plaintiffs also argue that the limitations period for their RICO claim should be tolled
16   because the clubs fraudulently concealed information that plaintiffs needed in order to discover,
17   through reasonable diligence, "that their careers ended prematurely as a result of Defendants'
18   tortious conduct" (Dkt. No. 153 at 6). Specifically, plaintiffs contend their "lack of knowledge
19   of their claims is primarily, if not solely, traceable to the efforts by Defendants to conceal the
20   risks of Medications provided," as well as "the names of the Medications" and "instructions as
21   to their use" (*id.* at 6–7). But such efforts would not have obscured the specific facts underlying
22   plaintiffs' RICO theory that the clubs' conduct shortened their NFL careers and diminished
23   their post-NFL prospects. The amended complaint does not explain how, for example,
24   concealment of a medication's side effects could possibly prevent a player from knowing that
25   their club was pressuring them to play and giving them medications to do so.[2]

---

[2] The *Pincay* decision also concluded that plaintiffs who "had constructive notice of their injuries" so as to trigger the statute of limitations could not claim that fraudulent concealment tolled the limitations period because, "in order to prevail on such a claim, plaintiffs 'must demonstrate that they had *neither actual nor constructive notice* of the facts constituting their claims for relief." *Pincay*, 238 F.3d at 1110 (emphasis in

8

Moreover, to toll the limitations period on the basis of fraudulent concealment, plaintiffs must establish "affirmative conduct upon the part of the [clubs] which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Pincay*, 238 F.3d at 1110 (quoting *Volk*, 816 F.2d at 1415). Additionally, plaintiffs "must plead with particularity the facts giving rise to the fraudulent concealment claim and must establish that they used due diligence in trying to uncover the facts." *Volk*, 816 F.2d at 1415–16. The amended complaint satisfies none of these requirements as to plaintiffs' RICO claim.

Finally, plaintiffs argue that damages stemming from alleged injuries to their business or property were too speculative for said injuries to accrue until the four years preceding this action (Dkt. No. 153 at 8–9). Thus, they contend, the statute of limitations should not bar their RICO claim. Plaintiffs cite *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339 (1971), wherein the Supreme Court concluded:

> In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.

The amended complaint, however, does not allege that any damages from plaintiffs' diminished post-NFL prospects materialized *only* in the four years preceding this action. There is thus no basis for concluding that damages too speculative to support a RICO claim when plaintiffs' NFL careers ended are no longer so now.

---

original). So too here. This order detects, however, difficulty in reconciling the foregoing conclusion in *Pincay* with the "injury discovery" rule and the recognition that, "Although fraudulent concealment may *toll* the statute of limitations . . . that does not settle the question of when the statute of limitations *began to run*. The two questions are analytically distinct." *Id.* at 1109 (emphasis in original). Under *Pincay*, it is hard to imagine how any plaintiff with actual or constructive notice of their injuries, such that the limitations period began to run on their claims, could successfully urge tolling on the basis of fraudulent concealment. Perhaps a more sensible coordination of the "injury discovery" rule and equitable tolling is that the latter "may be one answer" where a plaintiff discovers their injury and triggers the statute of limitations, but cannot bring their claim within the limitations period because the RICO *pattern* at issue involves fraud and "remains obscure in the face of [the] plaintiff's diligence in seeking to identify it." *Rotella*, 528 U.S. at 560–61. But either way, the amended complaint here fails to warrant tolling on the basis of fraudulent concealment, as this order explains next.

9

In short, the amended complaint shows plaintiffs' RICO claim is barred by the statute of limitations. This order therefore does not reach additional arguments regarding the sufficiency of the pleading as to this claim, except that the amended complaint's failure to plead allegations showing a conspiracy is addressed below within the context of plaintiffs' conspiracy claim.

**2.  STATE LAW CLAIMS.**

The amended complaint also asserts state law claims for intentional misrepresentation, concealment, and conspiracy. The clubs contend plaintiffs' intentional misrepresentation and concealment claims are not pled with the requisite particularity, and move to dismiss plaintiffs' conspiracy claim for (1) lack of a predicate claim and (2) failure to plead a conspiracy (Dkt. No. 139 at 14–21). Plaintiffs respond that the clubs should be barred from seeking dismissal of the intentional misrepresentation and conspiracy claims because the previous motion to dismiss already unsuccessfully challenged those same claims, albeit only on preemption and statute of limitations grounds (Dkt. No. 153 at 22–24).

Federal Rule of Civil Procedure 12(g)(2) "technically prohibits successive motions to dismiss that raise arguments that could have been made in a prior motion," but "courts faced with a successive motion often exercise their discretion to consider the new arguments in the interests of judicial economy." *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. C 10–05696 CRB, 2011 WL 2690437, at *2 n.1 (N.D. Cal. July 8, 2011) (Judge Charles Breyer); *see also In re Apple Iphone Antitrust Litig.*, No. 14-15000, 2017 WL 117153, at *4–5 (9th Cir. 2017). Here, there is no indication that the clubs' new arguments against plaintiffs' state law claims were interposed for delay, and resolving such arguments now will expedite disposition of the case. This order therefore reaches the merits of the arguments as to plaintiffs' state law claims. *See In re Apple*, 2017 WL 117153, at *4–5.

The parties debate whether Maryland or California law applies to plaintiffs' state law claims, but agree that the substantive elements of the claims are essentially the same either way. They even agree that the specific elements in dispute for purposes of the instant motion are deceit, reliance, and proximate causation (Dkt. Nos. 139 at 16; 153 at 22, 24–25; 158 at 10). If this case ever reaches the Rule 23 stage, the potential multiplicity of governing law for thirty-

two defendant clubs will raise significant questions as to which states' laws govern claims for each club (for example, should a player in New York or Illinois be relegated to the laws of California or Maryland?). At this stage, however, this case is not a class action and this order does not need to resolve such questions to decide whether the amended complaint adequately pleads the elements in question with the requisite particularity.

### 1. Intentional Misrepresentation and Concealment.

The parties agree that plaintiffs' conspiracy claim survives only if a predicate claim survives (Dkt. Nos. 139 at 15, 153 at 28). The parties also agree that the potential predicate claims — intentional misrepresentation and concealment — are both grounded in fraud, so the amended complaint must satisfy the heightened pleading requirements of Rule 9(b) as to those claims. Rule 9(b) provides, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Such averments of fraud must be accompanied by "the who, what, when, where, and how" of the alleged misconduct. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). This order therefore considers whether the amended complaint sufficiently alleges deceit, reliance, and proximate causation to support its intentional misrepresentation and concealment claims.

The clubs' briefs seem to construe plaintiffs' theory as focusing narrowly on the transactions whereby club personnel provided players with medications. Based on this interpretation, the clubs argue that the amended complaint does not specifically allege how (1) any statements or omissions made by club personnel about the drugs used were false (*e.g.*, Dkt. No. 139 at 17); (2) any disclosures regarding the risks or side effects of the drugs used would have altered plaintiffs' decision to take such drugs (*id.* at 18–21); or (3) any concealed side effects of the drugs used caused plaintiffs' alleged injuries (*id.* at 21).

Two facets of plaintiffs' theory underlying their intentional misrepresentation and concealment claims, however, merit further discussion. *First*, plaintiffs' counsel at oral argument defined the alleged "misrepresentation" as failing to inform players that club trainers violated the Controlled Substances Act by giving them medications. Even assuming counsel is correct as to that legal conclusion, however, his suggestion that plaintiffs suffered all their

11

alleged injuries because no one told them their trainers were technically violating the CSA strains credulity. It is also unsupported by the amended complaint, which alleges in support of plaintiffs' RICO claim that the clubs violated the CSA but does not specifically mention any omission of trainers' technical violations of the CSA within the context of plaintiffs' intentional misrepresentation or concealment claims (*see* Dkt. No. 136 at 89–98).

*Second*, the amended complaint can also be construed as alleging intentional misrepresentation and concealment beyond the medical risks, side effects, and proper usage of medications. Specifically, the amended complaint alleges the clubs represented they cared about and prioritized players' health and safety but, in various ways, drove players to return to play at the cost of their health or safety. For example, "The Clubs continuously and systematically misrepresented to [plaintiffs] the dangers of playing while the pain of injuries was masked by the Medications, including the risk of further and permanent damage to affected body parts" (Dkt. No. 136 at 90). Plaintiffs were "not counseled that inadequate rest will result in permanent harm to joints and muscles" (*id.* at 20). Doctors and trainers downplayed the seriousness of plaintiffs' injuries to "get [them] to return to play sooner" (*id.* at 22). And club personnel did not inform players about the drugs used, including potential contraindications or adverse consequences of usage (*e.g.*, *id.* at 94–95), because the players would otherwise not have used the offered medications the way they did (*id.* at 91, 96).

In support of this subtler theory of intentional misrepresentation and concealment, the amended complaint pleads the following supporting allegations with particularity:

- The NFL Physicians Society, which began in 1966 and includes doctors from all thirty-two clubs among its members, states its mission is "to provide excellence in the medical and surgical care of the athletes in the NFL and to provide direction and support for the athletic trainers in charge of the care of these athletes." The NFLPS website, cited in the amended complaint, describes annual meetings where club doctors address "key issues common to the membership" like "protecting players' health and safety" and "sharing best practices." The "essential goals of the NFLPS"

12

1       are to "continue improving the care of professional football players and to
2       prevent and treat injuries" (*id.* at 15–16).
3   •   The website of the Professional Football Athletic Trainers Society (which
4       began in the mid-1960s as the NFL Athletic Trainers Society), also cited
5       in the amended complaint, states the PFATS "represent[s] the athletic
6       trainers of the [NFL]," and its "purpose is to insure [*sic*] the highest
7       quality of health care is provided to the [NFL]" (*id.* at 15–16).
8   •   Within the NFL there is an "atmosphere of trust inherent in locker rooms,
9       in which players become friendly with their Clubs' medical and training
10      staffs" (*id.* at 90, 95).
11  •   Players "reasonably believed the Clubs were taking their best interests into
12      consideration when they provided and administered Medications," and
13      "would not . . . injure [them] and put them at risk of substantial and
14      continuing future injuries" (*id.* at 91, 95).
15  •   As a result of the clubs' misrepresentations and omissions, "Plaintiffs . . .
16      ingested vast amounts of Medications during their NFL careers that they
17      otherwise would not have" (*id.* at 91, 96).

18  The foregoing allegations indicate (1) the thirty-two clubs represented that they care about and
19  prioritize players' health and safety, and (2) plaintiffs believed such representations.

20      The clubs reply that plaintiffs took medications to return to play simply "because they
21  felt extreme pressure [from] fear of losing their jobs" (Dkt. No. 139 at 19). Thus, the clubs
22  argue, plaintiffs did not rely on any alleged misrepresentation by the clubs in doing so. This
23  reasoning is dubious since, insofar as players were motivated by the desire to keep their jobs,
24  they would presumably avoid playing with injuries masked by drugs if they knew that they
25  risked sustaining *career-ending* injuries by doing so. And, in any case, a player's fear of being
26  cut would not categorically rule out a further belief that, when push came to shove, their clubs,
27  doctors and trainers would not "put them at risk of substantial and continuing future injuries"
28  (*see, e.g.*, Dkt. No. 136 at 91).

13

The next question, then, is whether any clubs acted contrary to their representations by driving players to return to play at the cost of their health or safety. The amended complaint pleads the following supporting allegations with particularity:

- In 1994, while playing for the Detroit Lions, plaintiff Robert Massey hurt his right ankle during a game against the Atlanta Falcons. He finished playing the game after the club doctor injected him with Toradol, a non-steroidal anti-inflammatory drug. Afterwards, head coach Wayne Fonts saw Massey's swollen ankle in the training room and said "you know we didn't pay you that kind of money to miss games." Before the Lions' next game against the Minnesota Vikings, a club trainer gave Massey Indocin, another non-steroidal anti-inflammatory drug, and told him the pills would "help his ankle." The club doctor also gave Massey another Toradol shot and wrapped his ankle. Massey played that game and the rest of the season with a swollen ankle. He now lives in constant pain from, among other things, his ankles (*id.* at 57–58).
- In 1998, while playing for the Oakland Raiders, plaintiff Darryl Ashmore hurt his wrist during practice. With an important game against the Seattle Seahawks approaching, the club doctor, Warren King, told Ashmore "that the injury was only a sprain and that he would be fine with painkillers and anti-inflammatories." Ashmore played the game. The next morning, Dr. King told him his wrist was broken. Ashmore played the rest of the season with a wrist cast, painkillers, and anti-inflammatory drugs. His wrist is now permanently damaged (*id.* at 60).
- While playing for the Green Bay Packers and the Denver Broncos from 1984 to 1991, plaintiff Alphonso Carreker regularly consumed "enormous quantities" of anti-inflammatory drugs, which trainers for "each Club for whom he played" made readily available and "frequently volunteered." In 2013, Carreker underwent heart surgery to drain inflammation from an

14

infection in his heart after anti-inflammatory drugs proved "ineffective due to the resistance he had built up to such drugs . . . during his playing career" (*id.* at 61–62).

- In 2003, plaintiff Jerry Wunsch played for the Seahawks. Before a game against the Baltimore Ravens, a coach named Holmgren approached him and asked if he could play. Wunsch replied "I do not think so." Holmgren asked the club trainer, Sam Ramsden, "what can we do to help Mr. Wunsch play today?" Ramsden summoned club doctors who gave Wunsch Vicodin and Tylenol-Codeine #3 to take on top of the Indocin he was already taking. Around halftime, Wunsch "told anyone who would listen that he could not play anymore," and Ramsden gave him more Vicodin so he could continue for the second half of the game. Wunsch now suffers from a host of medical problems, including constant joint and nerve pain (*id.* at 63).

- In 1976, while playing for the Miami Dolphins, plaintiff Duriel Harris sprained ligaments in his ankle during a game against the Buffalo Bills. The following week, before a game against the Vikings, "Harris limped on to the field for pre-game warmups, not expecting to play." Two coaches, Don Shula and Howard Shellenberger, approached him and said "We need you — you need to play. We've talked to the doctors and they will give you a shot and you can play." Harris "was afraid he would be cut if he objected." He got a cortisone injection from the club doctor in the training room and played the game. Afterwards, his ankle "ballooned up" and prevented him from running or working out for approximately six months. Now, Harris is in "constant pain from all of his joints," including from "football injuries in his . . . ankles" (*id.* at 66–67).

- In 2000, while playing for the San Diego Chargers, plaintiff Jeffrey Graham played all but "one or two games" of the season with a broken

15

transverse process in his back while managing the pain with medications from club doctors and trainers. He "now lives in constant pain," which he believes "is completely attributable to various injuries suffered during his NFL career" that were "masked" by "painkiller injections" and "numerous drugs" (*id.* at 67–68).

- In 2003, while playing for the Vikings, plaintiff Cedric Killings sprained his right ankle during practice. The next morning, head coach Mike Tice said he "would be released from the Club" if he was not able to practice that day. Killings "wanted to keep his job" and "took [medications] given by the Club to ensure that he could practice in spite of the pain in his right ankle." He now "has constant pain in his . . . ankles," among various other health problems (*id.* at 69).

- In 2014, while playing for the Chargers, plaintiff Reggie Walker sprained his ankle during a game against the Bills. Following that injury, the club doctor gave him Toradol injections for every game until he retired from the NFL. Since retiring, Walker "often experiences pain in his ankles," among various other health problems (*ibid.*).

The foregoing specific allegations indicate that the Lions, Raiders, Broncos, Packers, Seahawks, Dolphins, Chargers, and Vikings drove certain plaintiffs to return to play at the cost of their health or safety, contrary to the clubs' representations that they would prioritize the latter. The amended complaint therefore pleads claims of intentional misrepresentation and concealment as to those specific clubs and plaintiffs with particularity.

As to the other clubs, however, the amended complaint contains only general or conclusory allegations, or allegations insufficient to plead intentional misrepresentation or concealment under any theory with the particularity required by Rule 9(b). For example, the amended complaint alleges that, "At one point, Mr. Wunsch was shot up with [Hyalgan] in his ankle, instead of being rested, and was told that the [Hyalgan] would act like oil to lubricate his gears because it was bone on bone in his ankle." The amended complaint does not even attempt

16

to identify when or where this happened, or who gave Wunsch Hyalgan instead of resting him (*see id.* at 62). As another example, the amended complaint alleges that, "While playing in the NFL, Eric King received hundreds of pills from trainers and injections from doctors" to "numb the pain and play." The amended complaint fails to specify what injuries King sustained, when in King's NFL career this happened, or which club was responsible (*see id.* at 64).

Plaintiffs' counsel further demonstrated the amended complaint's shortcomings during oral argument, when the Court asked him to identify where the amended complaint pleads specific allegations sufficient to state a claim for intentional misrepresentation or concealment against the Chicago Bears. Counsel was unable to point to any allegations supporting either claim *specifically* as to the Bears, and ultimately fell back on the single allegation that the Bears' "[t]rainers provided Mr. Graham with Ambien in St. Louis" (Dkt. No. 136 at 81). Cue the argument, rejected above, that trainers handing out medications violated the CSA and that alleging facts showing this technical violation, without more, adequately pleads claims for intentional misrepresentation and concealment under Rule 9(b).

The foregoing examples are non-exhaustive and provided for illustrative purposes only. It would be redundant and unnecessary to discuss the amended complaint's shortcomings as to every defendant club except for the Lions, Raiders, Broncos, Packers, Seahawks, Dolphins, Chargers, and Vikings. The point is that, as to other defendant clubs, the amended complaint fails to allege facts supporting plaintiffs' intentional misrepresentation and concealment claims with the particularity required by Rule 9(b). We must remember that a defendant club should only have to defend against claims pled properly against it. That the amended complaint is adequate as to some clubs does not somehow make it adequate as to all clubs.

**2. Conspiracy.**

Counsel for both sides have punted the question of which state's law applies to plaintiffs' conspiracy claim. This order may punt as well, because the amended complaint fails to allege a conspiracy under any applicable law. No factual, non-conclusory allegations in the amended complaint show any agreement or understanding between the clubs to adhere to a return-to-play practice or policy. At best, the amended complaint alleges the NFL has a return-

17

1    to-play *culture* driving individuals across the board — including trainers, doctors, and the
2    players themselves — to prioritize game performance over players' health.  Tellingly, "return to
3    play culture" was precisely the phrase used over and again in plaintiffs' original complaint (*see*
4    Dkt. No. 1 at 9, 31–36, 40, 83).  This phrase transmogrified in the amended complaint into a
5    "return to play practice or policy" (*see* Dkt. No. 136 at 1, 16–17, 20–21, 35, 74, 79, 99),
6    ostensibly to support plaintiffs' new RICO claim.  Yet even the amended complaint
7    occasionally lapses into its true meaning, describing the problem in the NFL as a permeative
8    "business culture" rather than a practice, policy, or conspiracy (*see, e.g.*, *id.* at 19–20).

9    Looking at the amended complaint as a whole, plaintiffs' extensive allegations warrant
10   no inference of any conspiracy but remain entirely consistent with a standalone team-by-team
11   return-to-play *culture* consistent with a non-collusive yet burning desire by each team to win
12   and attract audiences by keeping their best players, even when injured, on the field.  For
13   example, the amended complaint alleges the return-to-play "practice or policy" arose out of the
14   need to boost game attendance and television ratings by keeping the best players on the field
15   (*id.* at 1).  The clubs' "business plan" implementing return-to-play evolved from each club's
16   "financial interest in returning players to the game as soon as possible" because "[e]veryone's
17   job and salary" depended on it (*id.* at 16).  Return-to-play "became an accepted fact of doing
18   business . . . as profits soared" (*id.* at 17).  To maintain return-to-play, the clubs then engaged in
19   the conduct alleged in the amended complaint until "[t]hat culture . . . so permeated the NFL . . .
20   it is almost unshakeable" (*id.* at 20).  Nothing in this narrative of simple self-interest and
21   competition alleges or even suggests that individual clubs ever had — or needed — any
22   meeting, communication, agreement, or collusion with each other to keep injured players on the
23   field at the cost of their health or safety.

24   Plaintiffs, citing Maryland law, claim they adequately alleged the elements of a
25   conspiracy by pleading that "Defendants Comprise the [NFL]," which constitutes "a
26   confederation of two or more persons by agreement" (Dkt. No. 153 at 29).  *See Lloyd v. Gen.*
27   *Motors Corp.*, 916 A.2d 257, 284 (Md. 2007).  This reasoning is flawed because it divorces the
28   element of "agreement or understanding" from the purported underlying conspiracy.  To be

18

clear, the "conspiracy" plaintiffs need to prove up is not merely that the clubs collectively make up the NFL. Agreeing to form the NFL does not translate to further agreeing to subordinate plaintiffs' health and safety to returning them to play at all costs. The amended complaint contains no well-pled allegations of any conspiracy between clubs regarding the latter.

\*          \*          \*

The clubs urge dismissal of all class allegations in the amended complaint on the basis that it asserts only the RICO claim on behalf of a putative class (*see* Dkt. No. 136 at 2). Other portions of the amended complaint describing plaintiffs' state law claims, however, expressly refer to "Class Members" as the victims of the clubs' alleged misconduct (*see id.* at 89–99). This order construes this apparent conflict between different parts of the amended complaint — which seems to be a problem of inartful pleading — in favor of preserving the substantive allegations asserting state law claims on behalf of a putative class.

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss the amended complaint is **GRANTED** as to the RICO and conspiracy claims. Leave to amend the RICO claim is denied as futile because plaintiffs have already had ample opportunity to investigate and plead a timely claim under RICO. If, as discovery proceeds in this matter, evidence surfaces indicating the existence of a conspiracy, or indicating that some clubs lied to plaintiffs, then the Court will at least consider allowing plaintiffs to amend their complaint to re-add a conspiracy claim. Otherwise, generous opportunity to shore up the complaint having already been given, further leave to amend is not warranted as to this claim.

Defendants' motion to dismiss the amended complaint is **DENIED** as to the intentional misrepresentation and concealment claims against the Lions, Raiders, Broncos, Packers, Seahawks, Dolphins, Chargers, and Vikings, but **GRANTED** as to all other defendant clubs. Leave to amend is granted for plaintiffs to plead their best case as to their intentional misrepresentation and concealment claims, and to clarify which claims are asserted on behalf of a putative class. To be clear, this will be plaintiffs' last opportunity to amend, so they should plead their best case in all respects — not just in response to issues addressed in this order.

19

During oral argument, plaintiffs' counsel represented that, given the substantial amount of discovery plaintiffs have now taken, they "can amend [the complaint] to any degree of particularity [the Court] want[s] at this point." This order takes counsel at his word.

As with the denial of the clubs' prior motion to dismiss, the partial denial of the instant motion is without prejudice to later proof that the statute of limitations bars some or all of plaintiffs' surviving claims. Plaintiffs shall file their second amended complaint by **FEBRUARY 22**. Defendants shall file any motion to dismiss the second amended complaint by **MARCH 15**. The deadline for plaintiffs to file their class certification motion, to be heard on a 49-day briefing schedule, is continued from February 23 to **MAY 18**.

**IT IS SO ORDERED.**

Dated: February 3, 2017.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE