1  William N. Sinclair (SBN 222502)
   (bsinclair@mdattorney.com)
2  Steven D. Silverman (Admitted *Pro Hac Vice*)
   (ssilverman@mdattorney.com)
3  Stephen G. Grygiel
   (sgrygiel@ mdattorney.com)
4  Phillip J. Closius (Admitted *Pro Hac Vice*)
   (pclosius@ mdattorney.com)
5  Alexander Williams (Admitted *Pro Hac Vice*)
   awilliams@mdattorney.com
6  **SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC**
7  201 N. Charles Street, Suite 2600
   Baltimore, MD  21201
   Telephone:  (410) 385-2225
8  Facsimile:  (410) 547-2432

   Stuart A. Davidson (Admitted *Pro Hac Vice*)
   (sdavidson@rgrdlaw.com)
   Mark J. Dearman (Admitted *Pro Hac Vice*)
   (mdearman@rgrdlaw.com)
9  Thomas J. Byrne (SBN 179984)
   (tbyrne@nbolaw.com
10 Mel T. Owens (SBN 226146)
   (mowens@nbolaw.com)
   Janine D. Arno (Admitted *Pro Hac Vice*)
   (jarno@rgrdlaw.com)
   **ROBBINS GELLER RUDMAN**
11 **NAMANNY BYRNE & OWENS, P.C.**
   2 South Pointe Drive, Suite 245
     **& DOWD LLP**
   120 East Palmetto Park Road, Suite 500
12 Lake Forest, CA  92630
   Telephone:  (949) 452-0700
   Boca Raton, FL  33432
   Telephone:  (561) 750-3000
13 Facsimile:  (949) 452-0707
   Facsimile:  (561) 750-3364

14  Attorneys for Plaintiffs

15  [Additional counsel appear on signature page.]

16              UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18                SAN FRANCISCO DIVISION

19  ETOPIA EVANS, as the Representative of the  )   Case No. 3:16-cv-01030-WHA
    Estate of Charles Evans, et al.,            )
20                                              )   PLANTIFFS' SECOND AMENDED
                                                )   COMPLAINT
21                           Plaintiffs,        )
                                                )
22          vs.                                 )   REDACTED VERSION OF DOCUMENT
                                                )   SOUGHT TO BE SEALED
23  ARIZONA CARDINALS FOOTBALL CLUB,)
    LLC, et al.,                                )
24                                              )
                             Defendants.        )
25  _____ )

26

27

28

Plaintiffs, by and through undersigned counsel, file this Second Amended Complaint and in support thereof allege as follows:

## NATURE OF THE ACTION

1.    Plaintiffs bring this action for redress of injuries resulting from a conspiracy perpetrated by the 32 defendant clubs ("Clubs" or "Defendants") that comprise the National Football League ("NFL" or "League").  The allegations herein are supported by some of the hundreds of thousands of pages of documents that Defendants and third parties have produced and by testimony from Bud Carpenter (Bills' trainer); Lawrence Brown (NFL medical advisor on prescription drugs since the early 1990s); David Chao (Chargers' doctor); Gerald Kuykendall (Dolphins' doctor); John Marzo (Bills' doctor); Matthew Matava (Rams' doctor); David Olson (Vikings' doctor); Elliott Pellman (Jets' doctor and NFL medical advisor); Arthur Rettig (Colts' doctor); Andrew Tucker (Colts' doctor); and Anthony Yates (Steelers' doctor).

2.    The conspiracy is perhaps best exemplified by a single-page document prepared in 2014 by Dr. Thomas McClellan, an associate of Dr. Brown, titled ███████████████████ ████████████████████████████████████████████████████ ██████████████████████████████.  The document was produced by Dr. Brown during discovery in this matter.

3.    In the ██████████████, Dr. McClellan identifies three issues, each of which have several sub-points.  The first issue is "██████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

1

2

3

4

       4.      Plaintiffs made similar allegations in their Complaint:

Beginning in the 1960s, professional football began to rival baseball as the country's national sport. Football is far-better suited for television – a veritable match made in heaven. And once the profits flowed from television, the Clubs began to realize the seemingly limitless revenues they could achieve. At the same time, the individuals running the Clubs began to realize the necessity of keeping their best players on the field to ensure not only attendance at games but also the best possible TV ratings. That realization resulted in the creation of a return to play practice or policy by the Clubs that prioritized profit over players' health and safety. Given the injuries inherent in the game, concern for the players' health should include giving them adequate rest, having fewer games, and keeping more players on the roster. But all of that would cut into profit. So the Clubs chose a different method to keep their players on the field.

*Etopia Evans, et al. v. Arizona Cardinals Football Club, LLC*, 3:16-cv-02324 (N.D. Cal. 2014), Dckt. # 1, ¶¶ 2 – 4.

      5.      The next issue Dr. McClellan addresses is

1  ███████████████████████████████████████████████

2  ███████████████████████████████████████████████

3  ███████████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ████████████████████████████[1]

6      6.       Cue the Complaint:

As far back as the mid-1960s, Club doctors and trainers were providing players with controlled substances and prescription and non-prescription pain killers, anti-inflammatories, and sleep aids ("Medications") to get them back in the game as soon as possible, despite being injured, and keep them there.   Though the Medications have changed over the ensuing decades, the manner in which they have been distributed has not.  Players from around the country describe the same thing – Club doctors and trainers providing injections or pills, not telling the players what they were receiving, misstating the effects of the Medications (if they addressed the effects at all), and not talking about the need for informed consent or the long-term effects of what they were taking.   These doctors and trainers dispensed the Medications to their football patients in an amount and manner they would never do with their non-football patients.

*Id.*, ¶¶ 5 – 6.

---

    [1] Plaintiffs anticipate that Defendants will argue that the foregoing passage indicates that the ████████████████████████████████████.  Of course, until Dr. McClellan is deposed, we will not know exactly what it means.  But even if Dr. McClellan did mean that ████████████████

███████████████████████████████████████████████
█████████████████████████████████.

1    7.    Dr. McClellan's final issue is ███████████████████████

2    █████████████████████████████████████████████████████

3    █████████████████████████████████████████████████████

4    █████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████

6    █████████████████████████████████████████████████████

7    █████████████████████████████████████████████████████

8    █████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████

10   █████████████████████████████████████████████████████

11   █████████████████████████████████████████████████████

12   █████████████████████████████████████████████████████

13   █████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████

17   ████████████████████████

18   8.    Plaintiffs agree, and commit now (they would contend they have already done so)

19   to working with the Clubs on this problem.  In any event, this should be considered a standing

20   invitation to do so.

21   9.    But until Plaintiffs get that call, all they can do (if they are to do anything at all) is

22   proceed with their well-pled allegations that Defendants' actions violate the Controlled Substances

23   Act ("CSA") and/or Food Drug & Cosmetic Act ("FDCA") (which is incorporated to some degree

24   by the CSA), their implementing regulations, and analogous state laws and that their omissions

25   and concealment as detailed herein harmed Plaintiffs and the proposed class.

26

27

28

10.     It is illegal to distribute controlled substances and medications requiring prescriptions in the manner and at the locations described herein.  These illegal acts, and the omissions associated with them and described herein, have taken place on every Club since at least the mid-1960s and the named Plaintiffs, as a group, have played for every Club in the NFL from 1976 to 2014.

11.     All of the named Plaintiffs bring intentional misrepresentation and concealment claims against all Defendants based on their behavior as described herein.

### JURISDICTION AND VENUE

12.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the proposed class consists of more than one hundred persons, the overall amount in controversy exceeds $5,000,000 exclusive of interest, costs, and attorney's fees, and at least one Plaintiff is a citizen of a State different from one Defendant.  The claims can be tried jointly in that they involve common questions of law and fact that predominate over individual issues.

13.     This action was originally filed in the United States District Court for the District of Maryland and transferred to this Court upon Defendants' motion.  Defendants thus waive any argument that this Court does not have personal jurisdiction over them.  In any event, the Court does have personal jurisdiction over Defendants because they do business in this District, derive substantial revenue from their contacts with this District, and because two of the Defendants, the Oakland Raiders, LLP and the Forty Niners Football Company, LLC, operate within this District, where each other Defendant has played at least once.

14.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are entities with the capacity to sue and be sued and reside, as that term is defined at 28 U.S.C. §§ 1391(c)(2) and (d), in this District.

**THE PARTIES**

I.    **PLAINTIFFS DID NOT LEARN OF THE CAUSE OF THEIR INJURIES UNTIL WITHIN THE APPLICABLE STATUTES OF LIMITATIONS.**

15.    Plaintiffs suffer from two discrete sets of injuries directly caused by Defendants' omissions and concealment: (1) internal organ injuries; and (2) muscular/skeletal injuries exacerbated by the Clubs' administration of Medications to keep players on the field or in practice.

16.    Plaintiff Etopia Evans is the widow, and Personal Representative of the Estate, of Charles Evans, a representative member of the putative class.  As of the commencement of this action, Ms. Evans is a resident of Louisiana.  Mr. Evans died while a resident of the State of Maryland.  Mr. Evans played 107 games as a fullback for the Minnesota Vikings from 1993 – 1998 and the Baltimore Ravens from 1999 – 2000.

17.    Based on the information currently available to Ms. Evans – which is limited because: (a) she does not know all of the Medications that Defendants provided Mr. Evans, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects and Plaintiffs are still in the process of reviewing that information – she is aware that her husband suffered from damage to internal organs and the muscular/skeletal injuries discussed above.  Ms. Evans did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.  Mr. Evans was not aware that Defendants caused those injuries at the time of his death.

18.    Plaintiff Eric King is a representative member of the putative class.  As of the commencement of this action, he is a resident of California.  Mr. King played 63 games as a defensive back for the Buffalo Bills in 2005; the Tennessee Titans from 2006 – 2008; the Detroit Lions from 2009 – 2010; and the Cleveland Browns in 2010.

19.    Based on the information currently available to Mr. King – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the

1  Defendants possess most, if not all, of the information related to dosage units, frequencies and

2  durations of administrations and correlated, documented side effects and Plaintiffs are still in the

3  process of reviewing that information – at this time, the only injuries of which he is aware are the

4  muscular/skeletal injuries discussed above.  Mr. King did not become aware that Defendants

5  caused those injuries until, at the earliest, March of 2014.

6

7          20.     Plaintiff Robert Massey is a representative member of the putative class.  As of the

8  commencement of this action, he is a resident of North Carolina.  Mr. Massey played 140 games

9  as a defensive back for the New Orleans Saints from 1989 – 1990; the Phoenix Cardinals from

10 1991 – 1993; the Detroit Lions from 1994 – 1995; the Jacksonville Jaguars in 1996; and the New

11 York Giants in 1997.  He was selected to the Pro Bowl in 1992.

12

13         21.     Based on the information currently available to Mr. Massey – which is greatly

14 limited because: (a) he does not know all of the Medications that Defendants provided him, and

15 (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies

16 and durations of administrations and correlated, documented side effects and Plaintiffs are still in

17 the process of reviewing that information – at this time, the only injuries of which he is aware are

18 kidney damage and the muscular/skeletal injuries discussed above.  Mr. Massey did not become

19 aware that Defendants caused those injuries until, at the earliest, March of 2014.

20

21         22.     Plaintiff Troy Sadowski is a representative member of the putative class.  As of the

22 commencement of this action, he is a resident of Georgia.  Mr. Sadowski played 104 games as a

23 tight end for the Atlanta Falcons in 1990; the Kansas City Chiefs in 1991; the New York Jets from

24 1992 – 1993; the Cincinnati Bengals from 1994 – 1996; the Pittsburgh Steelers from 1997 – 1998;

25 and the Jacksonville Jaguars in 1998.

26         23.     Based on the information currently available to Mr. Sadowski – which is greatly

27 limited because: (a) he does not know all of the Medications that Defendants provided him, and

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                        - 7 -

(b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects and Plaintiffs are still in the process of reviewing that information – at this time, the injuries of which he is aware are the muscular/skeletal injuries discussed above.  Mr. Sadowski did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

24.     Plaintiff Chris Goode is a representative member of the putative class.  As of the commencement of this action, he is a resident of Alabama.  Mr. Goode played 97 games as a defensive back for the Indianapolis Colts from 1987 – 1993.

25.     Based on the information currently available to Mr. Goode – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects and Plaintiffs are still in the process of reviewing that information – at this time, the injuries of which he is aware are damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Goode did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

26.     Plaintiff Darryl Ashmore is a representative member of the putative class.  As of the commencement of this action, he is a resident of Florida.  Mr. Ashmore played 123 games as an offensive lineman for the Los Angeles and St. Louis Rams from 1993 – 1996; the Washington Redskins from 1996 – 1997; and the Oakland Raiders from 1998 – 2001.

27.     Based on the information currently available to Mr. Ashmore – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects and Plaintiffs are still in the process of reviewing that information – at this time, the injuries of which he is aware are

1   damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Ashmore did

2   not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

3       28.     Plaintiff Jerry Wunsch is a representative member of the putative class.  As of the

4   commencement of this action, he is a resident of Florida.  Mr. Wunsch played 120 games as an

5   offensive lineman for the Tampa Bay Buccaneers from 1997 – 2001 and the Seattle Seahawks

6   from 2002 – 2004.

7

8       29.     Based on the information currently available to Mr. Wunsch – which is greatly

9   limited because: (a) he does not know all of the Medications that Defendants provided him, and

10  (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies

11  and durations of administrations and correlated, documented side effects and Plaintiffs are still in

12  the process of reviewing that information – at this time, the injuries of which he is aware are

13  damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Wunsch did

14  not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

15

16      30.     Plaintiff Alphonso Carreker is a representative member of the putative class.  As of the

17  the commencement of this action, he is a resident of Georgia.  Mr. Carreker played 97 games as a

18  defensive end for the Green Bay Packers from 1984 – 1988 and the Denver Broncos in 1989 and

19  1991.

20

21      31.     Based on the information currently available to Mr. Carreker – which is greatly

22  limited because: (a) he does not know all of the Medications that Defendants provided him, and

23  (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies

24  and durations of administrations and correlated, documented side effects and Plaintiffs are still in

25  the process of reviewing that information – at this time, the injuries of which he is aware are

26  damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Carreker did

27  not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

28

32.     Plaintiff Steve Lofton is a representative member of the putative class.  As of the commencement of this action, he is a resident of Texas.  Mr. Lofton played 74 games as a defensive back for the Phoenix Cardinals from 1993 –1995, the Carolina Panthers from 1995 –1996 and in 1998 and 1999, and the New England Patriots from 1997 –1998.  Mr. Lofton was injured for the 1994 season.

33.     Based on the information currently available to Mr. Lofton – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects and Plaintiffs are still in the process of reviewing that information – at this time, the injuries of which he is aware are damage to his internal organs and the muscular/skeletal injuries discussed above.  Mr. Lofton did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

34.     Plaintiff Duriel Harris is a representative member of the putative class.  As of the commencement of this action, he is a resident of Louisiana.  Mr. Harris played 135 games as a wide receiver for the Miami Dolphins from 1976 – 1983 and 1985 and the Cleveland Browns and Dallas Cowboys in 1984.  He was a first team All-Conference and All-NFL selection in 1976.

35.     Based on the information available to Mr. Harris – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects and Plaintiffs are still in the process of reviewing that information – at this time, the injuries of which he is aware are damage to his internal organs, including his liver and kidneys, and the muscular/skeletal injuries discussed above. Mr. Harris did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

36.     Plaintiff Jeffery Graham is a representative member of the putative class.  As of the commencement of this action, he is a resident of Ohio.  He played 163 games for the Pittsburgh Steelers from 1991 – 1993, the Chicago Bears from 1994 – 1995, the New York Jets from 1996 – 1997, the Philadelphia Eagles in 1998 and the San Diego Chargers from 1999 – 2001.

37.     Based on the information available to Mr. Graham – which is greatly limited because: (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects and Plaintiffs are still in the process of reviewing that information – at this time, the injuries of which he is aware are the muscular/skeletal injuries discussed above.  Mr. Graham did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

38.     Plaintiff Cedric Killings is a representative member of the putative class.  As of the commencement of this action, he is a resident of Florida.  Mr. Killings played 34 games as a defensive tackle/special team player for the San Francisco 49ers in 2000; the Cleveland Browns and Carolina Panthers in 2001; the Minnesota Vikings in 2002-2003; the Washington Redskins in 2004-2005 and the Houston Texans in 2006-2007.

39.     Based on the information currently available to Mr. Killings – which is greatly limited because (a) he does not know all of the Medications that Defendants provided him, and (b) the Defendants possess most, if not all, of the information related to dosage units, frequencies and durations of administrations and correlated, documented side effects and Plaintiffs are still in the process of reviewing that information – at this time, the injuries of which he is aware are damage to internal organs and the muscular/skeletal injuries discussed above.  Mr. Killings did not become aware that Defendants caused those injuries until, at the earliest, March of 2014.

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                             - 11 -

1    40.    Plaintiff Reggie Walker is a representative member of the putative class.  As of the

2    commencement of this action, he is a resident of Colorado.  Mr. Walker played in 75 games as a

3    linebacker for the Arizona Cardinals from 2009 – 2012 and for the San Diego Chargers from 2013

4    – 2014.

5    41.    Based on the information currently available to Mr. Walker – which is greatly

6    limited because (a) he does not know all of the Medications that Defendants provided him, and (b)

7    the Defendants possess most, if not all, of the information related to dosage units, frequencies and

8    durations of administrations and correlated, documented side effects and Plaintiffs are still in the

9    process of reviewing that information – at this time, the injuries of which he is aware are the

10   muscular/skeletal injuries discussed above.

11   42.    Plaintiffs have attached as **Exhibit A** an excel spreadsheet with specific dates of

12   games played and missed by Mr. Evans and the other Plaintiffs who played in the NFL during their

13   careers.  Exhibit A also lists the names of the Club doctors and trainers for each year through 2010

14   as provided by the Defendants during discovery; Defendants have not yet produced the names of

15   the Club doctors and trainers for any season after 2010, or for that matter, any information post-

16   2010, having drawn an arbitrary deadline at the close of the 2010 season for producing information

17   in this case.

**II.    DEFENDANTS COMPRISE THE NATIONAL FOOTBALL LEAGUE.**

43.    Defendant Arizona Cardinals Club, LLC, individually and as successor to the

Phoenix Cardinals, St. Louis Cardinals, and Chicago Cardinals (collectively "Cardinals"), is

engaged in interstate commerce in the business of, among other things, promoting, operating, and

regulating the NFL.

44.    Defendant Atlanta Falcons Football Club, LLC ("Falcons") is engaged in interstate

commerce in the business of, among other things, promoting, operating, and regulating the NFL.

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                    - 12

45.     Defendant Baltimore Ravens LP ("Ravens"), individually and as successor to the Cleveland Browns, is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

46.     Defendant Buffalo Bills, Inc. ("Bills") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

47.     Defendant Panthers Football, LLC ("Panthers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

48.     Defendant The Chicago Bears Football Club, Inc. ("Bears") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

49.     Defendant Cincinnati Bengals, Inc. ("Bengals") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

50.     Defendant Cleveland Browns Football Club, LLC ("Browns") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

51.     Defendant Dallas Cowboys Football Club, Ltd. ("Cowboys") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

52.     Defendant PDB Sports, Ltd. ("Broncos") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

53.     Defendant Detroit Lions, Inc. ("Lions") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

54.     Defendant Green Bay Packers, Inc. ("Packers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

1    55.    Defendant Houston Holdings LP ("Texans") is engaged in interstate commerce in

2    the business of, among other things, promoting, operating, and regulating the NFL.

3    56.    Defendant Indianapolis Colts, Inc., individually and as successor to the Baltimore

4    Colts ("Colts"), is engaged in interstate commerce in the business of, among other things,

5    promoting, operating, and regulating the NFL.

6    57.    Defendant Jacksonville Jaguars, LLC ("Jaguars") is engaged in interstate

7    commerce in the business of, among other things, promoting, operating, and regulating the NFL.

8

9    58.    Defendant Kansas City Chiefs Football Club, Inc. ("Chiefs") is engaged in

10   interstate commerce in the business of, among other things, promoting, operating, and regulating

11   the NFL.

12   59.    Defendant Miami Dolphins, Ltd. ("Dolphins") is engaged in interstate commerce

13   in the business of, among other things, promoting, operating, and regulating the NFL.

14

15   60.    Defendant Minnesota Vikings Football Club, LLC ("Vikings") is engaged in

16   interstate commerce in the business of, among other things, promoting, operating, and regulating

17   the NFL.

18   61.    Defendant New England Patriots, LLC ("Patriots") is engaged in interstate

19   commerce in the business of, among other things, promoting, operating, and regulating the NFL.

20   62.    Defendant New Orleans Saints, LLC ("Saints") is engaged in interstate commerce

21   in the business of, among other things, promoting, operating and regulating the NFL.

22

23   63.    Defendant New York Football Giants, Inc. ("Giants") is engaged in interstate

24   commerce in the business of, among other things, promoting, operating and regulating the NFL.

25   64.    Defendant New York Jets, LLC ("Jets") is engaged in interstate commerce in the

26   business of, among other things, promoting, operating, and regulating the NFL.

27

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                    - 14 -

65.     Defendant The Oakland Raiders, LLP, individually and as successor in interest to the Los Angeles Raiders ("Raiders"), is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL and is a resident of this district.

66.     Defendant Philadelphia Eagles, LLC ("Eagles") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

67.     Defendant Pittsburgh Steelers, LLC ("Steelers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

68.     Defendant The Los Angeles Rams, LLC, individually and as successor in interest to the St. Louis Rams ("Rams"), is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

69.     Defendant Chargers Football Company, LLC ("Chargers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

70.     Defendant Forty Niners Football Company ("49ers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL and is a resident of this district.

71.     Defendant Football Northwest, LLC ("Seahawks") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

72.     Defendant Buccaneers LP ("Buccaneers") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

73.     Defendant Tennessee Football, Inc., individually and as successor in interest to the Houston Oilers ("Titans"), is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

74.     Defendant Pro-Football, Inc. ("Redskins") is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

**INTRADISTRICT ASSIGNMENT**

75.     This matter has been assigned to the San Francisco Division.

**FACTS COMMON TO ALL COUNTS**

I.     **THE RELEVANT HISTORY OF THE RELATIONSHIP BETWEEN THE CLUB DEFENDANTS  AND THEIR PLAYERS.**

A.     **Labor Relations Between the Clubs and Players.**

76.     Clubs playing American professional football first organized themselves as a league in 1920, calling the organization the American Professional Football Association.  The Clubs renamed the league the National Football League in 1923 and have conducted joint activities under that name until the present day.

77.     From 1923 until 1968, players had no bargaining rights and were subject to unilateral rules imposed jointly by the Clubs.  No collective bargaining agreement ("CBA") was in existence for the first 45 seasons of professional football.  The National Football League Players Association ("NFLPA"), even though it had been in existence since 1956, was not recognized as a union or the sole and exclusive bargaining representative for the Clubs' players until 1968.  The NFLPA negotiated the first CBA with the Clubs that year.  A second CBA between the Clubs and players was signed in 1970.

78.     The 1970 CBA expired after the 1973 season and no CBA was in existence for the 1973 – 1976 seasons.  During that period, the NFLPA filed an antitrust suit against the NFL and the Clubs: *Mackey v NFL*, 543 F.2d 606 (8th Cir. 1976).  In ruling for the players, the appeals court affirmed the District Court's holding that the restrictions on player movement contained in the 1968 and 1970 CBAs were not the product of *bona fide* arm's-length bargaining.  The Eighth Circuit further noted that "in part due to its recent formation and inadequate finances, the NFLPA,

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                                    - 16 -

1   at least prior to 1974, stood in a relatively weak bargaining position *vis-à-vis* the clubs." *Id.* at

2   615.

3         79.    In 1977, after the *Mackey* decision, the Clubs and players resolved their legal

4   differences in part through a new CBA, the first such agreement that was the product of good faith,

5   *bona fide* arm's-length bargaining.

6

7         80.    Upon the expiration of the 1977 CBA, the Clubs and players negotiated a new CBA

8   in 1982 that expired after the 1986 season.  No CBA was in existence for the 1987 – 1992 seasons.

9   As part of the settlement of another antitrust lawsuit filed by the players, a new CBA was executed

10  in 1993.  From that date until present, every football season has been played pursuant to a CBA.

11        81.    The football seasons from 1923 through 1967, 1973 through 1976 and 1987 through

12  1992 were not subject to any CBA.  The seasons from 1968 through 1972 were subject to CBAs

13  that were not the product of *bona fide*, arm's-length bargaining.  Therefore, only the 1977 through

14  the 1986 and 1993 through the 2016 seasons were governed by valid CBAs.

15

16        82.    No CBA has addressed, let alone regulated, the administration or dispensation of

17  Medications.  In public filings, the NFLPA has endorsed the statement that "[n]o CBA provision

18  addresses the NFL's responsibilities *vis a vis* the illicit provision of the Medications.  Not one of

19  the hundreds of NFL-selected pages of CBAs going back to 1968 mention[s] the Medications or

20  protocols for their provision."

21

22        **B.     The Clubs Mandated that Players Use Their Doctors and Trainers.**

23              **1.     Team Doctors Regularly Interact with the League.**

24        83.    Alvah Andrew "Doc" Young was a founder of the NFL and owned the Hammond

25  Pros, an early Club.  He was also the first professional football team doctor, serving from 1920 –

26  1926.  On information and belief, the Clubs have provided doctors for their players continuously

27  since the inception of the NFL.

28

84.     The Clubs provided doctors and trainers for the 1923 through 1967, 1973 through 1976, and 1987 through 1992 seasons during which time no CBA was in effect.  The Clubs provided doctors and trainers for the 1968 through 1972 seasons during which the CBAs in effect were not the product of *bona fide*, arm's-length bargaining.  Since their inception, the Clubs have recognized that they maintain a hazardous workplace.

85.     The NFL Physicians Society (the "NFLPS") was founded in 1966 by a group of long-time Club doctors and exists today.  Its mission is "to provide excellence in the medical and surgical care of the athletes in the NFL and to provide direction and support for the athletic trainers in charge of the care of these athletes."  *See* http://nflps.org/ (last visited February 22, 2017). It has hundreds of members, including physicians from all 32 Clubs.

86.     Although one would think that teams truly competing against each other would want to maintain a propriety interest in their medical treatments, the opposite is the case with the NFL.  For example, ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████ beginning in 1985, commonly known as the Combine, for which the Clubs share costs for medical examinations of draft-eligible players.  NFL physicians examine as many as 450 – 500 players at the Combine.  The Combine continues to this day and at each annual event, doctors from all 32 Clubs meet to discuss issues common to the member Clubs.

87.     According to the NFLPS, its goals are "to constantly work toward improving the care of the professional football players and prevention and treatment of injuries."  *See* http://nflps.org/ (last visited February 22, 2017).  Their stated purpose is to "manage injuries once they occur to allow players to reach their … highest level of potential."  *Id.*

1        88.     The NFLPS is governed by an executive committee that regularly interacts with the

2   League.  For example, Dr. Anthony Yates (Steelers' doctor), who served on that committee from

3   2000 to 2015 and is a former NFLPS president, testified at his deposition that ████████████

4   ████████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13        89.     Dr. Yates also testified that ████████████████████████████

14   ████████████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████

18        90.     He further testified that he ████████████████████████████

19   ████████████████████████████████████████████████████████████████████████████

20   ██████████████████████

21        91.     Dr. Matava (Rams' doctor) testified that, while president, he too ████████

22   ████████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████

92.    Dr. Yates further testified that ████████████████████████
████████████████████████████████, discussed in greater detail below.

93.    Moreover, ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

94.    From a review of related documents, and based on the testimony of Dr. Brown, it
appears that ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ████████████████████████

95.     Indeed, Dr. Marzo (Bills' doctor) testified that, ███████████████

██████████████████████████████████████████████████

████████████████████████

96.     Put simply, while the League, Clubs and their agents and employees have identified

Medication-related problems for decades, it appears they failed to act on them until ███████████

██████████████████████████████████████████████████

███████████████████████████████████

**2.     Trainers Interact Directly with Team Owners, GMs and Coaches.**

97.     On information and belief, the Clubs have provided trainers continuously since the

early years of the NFL.  The NFL Athletic Trainers Society was founded in the mid-1960's by a

number of long time Club trainers.[2]  According to the PFATS web site, that group came together

because it "saw an opportunity to share knowledge and techniques on injury prevention and

rehabilitation at the National Athletic Trainers Association … Annual Meeting and Clinical

Symposium."  *See* http://www.pfats.com/about/history/ (last visited February 22, 2017).

98.     After the AFL-NFL merger, AFL trainers "began attending" that annual meeting as

well and "team physicians soon followed."  *Id.*  "[In 1969], a league official began attending, and

by the end of the decade, then-NFL commissioner Pete Rozelle required all teams to send their

head athletic trainers to the annual NFL Athletic Trainers Meetings."  *Id.*

---

[2] That organization was succeeded in 1982 by the Professional Football Athletic Trainers Society ("PFATS").

99.     The web site used to state that PFATS was founded because NFL Clubs "are always trying to gain an edge.  [Clubs] need to provide the best and most complete care for their product – the players."  It appears that since that site was last visited in October 2016, that language has been removed.

100.     Today, PFATS is in partnership with the Physicians Society and the NFL and states that its mission is to serve the players of the NFL.

101.     The League, through its medical advisor, Dr. Brown, would communicate directly with the trainers about issues related to controlled substances.  For example, ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

## II.     THE CLUBS HAVE CREATED A RETURN TO PLAY PRACTICE OR POLICY THAT PERMEATES PROFESSIONAL FOOTBALL.

102.     The Clubs have recognized the appeal of violence associated with football since the inception of the sport.  But the Clubs have also recognized that, to give the public the best product possible, marquee players need to play, even if they are injured and in pain.  One solution to this inherent conflict – violence sells but it also puts players on the sidelines who bring fans to the game – would be to play fewer games (like in college), give players more time to rest between games, and have larger rosters (the NCAA allows for 105 man rosters before the first day of class or the first game – twice that of the NFL).  But that would cut into the Clubs' profit margins.

103.     Instead, the Clubs have resolved this inherent conflict in favor of profit over safety with more games, less rest (*e.g.*, Thursday night football), and smaller rosters that save payroll

expenses.  And they achieve their ends through a business plan in which every Club employee – general managers, coaches, doctors, trainers and players – has a financial interest in returning players to the game as soon as possible.  Everyone's job and salary depend on this simple fact.  The return to play practice or policy was based on four cornerstone concepts: profit, media, non-guaranteed contracts, and drugs.  As professional football took off, these bedrock concepts would become the driving force behind every business decision made by the Clubs.

104.    While professional football has been a popular spectator sport since its inception, with the widespread availability of television in the 1960's, the Clubs realized that the opportunity for profits would greatly increase as income would no longer be dependent solely on attendance at the games.  As the television networks began competing for the rights to televise games, the Clubs sought to further capitalize on the public's demand for the violence of the sport.  But the ever-escalating profitability of the Clubs was dependent on keeping the players on the field, even when games and practices spawned increasing numbers of injuries as the result of bigger, stronger players having less time between games to recover.  The health interests of the players were increasingly subordinated and forgotten as the Clubs evolved into multi-billion dollar businesses.

105.    The Clubs also manipulated the media to increase revenue and reinforce the return to play practice or policy.  In 1965, the Clubs created NFL Films to market video of the Clubs' games, coaches, and players.  NFL Films highlighted the violence of the game and the "toughness" of its players.  Dramatic collisions between players were highlighted in slow motion.  Players who returned to the game with severe injuries were lauded as courageous heroes.  These same themes were repeated by the broadcast networks.  American folklore regarding professional football players was indelibly established – the players were super human warriors who played through pain for the integrity of the game they loved.   The return to play practice or policy became an accepted fact of doing business by the Clubs as profits soared.

106.     One need only examine the 1987 season to understand the importance of keeping the best players out on the field at all costs.  That year, the players went on strike and the Clubs played a number of regular season games with so-called "replacement players."  Television ratings for these games dropped by more than 20%.  The networks agreed to continue broadcasting them only when the Clubs agreed to reduce prices to enable the networks to recoup the losses.  The Clubs never used replacement players again.  On information and belief, this experience reinforced to the Clubs the importance of having "star" NFL players on the field.

A.    **Increasing Revenue Fuels the Return to Play Practice/Policy.**

107.     Between 1990 and 2013, Defendants' total annual revenue jumped from $1.5 billion to over $9 billion.  Defendants' commissioner, Roger Goodell, has set a target of $27 billion by 2027.

108.     In its thirst for constantly-growing revenue, Defendants expanded from 24 to 32 Clubs, added two more regular season games (and are looking to add two more), expanded the number of Clubs participating in post-season play, and scheduled more games during the week (particularly on Thursday nights), leaving players with less recovery time and greater chances for new injuries or worsening of existing injuries.

109.     Indeed, professional football is such an omnipresent force, with off-season camps starting in April, the draft in May, practices and pre-season games through August, the regular season through December, and post-season often carrying over into February, that an entire TV channel, the NFL Network, devotes all day, every day to the game.

110.     During this same time, players have gotten bigger and stronger.  Mel Kiper, one of ESPN's senior football analysts, noted that in 2011, offensive linemen were on average 24 percent heavier than they were in 1979 and an average of 31 percent stronger than they were in 1991.  In the 1960s, the Colts' Hall of Fame defensive tackle Art Donovan was considered a giant at 263

1  pounds.  In recent years, the NFL has seen the likes of Aaron Gibson at 440 pounds, Albert

2  Haynsworth and Shaun Rogers at 350 pounds, and King Dunlap, who stands 6 feet 9 inches and

3  weighs 330 pounds.  ████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  ██████████████████████████

8      111.    More games, longer seasons, shorter recovery between games, plus bigger and

9  stronger players, equals more frequent and debilitating injuries.  These injuries pose a serious

10  business problem for Defendants, which need star players on the field any given Sunday – and

11  Monday and Thursday – so the money can keep rolling in.

12      112.    In a survey by the Washington Post, nearly nine out of 10 former players reported

13  playing while hurt.  Fifty-six percent said they did this "frequently."  An overwhelming number –

14  68 percent – said they did not feel like they had a choice as to whether to play injured.

15

16      113.    Those players are right – Defendants gave them no choice.  From the beginnings of

17  professional football to the present day, the Clubs have created a coercive economic environment

18  in which all players have non-guaranteed contracts.  The current standard player contract states

19  that the player's salary is game to game and a player's contract can be terminated for lack of skill

20  at any time (referred to as being "cut").  Players are constantly reminded by general managers,

21  coaches and the media of the competitive nature of the game and the importance of playing.  If a

22  player is injured, coaches advise him to return to play as soon as possible to prevent a replacement

23  from taking his spot on a Club.  Rookie players are immediately told of the decades' long adage

24  promulgated by the Clubs – "You can't make the Club in the tub."  The named Plaintiffs, including

25  Ms. Evans (who was told by Mr. Evans of the pressure he received), testified at their depositions

26  about the subtle and not-so-subtle pressures they faced to play despite being injured, some of which

27

28

is detailed herein.  The Clubs exert enormous economic pressure on the players to return to play as soon as possible and play through the pain.  This financial reality is reinforced by the Club-created image of the professional football player as heroic warrior.

114.    From the outset, the means by which the Clubs facilitated the return to play practice or policy was the widespread availability of the Medications.  Club doctors and trainers have distributed these controlled substances and prescription medications with little to no regard for the law or the players' health.  Club doctors and trainers know that, if players are given adequate rest and do not return to the game, the doctor or trainer will be replaced.  As the position of Club doctor and trainer have become increasingly lucrative, the pressures on the medical personnel to return players to the field have only increased.  The Clubs have established a business culture in which everyone's financial interest depends on doctors and trainers supplying Medications to players to keep them in the game.

115.    That culture has so permeated the NFL that today, it is almost unshakeable.  Although there are too many incidents of such behavior to list, three highly publicized, recent incidents make the point.  In a 2013 playoff game, Washington Redskins quarterback Robert Griffin III re-injured his knee severely in the first quarter but still returned to the game despite a clear inability to run or even walk normally.  He tore a ligament in his knee during the fourth quarter and was finally removed from the game.  And in a game against the Washington Redskins on October 27, 2014, Dallas Cowboys' quarterback Tony Romo experienced a hard tackle that resulted in two vertebrae in his back being chipped and fractured.  Romo returned to the game after taking a painkilling injection.  He then missed the next week's game.  Such injuries take six to eight weeks to heal.  However, less than two weeks after the injury, the Cowboys were playing a game in London, an important showpiece for the Clubs trying to increase football's international popularity.  Cowboys' owner Jerry Jones stated "[Romo's] going on the trip to London and logic

tells you that we wouldn't have him make that trip to London and back if we didn't think he was going to play." Romo played in the game in London and the rest of the games the Cowboys played that year. On information and belief, Romo would have been unable to play through such acute pain without frequent use of painkilling pills and injections. Finally, on February 5, 2017, ESPN's Adam Schefter reported that Atlanta Falcons center Alex Mack would play in the Super Bowl with a broken left fibula. Apparently there had been a concern that the four-time Pro Bowler would be unable to play after sustaining that injury during the NFC Championship Game and Schefter reported that the injury, had it occurred in the regular season, would require Mack to sit out six to eight weeks but that he would be receiving a pain-killer injection in his leg to alleviate the effect of the fracture, which occurred above the plate inserted in his leg before he broke his fibula in 2014.

116.   By contrast, according to Sally Jenkins of the Washington Post in a February 6, 2017 article titled "Tom Brady Rejected NFL's Medical Culture. At Almost 40, He's Never Played Better," recent Super Bowl MVP Tom Brady "seize[d] control of his own body from a league that specializes in ruining men with Mesozoic training methods and corrupt medical practices rife with painkiller abuses and MRSA infections." According to Ms. Jenkins, "around a decade ago, Brady told the NFL doctors and trainers to get their hands off him" and, instead of needles and pills, Mr. Brady did things his own way. The point of the article is that, the Super Bowl win notwithstanding, Mr. "Brady's ultimate victory is over the whole dumb, stick-a-needle-in-it NFL culture."

117.   The Clubs maintain the return to play practice or policy by ensuring that players are not told of the health risks associated with taking Medications. Players are not informed of the long-term health effects of taking controlled substances and prescription medications in the amounts given to them by the Clubs. Players are not counseled that inadequate rest will result in permanent harm to joints and muscles. Players are frequently not told the name of the Medication

they are being given.  Players are only told that, by taking the Medications offered by the Clubs, they will be able to continue playing or return to play sooner.

118.     The injuries at issue are caused by the volume of Medications given to the Plaintiffs by the Defendants.  As detailed herein, Plaintiffs report receiving Medications from the Defendants literally every week during the football season of each of their careers.  The sheer volume of the Medications, combined with the omissions and concealments by Defendants detailed below, makes it difficult for the Plaintiffs to remember the details of each and every time they received Medications in the NFL (indeed, an analogous inquiry would be to ask a non NFL player how many Advil pills they took in 2002), though Plaintiffs do detail many such administrations herein and documents provided by the Clubs identify their dispensing habits.

119.

1  120.    The amount of drugs dispensed to players is also revealed in drug inventories

2  produced by all the Clubs during discovery.  For example, ████████████████████

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ████████████████████████████████

12  121.    ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████.

16  122.    ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████.

24  123.    ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████

28

**B.     Manifestations of the Return to Play Practice or Policy.**

124.    People trust doctors.  Patients intuitively believe that doctors – who are bound by the Hippocratic Oath to put patient interests first – and other medical personnel prioritize the patient's best interests and would not intentionally advise a procedure or prescribe or distribute a medication that would injure their health.  Professional football players are no different.

**1.     Omissions Constitute Intentional Misrepresentations.**

125.    Club doctors and trainers do not inform players of the risks posed by the use of Medications, especially in the volume players are instructed to consume.  Given the trust placed in the doctors and trainers by players – and every named Plaintiff testified at their deposition that they trusted their doctors and trainers, failure to provide a player with a legally-required warning about a drug's side effects constitutes an actionable omission that renders the statement misleading or false.

126.    Club doctors and trainers do not inform players that they are distributing Medications in an amount, dosage and manner they know is illegal.  Doctors and trainers provide Medications to professional football players in amounts and distribution procedures they would

never do in their regular practice with non-football player patients.  Failure to inform players of known illegalities constitutes an intentional misrepresentation that the practices are, in fact, legal.

127.    Club doctors and trainers do not inform players of the health risks associated with mixing Medications in the volume and manner they are doing (referred to as "cocktailing").  These dangers are increased when the doctors and trainers know the Medications are often being mixed with Club-provided alcohol (*e.g.*, ███████████████████████████ ███████████████████████).  Failure to inform players of the known dangers from mixing the Medications being distributed by the Club to them constitutes an intentional misrepresentation.

128.    Club doctors and trainers do not inform players of the names of the Medications they are being given and often these Medications are provided without a prescription, legally referred to as misbranding.  Players frequently report that they were never told all of the drugs they were being given.  Failure to disclose the name of a controlled substance or prescribed medication to a player constitutes an intentional misrepresentation.

129.    Club doctors and trainers frequently fail to document properly in a player's medical records the usage of Medications.  In a review of the medical records of 745 former players provided by the Clubs for purposes of Workmen's Compensation claims, 164 (22%) players had no records at all, 196 (26.3%) mentioned no drugs at all, 64 (8.6%) mentioned drugs without dosages, and 321 (43%) mentioned only some dosages.  These failures highlight the omissions that occur as doctors and trainers fail to document the Medications they are providing the players.

**2.      The Clubs Engage in Concerted Activity to Keep Players on the Field, Regardless of the Cost.**

130.    The Clubs have conspired to put profit over player safety since at least the 1960s.

131.    As an initial matter, the Clubs have had ample opportunity to share information about revenue and how best to achieve high profit levels.  The NFL executive committee has a

1  member from each Club and they meet on an annual basis at a minimum.  Moreover, general

2  managers for the Clubs meet on a regular basis and the Clubs come together at other functions

3  during the year, including the yearly Combine.  And as described herein, the trainers are mandated

4  to meet on at least a yearly basis while the doctors meet at least annually at the Combine.  These

5  regular meetings, which have been taking place for decades, provide the Clubs with the chance to

6  share information to which the public is not privy.  And as detailed herein, e-mails are sent *en*

7  *masse* to all trainers or doctors about medications and trainers or doctors from one team

8  communicate with trainers or doctors from other teams about medications via e-mail (███████

9  ████████████████████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████████████████

14 ██████████████████.

15 132.    From a structural perspective, it is not difficult for the Clubs to collude.  There are

16 high barriers to entry in the League, which has no competition in the world and serious economic

17 incentives to maintain the *status quo*.  The limited number of Clubs – there are only 32 – is exactly

18 the sort of highly-concentrated market that fosters the creation, and permits the maintenance, of

19 illicit agreements like those detailed herein.  It is (obviously) against one's self-interest to violate

20 federal drug laws unless you know that everyone else is doing so and they all have the same reason

21 not to reveal what the others are doing.  Put another way, the usual incentives – increased market

22 share and revenue – are not there for one Club to flip on the others because if they do so, the whole

23 structure will come crashing down and all of them will pay the price.  Accordingly, even with the

24 movement of players from Club to Club, the Clubs know that so long as they present a united front,

25 they face little chance of detection.

133.    But simply because one has the means does not necessarily mean they have the motive to collude.  The Clubs have ample reason to do so.  As detailed herein, the NFL juggernaut has exploded in terms of revenue and it intends to get even bigger.  The Clubs share the same economic interest in keeping each other's stars on the field and playing more games to keep TV revenues high, along with jersey sales and all the other means by which the Clubs profit off their players, while at the same time keeping rosters small and overhead low.  Indeed, the revenue-sharing that takes place among the Clubs – they all share equally from their TV deal – means they have little if any interest in maximizing their own profit at the expense of competitors and, to the contrary, will protect each other in mutually-advancing their interests.

134.    And as detailed herein, the Clubs decided to keep their players on the field, and the profits high, by feeding drugs to their players in dangerous quantities and the manner in which they have done so – particularly after they have been made aware that their conduct is wrong – shows brazen disregard for federal and state drugs laws.  The ubiquity of their illegal conduct, which comes in several forms and has been ongoing for decades, negates any inference that the Clubs have been acting independently.  Such conduct includes in particular the manner in which the Clubs have distributed Medications to players, who have consistently reported that since the mid-1960s, Medications have been distributed as if they were candy.  The Medications have changed, but decade to decade, the players report a similarity in the manner in which they are distributed by the Clubs: Quaaludes and amphetamines beginning in the mid-1960's, Vioxx and OxyContin beginning in the 1970's, Percocet and Indocin in the 1980's and, beginning in the 1990's, Toradol.

135.    The introduction of Toradol by all the Clubs elevated the return to play practice or policy to new heights.  From the mid-1990's until the present day, the Clubs have given Toradol to players as both a painkiller and a prophylactic.  Players from multiple Clubs report lines of 30

– 35 players lined up for Toradol shots before games. Hall of Fame Coach and media analyst John Madden, commenting on the widespread availability of Toradol, noted "I know an announcer that goes down to the locker room to get a Toradol shot before a game." In the last few seasons, the Clubs have reduced the number of injections and increased the usage of Toradol pills. The Clubs use Toradol for practice but its extensive use is reserved primarily for games. As the Clubs have scheduled more mid-week games, Toradol has become an even more important component of the return to play practice or policy. The Clubs continue to use other painkillers and anti-inflammatories during the practice week.

136. [redacted]

1 ██████████████████████████████████████████████████████

2 ████████████.

3       137.    The Clubs imposed a uniform Toradol waiver beginning with the 2010 season, a

4 sample copy of which is attached hereto as **Exhibit E**.  Every player on each Club was asked to

5 sign the waiver, which is identical for each Club.

6

7       138.    Since the mid-1960's, the Clubs have provided players with sleep aids.  Ambien, a

8 controlled substance, has been the drug of choice for multiple decades.

9       139.    Since doctors are only present with the players on home game days, away game

10 weekends and one (occasionally a second) day during the week, trainers and their assistants had

11 to be folded into the loop of distributing Medications.  Players from at least the 1960's to the

12 present consistently state that trainers routinely gave them Medications without examination,

13 diagnosis, or warnings – all outside the presence of a licensed physician.

14

15       140.    As public awareness of the prevalence of drugs has increased, the Clubs have

16 jointly imposed a number of mandated procedures to control the drug distribution system while

17 keeping the flow as high as possible.  The Clubs required that all drugs be locked in a closet or

18 similar locked storage facility.  The Clubs also required that Club doctors register the Clubs'

19 facility as a storage facility for controlled substances and prescription medication.  The Clubs

20 finally looked into the possibility that they would purchase and utilize tracking software created

21 by a firm called SportPharm.  SportPharm collects the data and retains it in the event the Clubs are

22 questioned about their drug distribution by the Drug Enforcement Agency ("DEA") or an

23 appropriate state agency.

24

25       141.    On information and belief, the Clubs created a committee – the NFL Prescription

26 Drug Advisory Committee – to oversee the administration of controlled substances and

27 prescription drugs to players in all the Clubs.  The person in charge of the committee is Dr.

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                    - 35 -

1    Lawrence Brown and the committee, at least as of November 6, 2014, was comprised of the

2    following persons who were attending its meetings: Lawrence Brown, MD; Charles Brown, MD;

3    Louis Baxter, MD; Arun Ramappa, MD; Bertha Madras, PhD; Linda Cottler, PhD; Seddon

4    Savage, MD; Bryan Finkle, PhD; J. Michael Walsh, PhD; Jeff Miller, NFL V.P. for Security who

5    resigned in May 2016 from that position; Lawrence Ferazani, NFL Senior V.P. for Labor Litigation

6    & Policy; Amy Jorgensen, Director, Health and Safety Policy for the NFL; Nicolette Dy, project

7    coordinator for player health and safety issues for the NFL; Lanisha Frazier-Conerson, NFL

8    Program Administrator for Substances of Abuse; Brandon Etheridge, General Counsel for the

9    Baltimore Ravens who as of November 2014 was counsel to the NFL; Dr. Pellman; Christina

10   Mack; Adolpho Birch, NFL Senior V.P. of Labor Policy & League Affairs (and a person who, █

11

12   ███████████████████████████████████████████████████████████████████

13

14   ██████████████████████████"); and Dr. Matava.  The committee meets at least twice a year

15   at the Combine and at the summer League meetings.

16          142.    A document titled "████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████████████████

23   ███████████████████████████████████████████████████████████████████

24   ███████████████████████████████████████████████████████████████████

25   ███████████████████████████████████████████████████████████████████

26   █████████████████████████████████████████████████████████████████.

27

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                          - 36 -

143.   The Clubs also exert control over, and constant monitoring of, the storage and administration of controlled substances and prescription drugs through their agent, the NFL Security Office.   Security Office personnel regularly meet and consult with Club officials, including doctors and trainers, and conduct regular audits of Club record keeping and facilities.

144.    In the fifty-one football seasons played from 1964 to 2014, every Club has had a doctor and trainer distribute controlled substances and prescription medication to players in a manner that violates federal and state law.  Therefore, hundreds of doctors and trainers are treating their professional football patients differently from any other patient they treat, have treated or will treat.  Or, to paraphrase ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████

145.   Indeed, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.'"

146.   The only plausible explanation for this uniform, systematic, decades-long practice is that every Club is following an agreed-upon program of mandating that their doctors and trainers distribute drugs to get players back on the field at all costs.

C.    **Defendants' Actions Violate Federal Drug Laws.**

147.   United States law regulates the dispensation of certain medications that carry a greatly enhanced risk of abuse ("controlled substances") and other medications too dangerous to be sold over the counter ("prescription medications").  Federal law also criminalizes violations of

such regulations.  This regulatory regime protects against the dangers of abuse inherent in the use of controlled substances such as opioids and other powerful prescription painkillers and applies to anyone involved in the dispensation of these substances, from a physician operating a solo medical practice to a multibillion-dollar machine such as professional football.

### 1. The Controlled Substances Act Criminalizes the Dispensation and Possession of Medications that the Clubs Routinely Give Players.

148.    In 1970, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act (the "Act").  Title II of this Act, codified as 21 U.S.C. § 801, *et seq*., is known as the Controlled Substances Act or the "CSA."

149.    Regulation and enforcement of the CSA is delegated to the Food and Drug Administration ("FDA"), the DEA, and the Federal Bureau of Investigation ("FBI").

150.    The CSA[3] organizes controlled substances into five categories, or schedules, that the DEA and FDA publish annually and update on an as-needed basis.  The controlled substances in each schedule are grouped according to accepted medical use, potential risk for abuse, and psychological/physical effects.

151.    Under authority provided by the CSA at 21 U.S.C. § 821, the United States Attorney General can promulgate (and has promulgated) regulations implementing the CSA.

### a. The CSA's Regulatory Regime.

152.    The CSA contains a number of provisions governing the dispensation,[4] use, distribution, and possession of controlled substances.  Under the CSA, "[e]very person who manufactures or distributes any controlled substance[,]" or "who proposes to engage in the

---

[3] Medications regulated by the CSA also constitute prescription medications under the Food, Drug and Cosmetic Act, thereby requiring a prescription before they can be dispensed.

[4] The CSA defines the dispensation of a controlled substance as the delivery of a controlled substance "to an ultimate user … by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance[.]"  21 U.S.C. § 802(10).

manufacture or distribution of any controlled substance[,] … [or] who dispenses, or who proposes to dispense, any controlled substance," shall obtain from the Attorney General a registration "issued in accordance with the rules and regulations promulgated by [the Attorney General]." *Id.* at § 822(a)(1)-(2).

153.    To distribute Schedule II or III controlled substances, applicants must establish that they: (a) maintain "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels;" (b) comply "with applicable State and local law;" and (c) satisfy other public health and safety considerations, including past experience and the presence of any prior convictions related to the manufacture, distribution, or dispensation of controlled substances. *Id.* at § 823(b).

154.    The CSA mandates that controlled substances may be legally dispensed only by a practitioner or pursuant to a practitioner's prescription (as similarly established by 21 U.S.C. § 353(b)(1)) and within the purview of the practitioner's registered location. *Id.* at § 829.

155.    Moreover, Schedule II substances cannot be re-filled, *see id.* at § 829(a), while Schedule III and IV substances cannot be re-filled more than six months after the initial dispensation or more than five times "unless renewed by the practitioner." 21 U.S.C. § 829(b). Relevant examples of Schedule II substances include OxyContin and Percocet. Morphine, Codeine and Opium are also Schedule II substances. Ambien is a Schedule IV controlled substance.

156.    Only those prescriptions "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice" may be used to legally dispense a controlled substance under § 829(b). 21 C.F.R. § 1306.04(a) (2013).

157.    The CSA also establishes specific recordkeeping requirements for those registered to dispense controlled substances scheduled thereunder. For example, except for practitioners prescribing controlled substances within the lawful course of their practices, the CSA requires the

maintenance and availability of "a complete and accurate record of each substance manufactured, received, sold, delivered, or otherwise disposed[.]" 21 U.S.C. § 827(a)(3).

158.    The CSA's recordkeeping regulations require a person registered and authorized to dispense controlled substances to maintain records regarding both the substances' prior manufacturing and the subsequent dispensing of the substance.  Such records must include the name and amount of the substances distributed and dispensed, the date of acquisition and dispensing, certain information about the person from whom the substances were acquired and dispensed to, and the identity of any individual who dispensed or administered the substance on behalf of the dispenser. 21 C.F.R. § 1304(22)(c) (2013).

159.    Beyond specific recordkeeping, all registrants "shall [also] provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a) (2013).  Depending on the schedule assigned to a particular controlled substance, such substances must be securely locked within a safe or cabinet or other approved enclosures or areas.  *Id.* at §§ .72(b) & .75(b) (2013).  Any theft or significant loss of controlled substances must be reported to the DEA upon discovery of the theft or loss.  *Id.* at § .74(c) (2013).

### b.    The CSA's Criminal Regime.

160.    The CSA enacted a comprehensive criminal regime to penalize violations of its rules and regulations.

161.    Specifically, Part D of the CSA proscribes a series of "Prohibited Acts" that run the gamut from trafficking of controlled substances to their unlawful possession.

162.    For example, it is unlawful for any person to knowingly or intentionally "distribute, or dispense, or possess with intent to … distribute, or dispense, a controlled substance[]" in violation of the CSA.  21 U.S.C. § 841(a)(1).

163.    Each and every single violation of this section that involves a "Schedule III" controlled substance is a Federal felony subject to a variety of penalties, including but not limited to a term of imprisonment of up to ten years (15 years if the violation results in death or serious bodily injury) and a fine of $500,000 if the violator is an individual to $2,500,000 if the violator is not an individual (for first offenses).  *Id*. at § 841(b)(1)(E)(i).  These penalties are doubled if the violator has a prior conviction for a felony drug offense.  *Id*. at §841(b)(1)(E)(ii).

164.    It is also unlawful for anyone with a CSA registration to:

• "distribute or dispense a controlled substance" without a prescription or in a fashion that exceeds that person's registered authority.  *Id*. at § 842(a)(1)-(2);

• distribute a controlled substance in a commercial container that does not contain the appropriate identifying symbol or label, as provided under 21 U.S.C. § 321(k), or to "remove, alter, or obliterate" such an identifying symbol or label.  *Id*. at §§ 825, 842(a)(3)-(4); or

• "refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required" under the CSA.  *Id*. at § 842(a)(5).

A person who violates any of these provisions is subject to a civil penalty up to $25,000.  *Id.* at § 842(c)(1)(A).

165.    It is also unlawful for a person "knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized" under the CSA.  *Id*. at § 844(a).

166.    A violation of this provision is subject to a term of imprisonment of up to one year and a fine of up to $1,000 for a first offense.  *Id.*  Multiple violations of this provision result in a term of imprisonment of up to three years and a fine of at least $5,000.  *Id.*

167.    Furthermore, "[a]ny person who attempts or conspires to commit any offense" described above "shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  *Id.* at § 846.

168.    Except as authorized by the CSA, it is unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of distributing or using a controlled substance" or to "manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."  *Id.* at § 856(a)(1) – (2).  A violation of this section results in a term of imprisonment of up to 20 years and a fine of $500,000 if the violator is an individual or up to $2,000,000 if the violator is not an individual.  *Id.* at § 856(b).

169.    For decades, the Clubs' lack of appropriate prescriptions, failure to keep proper records, refusal to explain side effects, lack of individual patient evaluation, improper diagnosis and attention, dispensing of controlled substances outside of a practitioner's registered location(s), including at all away game stadiums, in hotels, and on airplanes, and use of trainers to distribute Schedule II and III controlled substances to its players, including Plaintiffs, individually and collectively violate the foregoing criminal and regulatory regime.  In doing so, the Clubs not only left their former players injured, damaged and/or addicted, but also committed innumerable violations of the CSA.

2.   **The Food, Drug, and Cosmetic Act Prohibits the Dispensation of Certain <u>Medications Without a Prescription, Label, or Side Effects Warnings</u>.**

170.    A significant complement to the foregoing statutory regime is the Food, Drug, and Cosmetic Act (the "FDCA").  Enacted by Congress in 1938 to supplant the Pure Food and Drug Act of 1906, the FDCA prohibits the marketing or sale of medications in interstate commerce without prior approval from the FDA, the agency to which Congress has delegated regulatory and enforcement authority.  *See* 21 U.S.C. § 331(d).

171.    The FDCA has been regularly amended since its enactment.  Most notably, changes in 1951 established the first comprehensive scheme governing the public sale of prescription pharmaceuticals as opposed to "over-the-counter" medications.  The purpose of this regulatory regime was to ensure that the public was protected from abuses related to the sale of powerful prescription medications.

172.    Pursuant to this amendment, the FDCA provides that if a covered drug has "toxicity or other potentiality for harmful effect" that makes its use unsafe unless "under the supervision of a practitioner licensed by law to administer such drug[,]" it can be dispensed only through a written prescription from "a practitioner licensed by law to administer such drug."  21 U.S.C. § 353(b)(1).  Any oral prescription must be "reduced promptly to writing and filed by the pharmacist" and any refill of such a prescription must similarly be authorized.  *Id.*  Failure to do so is frequently referred to as "misbranding."  *Id.*

173.    Jurisprudence interpreting the FDCA establishes that a proper "prescription" under the FDCA shall include directions for the preparation and administration of any medicine, remedy, or drug for an actual patient deemed to require such medicine, remedy, or drug following some sort of examination or consultation with a licensed doctor.  Conversely, a "prescription" does not mean any mere scrap of paper signed by a doctor for medications.

174.    As a result, a key element in determining whether or not § 353(b)(1) has been violated is the existence (or non-existence) of a doctor-patient relationship from which the "prescription" was issued.

175.    The FDCA further provides that the prescribing medical professional shall be the patient's primary contact and information source on such prescription medications and their effects.  *Id.* at §§ 352, 353.  As such, regulations promulgated by the FDA require medical professionals to provide warnings to patients about such effects.

176.    Dispensers violate the FDCA if they knowingly and in bad faith dispense medications without a prescription or with the intent to mislead or defraud.  21 U.S.C. §§ 331(a).

177.    Dispensing a drug without a prescription, as the Clubs' doctors and trainers regularly did and do, results in the drug being considered "misbranded" while it is held for sale. *Id.* at § 353(b)(1).  The FDCA prohibits: (a) introducing, or delivering for introduction, a misbranded drug into interstate commerce; (b) misbranding a drug already in interstate commerce; or (c) receiving a misbranded drug "in interstate commerce, or the delivery or proffered delivery thereof for pay or otherwise[.]"  21 U.S.C. §§ 331(a) – (c).

178.    It is also an FDCA violation to provide, as the Clubs' doctors and trainers routinely did and do, a prescription drug without the proper FDA-approved label.  *Id.* at § 352; 21 C.F.R. §§ 201.50 –201.57 (2013).  Stringent regulations dictate specific information that must be provided on a prescription drug's labeling, the order in which such information is to be provided, and even specific "verbatim statements" that must be provided in certain circumstances, such as the reporting of "suspected adverse reactions."  *See generally* 21 C.F.R. §§ 201.56, .57, .80 (2013).

179.    For instance, labeling for any covered medication approved by the FDA prior to June 30, 2001 must include information regarding its description, clinical pharmacology, indications and usage, contraindications, warnings, precautions, adverse reactions, drug abuse and

dependence, over dosage, dosage and administration, and how it was supplied, to be labeled in this specific order.  *See* 21 C.F.R. § 201.56(e)(1) (2013).

180.    Such information must be provided under the foregoing headings in accordance with 21 C.F.R. §§ 201.80(a)-(k) (2013).  For example, labeling regarding a covered drug's tendency for abuse and dependence "shall state the types of abuse [based primarily on human data and human experience] that can occur with the drug and the adverse reactions pertinent to them." *See id.* at § 201.80(h)(2) (2013).

181.    Covered medications approved by the FDA after June 30, 2001 are subject to even more stringent labeling requirements.  *See generally* 21 C.F.R. §§ 201.56(d)(1); .57(a) – (c) (2013).  For instance, labeling for such covered drugs must provide: (a) if the covered drug is a controlled substance, the applicable schedule; (b) "the types of abuse that can occur with the drug and the adverse reactions pertinent to them[;]" and (c) the "characteristic effects resulting from both psychological and physical dependence that occur with the drug and must identify the quantity of the drug over a period of time that may lead to tolerance or dependence, or both."  *See* 21 C.F.R. § 201.57(c)(10)(iii) (2013).

182.    The Clubs' use of trainers to distribute medications, lack of appropriate prescriptions, failure to keep records, refusal to explain side effects, and lack of individual patient care, individually and collectively, violate the FDCA.

183.    The FDCA expressly contemplates that the States will implement their own laws regulating controlled substances and prescription medications.  All States do have such laws. Many States' laws are stricter than the FDCA.

**C.    Specific Examples of Illegal Conduct by Defendants.**

**1.    The League/Clubs Knew They Were Violating the Law Decades Ago.**

184.    ████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ██████████████████████████."

8    185.   ██████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ███████████████████████████████████████.

11    186.   ██████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ███████████████████████"

5      187.    ████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 █████████████████████████████████████

15     188.    Yet two years later, ███████████████████████████, nothing had changed.

16 The Clubs still did not understand the law regarding controlled substances, as evidenced by the

17 many, ██████████████████████████████████████████████████,

18 among others and detailed herein.

19               **2.**       **Trainers Regularly Ordered and Dispensed Controlled Substances.**

20     189.    ████████████████████████████████████

21

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████.

24     190.    ████████████████████████████████████

25 ██████████████████████████

26         █████████████████████████████

27

28         ██████████████████████████████

1

2      191.   ██████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ██████████████████"

13     192.   ██████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24

25

26  _____
     [5] ████████████████████████████████████████████████████████████
     ██████████████████████████████████.

1 ███████████████████████████████████████████

2 ████████████████████████████

3   193.   ███████████████████████████████████

4 ████████████████████████████████████.

5

6         **3.      Defendants Did Not Properly Secure or Keep Medication Records.**

7   194.   ███████████████████████████████████

8 ███████████████████████████████████████████

9 ███████████████████████████████████████████

10 ███████████████████████████████████████████

11 ███████████████████████████████████████████

12 ███████████████████████████████████████████

13 ███████████████████████████████████████████

14 ███████████████████████████████████████████

15 ███████████████████████████████████████████

16 ███████████████████████████████████████████

17 ███████████████████████████████

18   195.   ███████████████████████████████████

19 ███████████████████████████████████████████

20 ███████████████████████████████████████████

21 ███████████████████████████████████████████

22 ███████████████████████████████████████████

23 ███████████████████████████████████████████

24 ███████████████████████████████████████████

25 ███████████████████████████████████████████

26 ███████████████████████████████████████████

27 ███████████████████████████████████████████

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17    196.

18

19

20

21

22

23

24

25    **D.    Defendants' Actions Have Long-Term Health Consequences for Players.**

26    197.    The constant pain that Plaintiffs and other players experience from their injuries

27  while playing for the Clubs leads directly to a host of health problems.

28

198.    Leading experts recognize that former professional football players who suffer from permanent musculoskeletal injuries often cannot exercise due to pain or other physical limitations, leading to a more sedentary lifestyle and higher rates of obesity.

199.    According to the Centers for Disease Control and Prevention, obesity is linked to: coronary heart disease, type-2 diabetes, endometrial cancer, colon cancer, hypertension, dyslipidemia, liver disease, gallbladder disease, sleep apnea, respiratory problems and osteoarthritis.

200.    Surveys of former NFL players confirm that they suffer from significantly higher rates of all these disorders when compared to the general population.

201.    In addition, it is well established that long-term use of opioids is directly correlated with respiratory problems and these problems are made worse by use of alcohol together with opioids.

202.    Long-term opioid use has also been tied to increased rates of certain types of infections, narcotic bowel syndrome, decreased liver and kidney function and to potentially fatal inflammation of the heart.  Opioid use coupled with acetaminophen use has been linked to hepatic (liver) failure.

203.    Long-term use of opioids has also been linked directly to sleep disorders and significantly decreased social, occupational and recreational function.

204.    Given the foregoing potential damage that opioids can inflict, nonsteroidal anti-inflammatory drugs ("NSAIDs") are often viewed as a safer alternative to narcotics.

205.    Despite that popular notion, NSAIDs are associated with a host of adverse health consequences.

206.    The two main adverse reactions associated with NSAIDs relate to their effect on the gastrointestinal ("GI") and renal systems.  Medical studies have shown that high doses of

prescription NSAIDs were associated with serious upper GI events, including bleeding and ulcers. Additionally, GI symptoms such as heartburn, nausea, diarrhea, and fecal blood loss are among the most common side effects of NSAIDs.   Medical reports have also noted that 10-30% of prescription NSAID users develop dyspepsia, 30% endoscopic abnormalities, 1-3% symptomatic gastrouodenal ulcers, and 1-3% GI bleeding that requires hospitalization.   Studies also indicate that the risk of GI side effects increases in a linear fashion with the daily dose and duration of use of NSAIDs.

207.    NSAIDs are also associated with a relatively high incidence of adverse effects to the renal system.   Medical journal articles note that "[p]rostaglandin inhibition by NSAIDs may result in sodium retention, hypertension, edema, and hyperkalemia."   One study showed the risk of renal failure was significantly higher with use of either Toradol or other NSAIDs.

208.    Patients at risk for adverse renal events should be carefully monitored when using NSAIDs.   As the NFLPS Task Force stated, such patients include those with "congestive heart failure, renal disease, or hepatic disease[, and] also include patients with a decrease in actual or effective circulating blood volume (*e.g.*, dehydrated athletes with or without sickle cell trait), hypertensives, or patients on renin-angiotensis, aldosterone-system inhibitors (formerly ACE inhibitor) or other agents that affect potassium homeostasis" [*sic*].

209.    Additionally, the anti-coagulatory effect of certain NSAIDs, including Toradol, can lead to an increased risk of hemorrhage and internal bleeding.   The *Physician's Desk Reference* specifically states that Toradol is "contraindicated as a prophylactic analgesic before any major surgery, and is contraindicated intra-operatively when hemostasis is critical because of the increased risk of bleeding."

210.    Moreover, certain NSAIDs can adversely affect the cardiovascular system by increasing the risk of heart attack.  Studies have shown that patients with a history of cardiac disease who use certain NSAIDs may increase their risk for heart failure up to ten times.

211.    Finally, other systemic side effects associated with the use of NSAIDs include headaches, vasodilatation, asthma, weight gain related to fluid retention and increased risk for erectile dysfunction.  Medical reports have also noted that "[i]ncreasing evidence suggests that regular use of NSAIDs may interfere with fracture healing" and that "[l]ong-term use of NSAIDs … has also been associated with accelerated progression of hip and knee osteoarthritis."

## III.    THE DEFENDANTS AND THE NFL HAVE RECOGNIZED THAT ITS DOCTORS/TRAINERS HAVE VIOLATED THE FOREGOING LAWS.

212.    The Defendants and the League have recognized the problem of painkiller abuse for decades.  In 1997, one General Manager said that painkiller abuse was "one of the biggest problems facing the league right now."  He said the League was trying to fix the problem, but described painkiller use among players as "the climate of the sport."

213.    And while the NFL has acknowledged that "[t]he deaths of several NFL players have demonstrated the potentially tragic consequences of substance abuse," over the ensuing decade, little changed until they finally got caught.

**A.**    ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

216. [redacted]

217. [redacted]

218. [redacted]



[redacted]

219. [redacted]

220. [redacted]

221. [redacted].

222. [redacted].

223. [redacted]

1　████████████████████████████████████████

2　████████████████████████████████████████

3　████████████████████████████████████████

4　████████████████████████████████████████

5　████████████████████████████████████████

6　████████████████████████████████████████

7　████████████████████████████████████████

8　█████"

9　224.　████████████████████████████████████

10　████████████████████████████████████████

11　████████████████████████████████████████

12　████████████████████████████████████████

13　████████████████████████████████████████

14　████████████████████████████████████████

15　████████████████████████████████████████

16　███████████████████████████

17　225.　████████████████████████████████████

18　████████████████████████████████████████

19　████████████████████████████████████████

20　████████████████████████████████████████

21　████████████████████████████████████████

22　████████████████████████████████████████

23　████████████████████████████████████████

24　█████████

**B.**　**The 2012 Toradol Study ██████████████.**

226.　In 2012, Dr. Mathew Matava, team doctor for the St. Louis Rams and then president-elect of the Physicians Society, formed a task force to examine the use of Toradol and

provide recommendations regarding the future use of the substance in the NFL: Matthew Matava *et al.*, "Recommendations of the National Football League Physician Society Task Force on the Use of Toradol Ketorolac in the National Football League," 4 *Sports Health* 5: 377-83 (2012) (hereinafter "Task Force Recommendations").

227. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"

228. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

229. The task force recognized that a decade had passed since the only other study to look at Toradol in professional sports took place. JM Tokish, *et al.*, "Ketorolac Use in the National Football League: Prevalence, Efficacy, and Adverse Effects," *Phys Sportsmed* 30(9): 19-24 (2002) (hereinafter the "Tokish Study").

230. The Tokish Study sent questionnaires to the head team physician and the head athletic trainer of each of the NFL's 32 teams, with 30 of them responding. In addition to finding that 28 of those 30 teams administered Toradol injections during the 2000 season, the Tokish Study also found the following:

- Of the 28 teams that used the drug, an average of 15 players were given injections (this answer ranged from 2 players to 35 players); and

- Twenty-six of the 28 teams used Toradol on game day.

231.    One team had a policy of no use within 48 hours of games, and another team had a policy of no use within 12 hours of games.

232.    Toradol has the potential for severe complications such as bleeding and renal damage.  In fact, the two teams that did not use Toradol injections had strong policies against its use, citing potential complications, including renal failure and increased risk of bleeding.

233.    Some players did experience Toradol complications; six teams reported at least one adverse outcome relating to Toradol use.  Specifically, four teams noted muscle injury, one documented a case of gastrointestinal symptoms that resolved with cessation of Toradol use, and one reported that a player had increased generalized soreness one day after injection.

234.    The Tokish Study concluded that "given that bleeding times are prolonged by 50% 4 hours after a single [shot of Toradol, use] on game day may deserve reconsideration in contact sports."  The study then called for additional investigation and sought the development of standardized guidelines for Toradol use in athletes.

235.    ███████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████

236.    ███████████████████████████████████████████
██████████████████████████████████████████████████

237.    Over a decade later, the Matava task force determined that standardized guidelines still had not been implemented, and that Toradol use had increased in the NFL during the intervening period.

238.    Therefore, the purpose of the task force was to "[p]rovide NFL physicians with therapeutic guidelines on the use of [Toradol] to decrease the potential risk of severe complications associated with NSAIDs – in particular, the increased risk of hemorrhage resulting from a significant collision or trauma."

239.    The task force recommended that:

- Toradol should not be administered prophylactically "prior to collision sports such as football, where the risk of internal hemorrhage may be serious" in light of the FDA's admonition "that [the drug] not be used as a prophylactic medication prior to major surgery or where significant bleeding may occur."

- Toradol should not be used "to reduce the anticipated pain, during, as well as after competition" because "[t]he perception of NFL players getting 'shot up' before competition has shed an unfavorable light on the NFL as well as on team physicians who are perceived as being complicit with the players' desire to play at all costs, irrespective of the medical consequences."

- If Toradol is to be administered, it should be given orally and not through the more aggressive injections/intramuscularly. The Task Force found that the greater risks associated with injections – infections, bleeding, and injury to adjacent structures – combined with quicker onset of the drug when taken orally "favors the oral route of administration."

240. ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████

241.   Notwithstanding recommendations from the NFLPS that condemn many of the current practices regarding the administration of Toradol on game days, the Matava task force granted the NFL a reprieve given the "unique clinical challenges of the NFL," allowing that "each team physician is ultimately free to practice medicine as he or she feels is in the best interest of the patient."

242.   Finally, despite the clear cut recommendations not to use Toradol prophylactically or intramuscularly, the task force gave itself an out by claiming that the medical literature is "deficient in terms of the ethical considerations implicit with the administration of injectable medications in the athletic setting solely for the athlete to return to competition."

243.   ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

244. ▮▮▮▮▮▮▮▮▮▮▮

## IV.   DEFENDANTS OMITTED OR CONCEALED INFORMATION THAT THEY WERE LEGALLY REQUIRED TO PROVIDE FROM THE PUTATIVE CLASS, <u>CAUSING THEM HARM.</u>

245.   Each of the Clubs, through an agent or employee, made intentional misrepresentations of the kind documented herein to each of the named Plaintiffs and/or members of the putative class.  Set forth below are representative examples of those misrepresentations for each Defendant.

246.   **<u>Arizona Cardinals</u>**:[6]  While playing for the Arizona Cardinals from 2009 to 2012, named Plaintiff Reggie Walker received and consumed large quantities of pain-numbing and anti-inflammatory medications, including but not limited to Toradol, at the Cardinals' training facility, home stadium and during away games, all of which he received from Cardinals team doctors or trainers, including but not limited to team doctor Amit Sahasrabudhe and trainers Jeff Herndon and Jim Shearer, who failed to provide a prescription when one was necessary; identify the medication by its established name; provide adequate directions for the medications' use, including adequate warnings of uses that have potentially dangerous health consequences; or provide the recommended or usual dosage for the medications.  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.  Mr. Walker testified at his deposition "that whole phrase, you're not going to make the team in the training room, or you have be on the field to – you're only as good as your last game.  That stuff is repeated all the time."

---

[6] As a reminder, Exhibit A hereto lists the dates of all games played by Mr. Evans and the remainder of the Plaintiffs.

1  Since retiring from the NFL, he has suffered the following injuries: his left pinky and ring fingers

2  are always numb and that numbness extends all the way to his left elbow; he has particularly

3  painful lower back problems; he often experiences pain in his ankles, knees and hips, and his right

4  leg feels shorter, and functions differently, than his left leg.  As of the time of filing, Mr. Walker

5  is only 30 years old.  Mr. Walker directly attributes the foregoing current injuries he suffers to the

6  injuries he suffered in the NFL that were masked by the Medications, or the Medications

7

8  themselves, provided to him by the Clubs for whom he played.

9          While playing for the Arizona Cardinals from 1991 to 1993, named Plaintiff Robert

10  Massey received and consumed large quantities of pain-numbing and anti-inflammatory

11  medications, including but not limited to Vicodin and Indocin, at the Cardinals' training facility,

12  home stadium and during away games, all of which he received from team trainers, including but

13  not limited to trainers Jim Shearer and Jeff Herndon, who failed to provide a prescription when

14  necessary; identify the medication by its established name; provide adequate directions for the

15  medications' use, including adequate warnings of uses that have potentially dangerous health

16  consequences; provide the recommended or usual dosage for the medications; or otherwise

17

18  meaningfully discuss the medications, including potential long-term effect, they were giving to

19  Mr. Massey.  The medications were provided to him for the sole purpose of enabling him to

20  practice and play through pain.  Mr. Massey also received Toradol injections weekly from Arizona

21  Cardinals' personnel, whose names he cannot remember, at the Cardinals' home stadium and their

22  training facility.  Mr. Massey was never informed of the side effects of Toradol.  Mr. Massey

23

24  currently lives in constant pain.  His shoulders, knees and ankles bother him on a daily basis.  He

25  is unable to exercise properly due to the pain and this has resulted in significant weight gain.  Mr.

26  Massey directly attributes the foregoing current injuries he suffers to the injuries he suffered in the

27

28

1 NFL that were masked by the Medications, or the Medications themselves, provided to him by the

2 Clubs for whom he played.

3        While playing for the Arizona Cardinals from 1991 to 1993, named Plaintiff Steve Lofton

4 received and consumed large quantities of pain-numbing and anti-inflammatory medications,

5 including but not limited to Tramadol, Naproxen and muscle relaxants, at the Cardinals' training

6 facility, home stadium and during away games, all of which he received from Cardinals' team

7 doctors or trainers, including but not limited to trainers John Omohundro, Jeffrey Herndon, and

8 Jim Shearer, who failed to provide a prescription when one was necessary; identify the medication

9 by its established name; provide adequate directions for the medications' use, including adequate

10 warnings of uses that have potentially dangerous health consequences; or provide the

11 recommended or usual dosage for the medications.  The medications were provided to him for the

12 sole purpose of enabling him to practice and play through pain.  Mr. Lofton testified at this

13 deposition that when talking about treating injuries, coaches "would try to encourage you to, you

14 know, tough through it, team needs you, that type of attitude."   Mr. Lofton currently lives with

15 intense pain every day.  His back, neck, shoulders, elbows, wrists, hands, and hips constantly hurt.

16 He has limited ability to exercise and has recently developed pain in his knees and the lower part

17 of his legs.  Mr. Lofton has no family history of back or hip pain.  He needs to sleep on a board or

18 similar hard surface to get any rest.  After his family leaves in the morning, he faces a day in which

19 he simply tries to find ways to forget the pain for just a few hours.  His doctor told him that, even

20 though he was in his mid-40's, he had the body of someone in his mid-80's. Mr. Lofton directly

21 attributes the foregoing current injuries he suffers to the injuries he suffered in the NFL that were

22 masked by the Medications, or the Medications themselves, provided to him by the Clubs for

23 whom he played.

24

25

26

27

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                    - 64 -

While playing for the St. Louis Cardinals during the 1986 and 1987 seasons, putative class member D. Troy Johnson received Motrin and aspirin, which he consumed, and cortisone injections from head trainer John Omohundro, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Johnson now suffers from glomerulonephritis and high blood pressure, which he directly attributes to the Medications provided to him by the Clubs for whom he played.

While playing for the St. Louis Cardinals in 1977, putative class member Marvin Kellum received (and consumed) anti-inflammatory drugs in paper cups from head trainer John Omohundro, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Kellum now suffers from chronic joint pain, fatigue, and arthritis in his shoulders, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs.

While playing for the St. Louis/Arizona Cardinals from 1979 to 1990, Roy Green, a putative class member here and named Plaintiff in the case of *Dent, et al. v. the National Football League*, C-14-2324-WHA (N.D. Ca. 2014), developed painful calcium build-ups on his Achilles tendons.  Rather than treat the pain through rest or surgery, head trainer John Omohundro, assistant trainers Jim Shearer and Jeff Herndon, and team doctors Russell Chick and Bernard Garfinkel gave him massive amounts of anti-inflammatory drugs and allowed him to skip practices to ensure that he would be able to play in games.  While playing for the Cardinals, Mr. Green had tests performed on him that showed he had high creatinine levels, indicative of a limitation on his kidneys.  No one from the NFL ever informed him of those findings and Mr. Green does not know which of the Cardinals team doctors, or for that matter, Cardinals' staff, was aware of those findings, but

1  presumably someone was looking at the tests.   In November 2012, Mr. Green had a kidney

2  replacement.

3      247.   **Atlanta Falcons**:  While playing for the Atlanta Falcons during the 1989 and 1990

4  seasons, named Plaintiff Troy Sadowski received and consumed large quantities of pain-numbing

5  and anti-inflammatory drugs, including but not limited to Tylenol 3 and Motrin, at the Falcons'

6  training facility, home stadium and during away games, from team doctors and trainers, including

7  trainer Billy Brooks, who failed to provide a prescription when one was necessary or adequate

8  directions for the medications' use, including adequate warnings of uses that have potentially

9  dangerous health consequences.  The medications were provided to him for the sole purpose of

10  enabling him to practice and play through pain.  Mr. Sadowski lives with constant pain in his back,

11  hips, wrists, knees, ankles and shoulders.  He still needs to take daily painkillers to get through the

12  day and to sleep.  He can no longer run and, when he walks, he feels as if his joints lack sufficient

13  lubrication.  He cannot lift his daughter nor have her sit on his lap without excruciating pain.  His

14  weight is increasing due to his inability to exercise.  Mr. Sadowski directly attributes the foregoing

15  current injuries he suffers to the injuries he suffered in the NFL that were masked by the

16  Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

17  While playing for the Atlanta Falcons from 1975 to 1985, putative class member Steve Bartkowski

18  received anti-inflammatory drugs, including Butazolidin, which he consumed, from team trainer

19  Jerry Rhea, who provided no warnings or mention of side effects and for the sole purpose of

20  enabling him to practice and play through pain.  Mr. Bartkowski now suffers from chronic joint

21  pain that he directly attributes to the Medications, or the Medications themselves, he received

22  while playing in the NFL.

23      248.   **Baltimore Ravens**:   As reported in ESPN Magazine on November 14, 2016, prior

24  to their January 3, 2015 playoff win against the Pittsburgh Steelers, Ravens' team doctor Andrew

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                    - 66 -

1   Tucker cleared putative class member Eugene Monroe to play, even though he had been suffering

2   from a nagging high ankle sprain and could "barely … walk, much less run, much less push off."

3   Mr. Monroe sought a second opinion from his own doctor, who advised him not to suit up (and he

4   didn't).  In the next game, a loss to the New England Patriots, "Baltimore's coaches played

5   [Monroe] on special teams and not at left tackle.  'It felt like punishment,' [Monroe] says.

6   Baltimore lost."  The article also details how, while playing for the Ravens from 2013 to 2015,

7   Mr. Monroe "stood in line for injections of the anti-inflammatory Toradol, and the rest of the time

8   he took the pills that team doctors and surgeons prescribed for him.  A 10-year prescription for the

9   anti-inflammatory Celebrex; another for the gastric distress the Celebrex caused; another for

10  Ambien, when he was too jacked up or in too much pain to sleep; another for the migraines caused

11  by his concussions; and then the prescriptions for the pain, Vicodin and Oxycontin, when he was

12  either trying to forestall surgery or trying to recover from it.  His intake wasn't out of the ordinary.

13  It was typical, and so was the fact that it got him high."  Ultimately, Mr. Monroe was cut by the

14  Ravens because, he thinks, he advocated for use of marijuana as opposed to opioids for dealing

15  with pain in the NFL.  Regardless, Mr. Monroe penned an article titled "Leaving the Game I Love"

16  in which he stated that he was "only 29 and [that he] still ha[s] the physical ability to play at a very

17  high level, so [he knows his] decision to retire may be puzzling to some.  But I am thinking of my

18  family first right now – and my health and my future."  He went on in that article to state that

19  "[m]ore steps need to be taken to curb the overuse of opioids in NFL locker rooms."

20          In another article that Mr. Monroe penned on May 23, 2016, "Getting off the T Train," he

21  described "a small office sectioned off from the training room in M&T Bank Stadium that we use"

22  for the "T Train" – Toradol injections, which according to Mr. Monroe "is nothing more than a

23  bunch of really large guys waiting to pull their pants down to get shot in the butt with Toradol, a

24  powerful painkiller that will help them make it through the game and its aftermath."  In that article,

25  

26  

27  

28

1    in which he advocates for medical marijuana research on pain in the NFL, Mr. Monroe poses the

2    following question: "How can a league so casual about the use of addictive opioids take such a

3    hard line on a drug that might provide a safer alternative?"  He also tells the story of a former

4    University of Virginia teammate who "had gotten addicted to pain pills [in the NFL] and

5    essentially vanished [and] left his home for the streets and is now addicted to heroin."

6

7        While playing for the Baltimore Ravens in 1999 and 2000, Charles Evans, represented in

8    this matter by his ex-wife, Etopia Evans, received pills from team trainers, including Bill

9    Tessendorf, and Toradol injections from doctors, who upon information and belief were Claude

10   Moorman and/or Andrew Tucker, at the Ravens' training facility, home stadium and during away

11   games.  At her deposition, Ms. Evans testified that, while he played for the Ravens, Mr. Evans

12   would take Motrin and Percocet, which were given to him in "a little yellowish envelope" that had

13   no writing on it.  She further testified that, while she could not "put a number on it," Mr. Evans

14   took "a lot of pills" while with the Ravens and that he took more pills in Baltimore than he had in

15   Minneapolis.  Ms. Evans testified that Mr. Evans did anything and everything he could to stay on

16   the field and was worried every "single day" he played in the NFL about being cut and "losing his

17   spot to guys from major universities because he knew that he came from a small black college that

18   no one had ever heard of, and if he came off the field the guy from Ohio State or everybody who

19   backed him up came from a big school [and if they came in], it [would] be hard for [Mr. Evans] to

20   get back into the rotation" and, as a result, Mr. Evans avoided surgery and instead took pain pills

21   and Toradol injections, which were readily provided to him.

22

23       After retiring from the Baltimore Ravens in 2001, Mr. Evans served as a sideline reporter

24   for the team through the time of his death in 2008 at the age of 41 from heart failure.  Ms. Evans

25   testified that, while serving as a sideline reporter, Mr. Evans would go to Ravens' team trainer Bill

26   Tessendorf at the Ravens training facility in Owings Mills, Maryland to obtain pain pills and anti-

27

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                                    - 68 -

inflammatory drugs, including Percocet, Vicodin, Motrin and Advil.  Ms. Evans further testified that Mr. Evans would tell her that he was going to obtain those medications from Mr. Tessendorf, did in fact obtain those medications from Mr. Tessendorf, and that he consumed them.  She further testified that she never saw him with a "prescription-like" bottle containing any of the medications he received from Mr. Tessendorf, which caused her to "know" that Mr. Evans did not receive a prescription for those medications (such as Percocet and Vicodin) that required one.  She further testified that Mr. Evans saw Ravens doctors after he finished playing for knee, ankle, and neck injuries and that the ankle and neck injuries originally occurred in Minnesota.

After he retired, Mr. Evans was addicted to painkillers.  He became a person Mrs. Evans no longer recognized – constantly in pain and searching for relief.  Eventually, Mrs. Evans and their child moved back to her home in Baton Rouge because daily life with Mr. Evans had become too difficult, thereafter seeing him on family vacations and frequent visits.  Ms. Evans testified at her deposition that, after his retirement, Mr. Evans was in pain in all the areas where he had suffered major injuries while playing, such as his wrist, knees, ankles and triceps.  A limp that had started while he played for the Vikings became progressively worse.  She further testified that he began to progressively lose his hearing in his right ear while playing for the Vikings, that by the time he got to the Ravens, he was completely deaf in his right ear, and that he told no one (other than her) about it because of "job security."  She further testified that, in 2008, the year he died, he "was just aching all over" and that he attributed that pain to the time he played in the NFL.

In 2008, eight years after retiring from professional football, Mr. Evans died of heart failure due to an enlarged heart.  His family had no history of heart problems and his parents were alive as of the filing of this action.  Mr. Evans died alone in a jail cell – he had been incarcerated two days before his death for failure to pay support for a child from college.  He had spent his money on painkillers instead.  Ms. Evans directly attributes Mr. Evans' addiction, pain, and death to the

1    injuries he suffered in the NFL that were masked by the Medications, or the Medications

2    themselves, provided to him by the Clubs for whom he played.

3          While playing for the Baltimore Ravens from 1998 – 2001, putative class member Brad

4    Jackson received Toradol, Indocin, Percocet, Vicodin, Prednisone steroid packs, and other anti-

5    inflammatory drugs, which he consumed, as well as injections of cortisone and other anti-

6    inflammatory drugs, from Dr. Andrew Tucker and trainers Bill Tessendorf and Marc Smith, who

7    provided no warnings or mention of side effects and for the sole purpose of enabling him to

8    practice and play through pain. Mr. Jackson now suffers from chronic joint pain, which he believes

9    is directly attributable to the injuries he suffered in the NFL that were masked by the Medications,

10   or the Medications themselves, provided to him by the Clubs for whom he played.

11

12         249. **Buffalo Bills**: While playing for the Buffalo Bills during the 2006 pre-season,

13   named Plaintiff Eric King injured his back and was given narcotics by team doctors and forced

14   back into the game before his back healed. During the next game, he hurt his back again. He was

15   given controlled substances after that injury. The pills he received from the doctors were pills in

16   small vials and envelopes, sometimes with no writing on them. In addition, during the 2005

17   season, Mr. King received and consumed pain-numbing and anti-inflammatory medications,

18   including but not limited to Percocet, Toradol, and muscle relaxants, at the Bills' training facility,

19   home stadium and during away games, all of which he received from Bills team doctors or trainers,

20   including but not limited to trainer Shone Gipson, who failed to provide a prescription when one

21   was necessary; identify the medication by its established name; provide adequate directions for the

22   medications' use, including adequate warnings of uses that have potentially dangerous health

23   consequences; or provide the recommended or usual dosage for the medications.

24

25

26   ███████████████████████████████████████████████████████

27   ███████████████████████████████████████████████████████

28

1 ███████████████████████████████████████

2 ███████████████████████████████████████

3 ███████████████████████████████████████

4 ███████████████████████████████████████

5 ███████████████████████████████████████

6 ███████████████████████████████████████

7 ███████████████████████████████████████

8 ███████████████████████████████████████

9 ██████

10     The medications provided to Mr. King were done so for the sole purpose of enabling him

11 to practice and play through pain.  Mr. King now lives with constant pain.  During his career, he

12 had two surgeries on his left forearm and one on his left shoulder.  He also hurt his lower left back.

13 In addition to the surgeries and injections, he was taking pills at least twice a week.  The same left

14 forearm and shoulder and back that were "fixed" by Club doctors bring pain to Mr. King's daily

15 life.  Mr. King directly attributes the foregoing current injuries he suffers to the injuries he suffered

16 in the NFL that were masked by the Medications, or the Medications themselves, provided to him

17 by the Clubs for whom he played.

18     While playing for the Buffalo Bills during the 1987 and 1988 seasons, putative class

19 member Dwight Drane regularly received cortisone and other numerous injections from team

20 doctor Richard Weiss, who provided no warnings or mention of side effects and for the sole

21 purpose of enabling him to practice and play through pain.

22     And while playing for the Buffalo Bills from 1987 – 1991, Mr. Drane received anti-

23 inflammatory drugs, which he consumed, from trainers Bud Carpenter and Eddie Abramoski, who

24 provided no warnings or mention of side effects and for the sole purpose of enabling him to

25 practice and play through pain.

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA

- 71

1   Mr. Drane now suffers from arthritis, weakened muscles and tendons, stiff joints and joint

2   pain that he believes is directly attributable to the injuries he suffered in the NFL that were masked

3   by the Medications, or the Medications themselves, provided to him.

4   While playing for the Buffalo Bills from 1978 – 1985 and again in 1987, putative class

5   member Will Grant received anti-inflammatory drugs and painkillers, including Butazolidan,

6   Naprosyn and Percodan, which he consumed, from Dr. Richard Weiss and trainers Bud Tice and

7   Eddie Abramoski, who provided no warnings or mention of side effects and for the sole purpose

8   of enabling him to practice and play through pain.  Mr. Grant now suffers from various orthopedic

9   ailments, including knee and ankle replacements, that he believes is directly attributable to the

10  injuries he suffered in the NFL that were masked by the Medications, or the Medications

11  themselves, provided to him.

12  

13  250.  **Carolina Panthers**:  While playing for the Carolina Panthers in 1995, 1996, 1998

14  and 1999, named Plaintiff Steve Lofton received and consumed enormous quantities of pain-

15  numbing and anti-inflammatory medications, including but not limited to Tramadol, Naproxen,

16  and muscle relaxants, at the Panthers' training facility, home stadium and during away games, all

17  of which he received from Panthers team doctors or trainers, including but not limited to head

18  trainer John Kasik, who failed to provide a prescription when one was necessary; identify the

19  medication by its established name; provide adequate directions for the medications' use, including

20  adequate warnings of uses that have potentially dangerous health consequences; or provide the

21  recommended or usual dosage for the medications.  The medications were provided to him for the

22  sole purpose of enabling him to practice and play through pain.  Mr. Lofton now suffers from the

23  injuries described above, which he directly attributes to the injuries he suffered in the NFL that

24  were masked by the Medications, or the Medications themselves, provided to him by the Clubs for

25  whom he played.

26  

27  

28  

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                    - 72 -

1   While playing for the Carolina Panthers from 2001 – 2002, putative class member Brad Jackson

2   received Toradol, Indocin, Percocet, Vicodin, and other anti-inflammatory drugs, which he

3   consumed, from trainers Ryan Vermillion and Mark Shermansky, who provided no warnings or

4   mention of side effects and for the sole purpose of enabling him to practice and play through pain.

5   Mr. Jackson now suffers from chronic joint point that he believes is directly attributable to the

6   injuries he suffered in the NFL that were masked by the Medications, or the Medications

7   themselves, provided to him.

8

9       251.   **Chicago Bears**:  While playing for the Chicago Bears from 1994 to 1995, named

10  Plaintiff Jeff Graham received and consumed enormous quantities of pain-numbing and anti-

11  inflammatory medications at the Bears' training facility, home stadium and during away games,

12  all of which he received from Bears team doctors or trainers, including but not limited to trainers

13  Fred Caito and Tim Bream, who failed to provide a prescription when one was necessary; adequate

14  warnings of uses that have potentially dangerous health consequences; or provide the

15  recommended or usual dosage for the medications.  The medications were provided to him for the

16  sole purpose of enabling him to practice and play through pain.  At his deposition, Mr. Graham

17  testified that he took anti-inflammatory "injections before every game."  He further testified that

18  the players "were pressured to play" by "the coaches, you know, getting on the field and playing.

19  The trainers wanted you to play.  I mean everybody wanted you to get out there and play."  He

20  further testified that his position coach, Ivan Fears, would routinely say to him "Jeff, we need you

21  to play."

22

23      At other times during his playing career, Mr. Graham took in pill form Celebrex, Indocin,

24  Toradol, Tylenol-Codeine # 3, Prednisone and Catephlam.  Trainers also gave him pills without

25  telling him the name of the drug he was receiving.  These pills were handed to him by Club trainers

26  or placed in envelopes or vials.  For approximately the last seven years of his career, he received

injections of Toradol twice a week – once for practice and before every game.  He also received many injections of Cortisone in various injured body parts.  His Clubs frequently provided Mr. Graham with alcohol during the return flight from away games.  His experience regarding these Medications was substantially similar with each Club for whom he played.

Mr. Graham now lives in constant pain.  He has pain in both shoulders, neck, hips, lower back, both elbows, both hamstrings, his fingers, wrists, left toe and right knee.  He cannot stand for long periods and needs special shoes to lessen the pain.  He is stiff and sore all day.  He cannot sleep at night, moving from bed to floor to couch throughout the night.  Mr. Graham struggles to control his weight due to his limited ability to exercise.  He believes his current pain is directly attributable to various injuries suffered during his NFL career.

While playing for the Chicago Bears from 1975 to 1983, putative class member Thomas Daniel Neal received Darvon, Percocet, and Vicodin, which he consumed, and cortisone and other painkiller injections from head trainer Fred Caito and team doctors Theodore Fox and Clarence Fossier, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Neal now suffers from high blood pressure, arthritis, and chronic joint pain, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the Chicago Bears during the 1983, 1988, and 1991 seasons, putative class member here, named Plaintiff in the case of *Dent, et al. v. the National Football League*, C-14-2324-WHA (N.D. Ca. 2014), and Hall of Famer Richard Dent received enormous amounts of anti-inflammatory drugs and painkillers, which he took upon receipt, from head trainer Fred Caito and team doctors Clarence Fossier and John Bryna, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Dent now

suffers from an enlarged heart and nerve damage, particularly in his feet, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

In particular, during his rookie 1983 season, Mr. Dent badly tore his hamstring and tendons/ligaments in his right ankle when four players fell on him during a pre-season game against the Buffalo Bills.  The pain was so bad that it was difficult for Mr. Dent to sit on the toilet or walk.  He questioned head trainer Fred Caito as to whether he should return to play but rather than sit him out, Mr. Caito gave Mr. Dent massive amounts of anti-inflammatory drugs and painkillers to enable him to play.  He ended up playing in the final pre-season game against the Kansas City Chiefs, so doped up on medications that he could hardly remember playing.

Moreover, on September 9, 1990 during a game against the Seattle Seahawks, Mr. Dent suffered a broken bone in his foot.  Fred Caito and team doctors Clarence Fossler and Jay Munsel told him that he had done all the damage he could and that, while he therefore could have surgery, they could also supply him with painkillers to allow him to continue playing.  Trusting the doctors and trainers had his best interests at heart, he chose to continue playing and for the following eight weeks, he received repeated injections of painkillers from those doctors, as well as pills from Mr. Caito, to keep playing.  Today, Mr. Dent has permanent nerve damage in that foot.

While playing for the Chicago Bears during a playoff game against the New York Giants, Keith Van Horne, a putative class member here and named Plaintiff in the case of *Dent, et al. v. the National Football League*, C-14-2324-WHA (N.D. Ca. 2014), could not lift his arm.  He told the team doctor and head trainer Fred Caito what was going on; rather than keep him out of the game, they gave him two Percodan for the first half and two Percodan for the second half.  They did not tell him any side effects or give him any warnings related to the foregoing administration of a Schedule II controlled substance.

This was not the only issue that Mr. Van Horne had with Percodan.  Early in his career, he obtained a prescription for Percodan related to an ankle injury from a physician not affiliated with the NFL.  Days later, head trainer Fred Caito called Mr. Van Horne into his office and lambasted him for obtaining the Percodan because it led the DEA to issue a letter to the Bears inquiring as to why Mr. Van Horne was obtaining Schedule II controlled substances.  When Mr. Van Horne explained that he had obtained the controlled substances from a physician, Mr. Caito dismissed the explanation, and had the temerity to say that Mr. Van Horne had put him in a bad spot by lawfully obtaining Percodan from a licensed physician after a consult and work-up, which is the way it is supposed to work, because he ordered controlled substances, including Percodan, before the season, in bulk, in players' names (even if they had no need for the medication), all of which are violations of the CSA and/or its implementing regulations

252.  **Cincinnati Bengals**:  While playing for the Cincinnati Bengals from 1994 to 1996, named Plaintiff Troy Sadowski received Toradol shots before every game for which he suited up at the stadium at which the game was taking place from Rob Recker, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  The injections were given prophylactically.  In addition, Mr. Sadowski  received and consumed enormous quantities of pain-numbing and anti-inflammatory medications, including but not limited to Tylenol-Codeine # 3 and muscle relaxants, at the Bengals' training facility, home stadium and during away games, all of which he received from Bengals team doctors or trainers, including but not limited to trainers Paul Sparling and Rob Recker, who failed to provide a prescription when one was necessary or identify the medication by its established name.  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.  Mr. Sadowski testified at his deposition that "trainers will pressure you, get you out of the training room, hey, you been in here too long, get out of here."  Mr. Sadowski now suffers from

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                                    - 76

1   the injuries described above, which he directly attributes to the injuries he suffered in the NFL that

2   were masked by the Medications, or the Medications themselves, provided to him by the Clubs for

3   whom he played.

4          While playing for the Cincinnati Bengals from 1970 to 1978, putative class member Ken

5   Johnson received anti-inflammatory drugs, including Butazolidan, which he consumed, from

6   Marvin Pollins, who provided no warnings or mention of side effects and for the sole purpose of

7   enabling him to practice and play through pain.  Mr. Johnson now suffers from arthritis in his

8   shoulders and knees, high blood pressure, a chemical imbalance in his brain, an enlarged prostrate,

9   and sciatic nerve pain down his left side, all of which he attributes directly to the injuries he

10  suffered in the NFL that were masked by the Medications, or the Medications themselves, provided

11  to him by the Clubs for whom he played.

12         While playing for the Cincinnati Bengals from 1977 to 1983, putative class member Peter

13  Johnson received anti-inflammatory drugs, which he consumed, from Bill Davis and Marvin

14  Pollins, who provided no warnings or mention of side effects and for the sole purpose of enabling

15  him to practice and play through pain.  Mr. Johnson now suffers from arthritis, a fractured neck,

16  high blood pressure, and headaches, all of which he directly attributes to the injuries he suffered

17  in the NFL that were masked by the Medications, or the Medications themselves, provided to him

18  by the Clubs for whom he played.

19         While playing for the Cincinnati Bengals from 2000 to 2002, putative class member Curtis

20  Keaton received Vioxx, Celebrex, Ibuprofen, Naproxen, Flexeril, Percocet, which he consumed,

21  and Cortisone and other pain killer injections from team trainer Paul Sparling, who provided no

22  warnings or mention of side effects and for the sole purpose of enabling him to practice and play

23  through pain.  Mr. Keaton now suffers from chronic joint pain, which he believes is directly

1    attributable to the injuries he suffered in the NFL that were masked by the Medications, or the

2    Medications themselves, provided to him by the Clubs for whom he played.

3        253.  **Cleveland Browns**:        While playing for the Cleveland Browns on or about

4    October 8, 1984, named Plaintiff Duriel Harris began having heart issues during practice; he

5    testified at his deposition that it was "beating like a rabbit heart."  He was in the middle of running

6    sprints when it happened and testified that he had to stop, having never had to quit a drill in his

7    life, because he was afraid he was having a heart attack.  He then went inside the training room

8    where trainers and doctors had him do simple jumping jacks but his heart kept racing.  He was

9    then rushed to the Cleveland Clinic, where he saw the team doctor, Dr. Bergfeld, who prescribed

10   him medications.  He then went back to the Browns doctors and trainers, including Bill Tessendorf,

11   who told him he was OK to practice and to take the medications prescribed to him without ever

12   telling him what caused the heart problem in the first place, whether it would come back, or

13   whether he might die as a result of it.  Mr. Harris testified that thereafter, he had to "play with that

14   fear in the back of [his] mind" because this had never happened to him before and it "scared the

15   living daylights out of [him]."  Even though he still played after the incident, he was never the

16   same player.

17

18        Mr. Harris currently has elevated serum creatinine concentrations.  He is not on dialysis at

19   this time, but his doctor is monitoring his kidney for any signs of additional failure. His heart also

20   has an irregular beat due to an enlarged chamber.  He takes daily pills to help his heart pump,

21   which is related to the heart issues he had with the Browns.  Mr. Harris has also required surgery

22   to remove one parathyroid gland after it was discovered that his parathyroid glands were

23   improperly regulating the calcium levels in his body.  He does not smoke or drink alcohol and he

24   has no family history of kidney, heart or thyroid problems.  Mr. Harris is also in constant pain from

25   all of his joints.  He has arthritis in his fingers and remembers a doctor stitching up the webbing

of his hand at half time of a game.  He also has pain from football injuries in his neck, back, hands, shoulders, knees and ankles.  On or around February 13, 2017, Mr. Harris underwent a cardiogram which showed a partial arterial blockage.  As a result of this finding, Mr. Harris' medical providers scheduled an angiogram to further investigate the blood flow in his arteries.  Prior to the angiogram, however, Mr. Harris' laboratory results showed a large spike in his kidney creatinine levels.  This finding caused Mr. Harris' doctors to cancel the scheduled angiogram and recommend that he immediately see a kidney specialist to diagnose this impaired functionality.  At this time, Mr. Harris is attempting to schedule an appointment with a kidney specialist before Friday, February 24, 2017.  Pending this visit, all of Mr. Harris' future medical procedures – including a knee replacement – have been placed on hold.  Mr. Harris directly attributes the foregoing current injuries he suffers to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the Cleveland Browns during the 1976 and 1977 seasons, putative class member Albert R. Dennis III consumed anti-inflammatory drugs, which Leo Murphy and other trainers for the club provided to him without warnings or mention of the side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Dennis now suffers from high blood pressure, urinary problems, fatigue, lower back pain, headaches, and ankle and foot swelling that he believes is directly attributable to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him.

While playing for the Cleveland Browns from 1975 to 1982, putative class member Cleophus Miller regularly received cortisone injections from Drs. Victor Ippolito and John Bergfield and trainer Leo Murphy, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Miller now suffers from knee, shoulder and ankle problems, all of which he believes is directly attributable to the injuries

1  he suffered in the NFL that were masked by the Medications, or the Medications themselves,

2  provided to him by the Club for whom he played.

3      254.  **Dallas Cowboys**:  When named Plaintiff Duriel Harris first arrived in Dallas in

4  1984, the player personnel director told him that if he didn't sign a medical waiver for his heart,

5  the Club would cut him right then.  He signed the waiver.  Then, during the week of July 29, 1985

6  (right before the first pre-season game), he hurt his back and was having back spasms.  From that

7  point through the last pre-season game on August 31, trainers Dan Cochren and Ken Locker gave

8  him muscle relaxants every day at the Cowboys' training facility and in doing so, failed to provide

9  him with warnings or any information about side effects as to the medications they were providing

10  him.  He remembers it so clearly because the trainer gave him boots and he had to hang upside

11  down from a chinning bar and after he was hanging, they would give him the muscle relaxant.  The

12  

13  medications were provided to him for the sole purpose of enabling him to practice and play through

14  pain.  Mr. Harris now suffers from the injuries described above, which he directly attributes to the

15  injuries he suffered in the NFL that were masked by the Medications, or the Medications

16  themselves, provided to him by the Clubs for whom he played.

17  

18      255.  **Denver Broncos**:  While playing for the Denver Broncos, plaintiff Alphonso

19  Carreker regularly consumed enormous quantities of painkilling anti-inflammatory drugs and

20  muscle relaxers, which trainers for that club made readily available and frequently volunteered.

21  The Medications included Motrin 800, Oxycontin, Tylenol-Codeine #3 and Percocet.  He was

22  taking three or four pills during the week and the nights before and after every game.  The trainers

23  had the pills in bags and handed them to Mr. Carreker for his use.  Any player who asked to get a

24  pill always received one and the trainers frequently volunteered pill availability.  He also received

25  frequent Cortisone injections in his knees and shoulders.  Mr. Carreker was never informed of the

26  possible side effects of any of these drugs.

27  

28

Mr. Carreker discovered he had an infection in his heart in 2012, which caused severe inflammation around his heart.  The anti-inflammatories he was given for that malady were ineffective due to the resistance he had built up to such drugs from the enormous quantities taken during his playing career.  In or around September 2013, he underwent heart surgery to drain the inflammation from around his heart.  In or around 2008, Mr. Carreker was diagnosed with gouty arthritis as a result of his liver insufficiently processing the amount of uric acid in his body.  This condition regularly causes pain, swelling and poor circulation in various joints including, but not limited to, his lower legs and feet.  His doctors have advised him not to eat beef or pork because of his heart and stomach problems.  Mr. Carreker has constant pain in his neck, back, ankles, knees and shoulders.  He has had surgeries on his knees and has not yet decided on whether to have a recommended rotator cuff surgery.  Mr. Carreker directly attributes the foregoing current injuries he suffers to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

256.   **Detroit Lions**: While playing for the Detroit Lions during the 2009 and 2010 seasons, named Plaintiff Eric King received and consumed pain-numbing and anti-inflammatory medications, including but not limited to Toradol, Oxycontin, Percocet, and Vicodin, at the Lions' training facility, home stadium and during away games, all of which he received from Lions team doctors or trainers, including but not limited to trainers Dean Kleinschmidt and/or Al Bellamy, who failed to provide a prescription when one was necessary; identify the medication by its established name; provide adequate directions for the medications' use, including adequate warnings of uses that have potentially dangerous health consequences; or provide the recommended or usual dosage for the medications.  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.  In particular, on September 13, 2009, Mr. King separated his left shoulder but testified that he was told by the team doctor, David

1  Collon or Kyle Anderson, that he needed to "heal fast and get back out on the field as soon as I

2  possibly could have" and that Mr. Kleinschmidt and/or Mr. Bellamy gave him Oxycodone to play.

3  Mr. King now suffers from the injuries described above, which he directly attributes to the injuries

4  he suffered in the NFL that were masked by the Medications, or the Medications themselves,

5  provided to him by the Clubs for whom he played.

6  On September 4, 1994, the Detroit Lions were playing the Atlanta Falcons in the first game of the

7  season.  Named Plaintiff Robert Massey had just signed his first large contract, coming to the

8  Lions as a free agent.  He re-injured his right ankle (injured in his previous tenure with the Saints)

9  early in the game and someone – Mr. Massey believes it was a trainer – injected him with Toradol

10 on the sideline while the game was being played.  He finished playing the game.  After the game,

11 he was lying on the training table as the ankle ballooned.  Head Coach Wayne Fonts entered the

12 training room, saw Mr. Massey and the swollen ankle and then said to him "Congratulations, you

13 played a great game today.  But you know we didn't pay you that kind of money to sit on the

14 bench… I need you to help us win games."  He didn't practice much during the next week because

15 he couldn't run.  The Lions' next game was away against the Minnesota Vikings on September

16 11, 1994.  On the evening before the game, a trainer approached Mr. Massey, gave him some pills

17 of Indocin and told him they would help his ankle.  Two hours before the game, the Club doctor

18 gave him a Toradol shot and the trainer wrapped his ankle extensively.  Mr. Massey played the

19 entire game and intercepted a pass.  Mr. Massey was given Toradol to permit him to get through

20 the season practicing and playing on a painful and swollen ankle.  He now lives in constant pain

21 from, among other things, his ankles.  Mr. Massey received numerous doses from Lions trainers

22 of what believes was Indocin and Ibuprofen and similar medications to numb the pain he was in,

23 so he could practice and to play in games.  Mr. Massey believes the dose amounts increased from

24 those administered in his previous seasons.  Mr. Massey also recalls being given a Darvocet or

another muscle relaxer, but is not sure what team he was with when he received that medication. As Mr. Massey has testified, on his "five different teams, the only thing that was different was the names of the people you dealt with."

257.  **Green Bay Packers**: While playing for the Green Bay Packers, named Plaintiff Alphonso Carreker regularly consumed large quantities of anti-inflammatory drugs, painkillers, including Motrin 800s, and muscle relaxants, which trainers for that club made readily available and frequently volunteered.  In addition, for every game he played for the Packers, Mr. Carreker took at least one pill either before the game or at halftime.  Although the trainers frequently did not tell him what they were giving him, Mr. Carreker believes it was one of four: Vicodin, Percocet, Hydrocodone or Tylenol 3 with Codeine.  Mr. Carreker further remembers that Packers' team doctor Brusky would come to the Packers' training facility on either Thursday or Friday in any given week in season to see players with a specific injury.  The player would indicate to Dr. Brusky the body part that was hurting and his consistent response before injecting the injured area was "I have a cocktail for that."   In 2013, Mr. Carreker underwent heart surgery to drain inflammation from an infection in his heart after anti-inflammatory drugs proved ineffective due to the resistance he had built up to such drugs during his playing career.

258.  **Houston Texans**:  While playing for the Houston Texans from 2006 to 2007, named Plaintiff Cedric Killings received and consumed pain-numbing and anti-inflammatory medications at the Texans' training facility, home stadium and during away games, all of which he received from Texans team doctors or trainers, including but not limited to trainers Kevin Bastin and Jon Ishop, who failed to provide the recommended or usual dosage for the medications.  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.  Mr. Killings has recently been placed on medication for high blood pressure.  After retiring from professional football, Mr. Killings also experienced an inflamed gall bladder, which

1    necessitated the removal of the entire organ in an emergency surgery.  Mr. Killings also has

2    constant pain in his back, shoulders, knees, ankles and hands.  He was taking pills and/or injections

3    for pain in all of these areas during his playing career.  Mr. Killings has no family history of gall

4    bladder problems or chronic pain in any of the joints mentioned herein.  Mr. Killings directly

5    attributes the foregoing current injuries he suffers to the injuries he suffered in the NFL that were

6    masked by the Medications, or the Medications themselves, provided to him by the Clubs for

7    whom he played.

8

9        259.   **Indianapolis Colts**:  While playing for the Indianapolis Colts from 1987 to 1993,

10   named Plaintiff Chris Goode received and consumed enormous quantities of pain-numbing and

11   anti-inflammatory drugs, including but not limited to Naproxen, Tylenol-Codeine # 3, Vicodin,

12   Indocin, and Percocet, at the Colts' training facility, home stadium and during away games, all of

13   which he received from team doctors and trainers, including but not limited to trainers Hunter

14   Smith and Dave Hammer, who failed to provide a prescription when one was necessary; identify

15   the medication by its established name; provide adequate directions for the medications' use,

16   including adequate warnings of uses that have potentially dangerous health consequences; or

17   provide the recommended or usual dosage for the medications.  The medications were provided to

18   him for the sole purpose of enabling him to practice and play through pain.  After suffering a neck

19   injury in the 1993 season, Mr. Goode believes that the Colts were unwilling to re-sign him out of

20   fear of his inability to play the following season.  Moreover, he believes that other teams were told

21   of his neck injury and that they were unwilling to sign him because of that reason too.  Mr. Goode

22   was diagnosed as having renal cancer in or around 2015.  He underwent a partial nephrectomy in

23   May 2015 to remove half of his kidney along with the malignant tumor growth.  He is currently in

24   remission but continues to experience pain on a daily basis resulting from this surgery.  Just last

25   week, he began experiencing new complications related to his kidneys.  Mr. Goode has no family

26

27

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                        - 84 -

1   history of any kidney problems.   He also suffers from numbness in his arms and legs and constant

2   pain in his neck, back, elbows, wrists, feet, knee and ankle.  Mr. Goode directly attributes the

3   foregoing, current injuries to the injuries he suffered in the NFL that were masked by the

4   Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

5        While playing for the Indianapolis Colts during the 1985, 1988, 1989, 1990 and 1993

6   seasons, putative class member Kevin Call received Valium, Prednisone, Tylox, Tylenol with

7   Codeine, Toradol, Codeine and Naprosyn, which he consumed, from team doctors Shelbourne,

8   Rettig, and Misamore and team trainers Hunter Smith and Dave Hammer, who provided no

9   warnings or mention of side effects and for the sole purpose of enabling him to practice and play

10  through pain.  Mr. Call now suffers from chronic headaches and joint pain that he believes is

11  directly attributable to the injuries he suffered in the NFL that were masked by the Medications,

12  or the Medications themselves, provided to him.

13       While playing for the Indianapolis Colts during the 1997 season, putative class member

14  here, named Plaintiff in the case of *Dent, et al. v. the National Football League*, C-14-2324-WHA

15  (N.D. Ca. 2014), and Hall of Famer Richard Dent received anti-inflammatory drugs and

16  painkillers, which he took upon receipt, from head trainer Hunter Smith and assistant trainers Dave

17  Hammer and Dave Walston and team doctors Arthur Rettig, Doug Robertson and Donald

18  Shelbourne, who provided no warnings or mention of side effects and for the sole purpose of

19  enabling him to practice and play through pain.  Mr. Dent now suffers from an enlarged heart and

20  nerve damage, particularly in his feet, which he directly attributes to the injuries he suffered in the

21  NFL that were masked by the Medications, or the Medications themselves, provided to him by the

22  Clubs for whom he played.

23       260.   **Jacksonville Jaguars**:  While playing for the Jacksonville Jaguars during the 1996

24  season, named Plaintiff Robert Massey received and consumed enormous quantities of pain-

numbing and anti-inflammatory medications, including but not limited to a "whole bunch of Toradol shots" and what he believes were Ibuprofen and Indocin, at the Jaguars' training facility, home stadium and during away games, all of which he received from team trainers, including but not limited to head trainer Mike Ryan, who failed to provide a prescription when necessary; identify the medication by its established name; provide adequate directions for the medications' use, including adequate warnings of uses that have potentially dangerous health consequences; or provide the recommended or usual dosage for the medications.  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.  Mr. Massey now suffers from the injuries described above, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

261.  **Kansas City Chiefs**:  While playing for the Kansas City Chiefs during the 1991 season, named Plaintiff Troy Sadowski received and consumed enormous quantities of pain-numbing and anti-inflammatory medications at the Chiefs' training facility, home stadium and during away games, all of which he received from Chiefs' team doctors or trainers, including but not limited to trainer David Kendall, who failed to provide a prescription when one was necessary or adequate directions for the medications' use, including adequate warnings of uses that have potentially dangerous health consequences.  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.   Mr. Sadowski now suffers from the injuries described above, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the Kansas City Chiefs during the 1996 season, trainers for that club regularly provided putative class member Reggie Johnson with Naprosyn without warnings of side

1  effects.  Mr. Johnson now suffers from stomach pain and acid reflux that he believes is directly

2  attributable to the Medications provided to him by the Clubs for whom he played.

3       262.  **Los Angeles Rams**:  While playing for the Los Angeles/St. Louis Rams from 1992

4  to 1996, named Plaintiff Darryl Ashmore received and consumed enormous quantities of pain-

5  numbing and anti-inflammatory medications, including but not limited to Darvocet, Percocet,

6  Vicodin, Celebrex and sleeping pills, at the Rams' training facility, home stadia and during away

7  games, all of which he received from Rams' team doctors and trainers, including trainer Jim

8  Anderson, who failed to provide a prescription when one was necessary; identify the medication

9  by its established name; provide adequate directions for the medications' use, including adequate

10  warnings of uses that have potentially dangerous health consequences; or provide the

11  recommended or usual dosage for the medications.  The medications were provided to him for the

12  sole purpose of enabling him to practice and play through pain.  In particular, on September 17,

13  1995 in a game against the Carolina Panthers, Mr. Ashmore ruptured a disc in his neck (which

14  would later turn into a career-ending neck injury) but was kept on the field for that game, and for

15  the remainder of the season, through Medications given to him by Rams' team doctors and trainers,

16  including Mr. Anderson, at their training facility, home stadium and during away games.

17       Mr. Ashmore is now in constant pain in his neck, shoulders and knees.  He has also been

18  told that his kidneys may be damaged because a blood test revealed that his kidneys were leaking

19  protein.  His life insurance company raised his premiums due to the elevated serum creatinine

20  levels in his body.  He has no family history of kidney problems.  Mr. Ashmore directly attributes

21  the foregoing current injuries he suffers to the injuries he suffered in the NFL that were masked

22  by the Medications, or the Medications themselves, provided to him by the Clubs for whom he

23  played.

24

25

26

27

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                    - 87 -

1    While playing for the Los Angeles Rams in the 1986 season, trainer Jim Anderson regularly gave

2    Indocin to putative class member Steve Bartkowski, which he consumed, while failing to advise

3    him of any dangers related to the drug and for the purpose of allowing him to practice and play

4    despite pain.  Mr. Bartkowski now suffers from chronic joint pain that he attributes directly to the

5    injuries he suffered while playing in the NFL that were masked by the Medications, or the

6    Medications themselves, provided to him by the Clubs for whom he played.

7

8        263.    **Miami Dolphins**:  On December 5, 1976, the Miami Dolphins were playing a home

9    game against the Buffalo Bills.  Named Plaintiff Duriel Harris was a 20-year-old rookie.  He

10   severely sprained ligaments in his ankle at the end of that game and practiced very little during the

11   following week.  The Dolphins' final game of the year was the next week on December 11, 1976

12   at home against the Minnesota Vikings.  Mr. Harris limped on to the field for pre-game warmups,

13   not expecting to play.  Mr. Harris told the Trainer, Bob Lundy, that he could not play.  Mr. Lundy

14   said something to the effect of Mr. Harris having a "low threshold for pain" and said Mr. Harris

15   could receive a shot that would permit him to play.  Head Coach Don Shula and Wide Receivers

16   Coach Howard Shellenberger then approached Mr. Harris and Coach Shula said "We need you –

17   you need to play.  We've talked to the doctors and they will give you a shot and you can play."

18   Mr. Harris recalls the exchange as not presenting a choice, as challenging his manhood, and he

19   was afraid he would be cut if he objected.  Coach Shula, who had a saying "anybody can play this

20   game healthy," was "insisting" that Mr. Harris play.  Feeling "intimidated," Mr. Harris limped

21   back to the training room and the trainer pulled off his shoe and cut the tape from his ankle.  The

22   Club doctor then gave him a Cortisone shot in the ankle and the trainer re-taped it.  Mr. Harris

23   played the game even though the shot wore off in the fourth quarter and he was hurt and visibly

24   limping.  After the game, the trainer cut the tape off and the ankle ballooned up.  Mr. Harris

25   returned home and couldn't run for three months.  The Dolphins then flew him to a California

26

27

28

1   specialist who recommended more rest.  Mr. Harris couldn't run or workout until June of 1977

2   which substantially inhibited his ability to train prior to the 1977 NFL season.  The Dolphins

3   finished with six wins and eight losses in 1976 so the Vikings game had no meaning *vis a vis*

4   playoffs.  Although the Dolphins Team Doctor told Mr. Harris the shot would not cause any further

5   damage to his ankle, playing on the injured ankle did cause further damage.  In addition, while

6   playing for the Miami Dolphins from 1976 to 1983, Mr. Harris received and consumed enormous

7   quantities of pain-numbing and anti-inflammatory medications, including but not limited to what

8   he believes may have been Tylenol-Codeine #3, Toradol, Percocet, Vicodin and Darvon, at the

9   Dolphins' training facility, home stadium and during away games, all of which he received from

10  Dolphins' team trainers, including but not limited to trainers Bob Lundy and Junior Wade, who

11  failed to provide a prescription when one was necessary; identify the medication by its established

12  name; provide adequate directions for the medications' use, including adequate warnings of uses

13  that have potentially dangerous health consequences; or provide the recommended or usual dosage

14  for the medications.  As Mr. Harris has testified, "the trainers wouldn't really tell you what it was"

15  and "everything was given to me in unmarked envelopes."  Mr. Harris received medications on

16  the team plane after away games, unaccompanied by any information about the medications,

17  provided in an "envelope with no writing on it." The medications were provided to him with the

18  purpose of enabling him to practice and play through pain. Mr. Harris now suffers from the injuries

19  described above, which he directly attributes to the injuries he suffered in the NFL that were

20  masked by the Medications, or the Medications themselves, provided to him by the Clubs for

21  whom he played.

22      264.  **Minnesota Vikings**: During the 2003 season with the Minnesota Vikings, plaintiff

23  Cedric Killings sprained his right ankle in practice.  The next morning, Head Coach Mike Tice

24  stated loud enough for others to hear that, if he was not able to practice that day, he would no

1   longer be with the team.  Mr. Killings took Medications given by the Club to ensure that he could

2   practice in spite of the pain in his right ankle.  He wanted to keep his job.  Mr. Killings now suffers

3   from the injuries described above, which he directly attributes to the injuries he suffered in the

4   NFL that were masked by the Medications, or the Medications themselves, provided to him by the

5   Clubs for whom he played.

6        At her deposition, Ms. Evans testified that when she first met her husband, Charles Evans,

7   in Minnesota in 1992 – 93, he did not talk about medications he was taking but that, over time, she

8   saw him take pills for pain that he received from the Vikings' medical staff.  She further testified

9   that, over time, she either recognized the pills he was taking, or he told her he was taking, Vicodin,

10  Percocet and prescription Motrin while with the Vikings.  She further testified that the dosages

11  varied and that Mr. Evans would obtain the medications from the Vikings training facility.  She

12  further testified that Mr. Evans obtained these medications from team trainer Steve Wetzel and

13  team doctors Sheldon Burns and Fred Zamberletti.  She further testified that Dr. Burns would give

14  her medications that required a prescription, such as amoxicillin, without writing her a prescription

15  and would not advise her as to how to take the medication.

16        265.   **New England Patriots**:  While playing for the New England Patriots during the

17  1997 and 1998 seasons, named Plaintiff Steve Lofton received and consumed enormous quantities

18  of pain-numbing and anti-inflammatory medications, including but not limited to Tramadol,

19  Naproxen, and muscle relaxants, at the Patriots' training facility, home stadium and during away

20  games, all of which he received from Patriots' team doctors or trainers, including but not limited

21  to trainer Ron O'Neill, who failed to provide a prescription when one was necessary; identify the

22  medication by its established name; provide adequate directions for the medications' use, including

23  adequate warnings of uses that have potentially dangerous health consequences; or provide the

24  recommended or usual dosage for the medications.  The medications were provided to him for the

1    sole purpose of enabling him to practice and play through pain.   Mr. Lofton now suffers from the

2    injuries described above, which he directly attributes to the injuries he suffered in the NFL that

3    were masked by the Medications, or the Medications themselves, provided to him by the Clubs for

4    whom he played.

5           266.   **New Orleans Saints**:  While playing for the New Orleans Saints during the 1989

6    and 1990 seasons, named Plaintiff Robert Massey received and consumed enormous quantities of

7    pain-numbing and anti-inflammatory drugs, including but not limited to Indocin, Oxycodone,

8    Keflex, and Toradol, at the Saints' training facility, home stadium and during away games, all of

9    which he received from team trainers, including but not limited to head trainer Dean Kleinschmidt

10   and assistant trainer Kevin Mangum, who failed to provide a prescription when necessary; identify

11   the medication by its established name; provide adequate directions for the medications' use,

12   including adequate warnings of uses that have potentially dangerous health consequences; or

13   provide the recommended or usual dosage for the medications.  Mr. Massey remembers dealing

14   only with team trainers concerning medications, with the Saints and with every team for whom he

15   played (Saints, Lions, Cardinals, Giants, Jaguars). When Mr. Massey injured his ankle during a

16   game, the New Orleans Saints Trainers, Dean Kleinschmidt and Kevin Mangum shot him with

17   Toradol on the sideline, and Mr. Massey returned to play.  Toradol and the many other medications

18   were provided to him for the sole purpose of enabling him to practice and play through pain.  In

19   particular, during the second half of a home game in 1989 during the middle of the season (the

20   Saints played the Jets on October 15, the Rams on October 22, the Falcons on October 29, the

21   Patriots on November 12, and the Falcons again on November 19), Mr. Massey testified that he

22   "was on defense going to make a tackle, and the guy stopped and tried to cut back, and I was trying

23   to stop, and I ended up grabbing his facemask … but my ankle rolled."  He further testified that he

24   only came out for about a series, got a shot of Toradol from trainers Dean Kleinschmidt and Kevin

1   Mangum, and went back and played the rest of the game because he was "worried" about

2   competition for his spot.  Mr. Massey now suffers from injuries described above, which he directly

3   attributes to the injuries he suffered in the NFL that were masked by the Medications, or the

4   Medications themselves, provided to him by the Clubs for whom he played.

5           Being given no information, such as potential long-term consequences, from the Trainers,

6   or any Team Doctor, about the medications he was given other than "this will help you with your

7   pain," or "help with the inflammation," Mr. Massey was also pressured to take the medications.

8   The Saints coach, Jim Mora, repeatedly told Mr. Massey "you got to practice…you need got to be

9   ready for practice."   Coach Mora also told Mr. Massey: "You need all the practice you can

10  get…You're not that good…that you can afford to miss practice time." Despite having a serious

11  ankle injury with the Saints, confirmed by an X-ray that the Saints trainer, Kevin Mangum,

12  reviewed with Mr. Massey, Mr. Massey was given Indocin "week after week after week" to permit

13  him to continue to play because Coach Mora was not going to let Mr. Massey have the necessary

14  operation until the season had ended.  Mr. Massey was "told it's an injury you can play with" and

15  was not told it would get worse, only "you can play with it."  Mr. Massey understood that when

16  the trainers gave him medication "they gave it to you to take it, so I took it."

17          While playing for the New Orleans Saints from 1999 to 2001, putative class member

18  Robert Wilson regularly received Percocet and Vicodin from team trainers Dean Kleinschmidt and

19  Kevin Mangum, who provided no warnings or mention of side effects and for the sole purpose of

20  enabling him to practice and play through pain.  Mr. Wilson currently suffers from right mid-

21  abdominal pain, dyspepsia, and gastritis, all of which he directly attributes to the injuries he

22  suffered in the NFL that were masked by the Medications, or the Medications themselves, provided

23  to him by the Clubs for whom he played.

24

25

26

27

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                                - 92

1   While playing for the New Orleans Saints during the 2002 and 2003 seasons, putative class

2   member Curtis Keaton regularly received Vioxx, Celebrex, Ibuprofen, Naproxen, Flexeril and

3   Percocet, which he consumed, from team trainer Scottie Patton, who provided no warnings or

4   mention of side effects and for the sole purpose of enabling him to practice and play through pain.

5   Mr. Keaton now suffers from chronic joint pain that he believes is directly attributable to the

6   injuries he suffered in the NFL that were masked by the Medications, or the Medications

7   themselves, provided to him by the Clubs for whom he played.

8

9   267.   **New York Giants**:  While playing for the New York Giants during the 1997 season,

10  named Plaintiff Robert Massey received and consumed enormous quantities of pain-numbing and

11  anti-inflammatory medications, including but not limited what he believes was  Indocin and

12  Ibuprofen at the Giants' training facility, home stadium and during away games, all of which he

13  received from Giants team  trainers, including trainers Ronnie Barnes and Byron Hanson.  Mr.

14  Massey believes he also received Toradol, which is not reflected on Giants medical records

15  provided; Mr. Massey does not recall ever seeing a doctor or trainer record any medications

16  administered or dispensed to Mr. Massey.  The trainers failed to provide a prescription when one

17  was necessary; identify the medication by its established name; provide adequate directions for the

18  medications' use, including adequate warnings of uses that have potentially dangerous health

19  consequences; or provide the recommended or usual dosage for the medications.  The medications

20  were provided to him for the sole purpose of enabling him to practice and play through pain.   Mr.

21  Massey now suffers from the injuries described above, which he directly attributes to the injuries

22  he suffered in the NFL that were masked by the Medications, or the Medications themselves,

23  provided to him by the Clubs for whom he played.

24

25

26  While playing for the New York Giants from 1985 to 1989, putative class member George

27  Adams regularly received Vicodin, sleeping pills, and Cortisone injections from trainer Ronnie

28

Barnes and team doctor Russell Warren, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Adams currently suffers from high blood pressure and chest pains, which he directly attributes to the Medications provided to him by the Clubs for whom he played.

While playing for the New York Giants during the 2004 season, putative class member Curtis Keaton regularly received Vioxx, Celebrex, Ibuprofen, Naproxen, Flexeril and Percocet from team trainer Ronnie Barnes, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Keaton now suffers from chronic joint pain that he believes is directly attributable to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

268.  **New York Jets**: While playing for the New York Jets during the 1996 and 1997 seasons, named Plaintiff Jeff Graham received and consumed enormous quantities of pain-numbing and anti-inflammatory medications at the Jets' training facility, home stadium and during away games, all of which he received from Jets team doctors or trainers, including but not limited to trainers David Price and John Mellody and doctor Elliott Pellman, who failed to provide a prescription when one was necessary; ever discuss any of the medications' risks or long-term health effects; include adequate warnings of uses that have potentially dangerous health consequences; or provide the recommended or usual dosage for the medications.  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.  At his deposition, Mr. Graham testified that following a tear of some cartilage in his knee, Jets trainers and doctors looked at him and said "you know, we don't have enough receivers to play in the game, so you know, can you see if you can, you know, go out there and put it together for us … and withstand the pain."  He further testified that the Jets coaches "looked down on me not playing"

because of a turf toe injury and that Coach Bill Parcells "had a nonsense clause as far as injuries" and would tell Mr. Graham directly that "you need to be playing, you need to get out here…." On each of these occasions, all of which occurred at the Jets' training facility, home stadium or during away games, Mr. Graham was administered pain killers and/or anti-inflammatory drugs by Jets trainers and doctors, including but not limited to trainers David Price and John Mellody and doctor Elliott Pellman, to assist him in getting back on the field.   Mr. Graham now suffers from the injuries described above, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the New York Jets during the 1992 and 1993 seasons, named Plaintiff Troy Sadowski received and consumed large quantities of pain-numbing and anti-inflammatory drugs, including but not limited to Tylenol 3 and Motrin, at the Jets' training facility home stadium and during away games, all of which he received from Jets' team doctors and trainers, including from team trainer Pepper Burruss, who failed to provide a prescription when one was necessary; identify the medication by its established name; provide adequate directions for the medications' use, including adequate warnings of uses that have potentially dangerous health consequences; or provide the recommended or usual dosage for the medications.  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.   Mr. Sadowski now suffers from the injuries described above, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the New York Jets in 1989, putative class member Stevon Moore regularly received cortisone injections and Lortab from team doctor Elliott Hirshman, who provided no warnings or mention of side effects and for the sole purpose of enabling him to

practice and play through pain.  Mr. Moore currently suffers from stomach and bowel problems, breathing problems, acid reflux, high blood pressure and urinary problems, all of which he directly attributes to the Medications provided to him by the Clubs for whom he played.

269.  **Oakland Raiders**:  While with the Raiders, named Plaintiff Darryl Ashmore believed he had broken his wrist at practice on or about October 25, 1998.  Between that date and November 1, when the Raiders had an important Sunday night game against the Seattle Seahawks, he was told by the Club's doctor, Dr. Warren King, that the injury was only a sprain and that he would be fine to play with painkillers and anti-inflammatories.  He played the Sunday night game without a cast and the next morning, Dr. King told him that his wrist was in fact broken and needed a cast.  He played with a cast for the rest of the season and used painkillers and anti-inflammatories provided by the Clubs, and in particular Toradol, for the remainder of his career to numb the pain in his wrist.  His wrist is now permanently damaged.  Mr. Ashmore directly attributes that injury to the injuries he suffered during the 1998 season as described above that were masked by the Medications provided to him.  In addition, trainers Rod Martin and Scott Touchet administered large quantities of pain-numbing and anti-inflammatory drugs to Mr. Ashmore, including but not limited to Vioxx, Darvocet, Percocet and sleeping pills, at the Raiders' training facility, home stadium and during away games, while failing to provide a prescription when one was necessary; identify the medication by its established name; provide adequate directions for the medications' use, including adequate warnings of uses that have potentially dangerous health consequences; or provide the recommended or usual dosage for the medications.  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.  Mr. Ashmore now suffers from the injuries described above, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

270.  **Philadelphia Eagles**: While playing for the Philadelphia Eagles during the 1998 season, named Plaintiff Jeff Graham received and consumed enormous quantities of pain-numbing and anti-inflammatory medications at the Eagles' training facility, home stadium and during away games, all of which he received from Eagles team doctors or trainers, including but not limited to head trainer James Collins, who failed to provide a prescription when one was necessary; provide adequate warnings of uses that have potentially dangerous health consequences; or provide the recommended or usual dosage for the medications.  Mr. Graham testified that he knew "for a fact that I took injections prior to almost every game in Philadelphia."  He further testified that "if it was a strain or a groin and I was going through it and I had to get an injection to go through and finish the game or start the game and finish and that kind of thing, I was pressured to do that, just the sense of the pressure because of the situation that was going on."  The medications were provided to him for the sole purpose of enabling him to practice and play through pain.   Mr. Graham now suffers from the injuries described above, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the Philadelphia Eagles from 1983 to 1987, putative class member Jody Schulz received enormous quantities of anti-inflammatory drugs, which he consumed, from team trainer Otho Davis, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Schulz now suffers from chronic joint pain that he believes is directly attributable to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the Philadelphia Eagles during the 1997 seasons, putative class member here, named Plaintiff in the case of *Dent, et al. v. the National Football League*, C-14-2324-WHA (N.D. Ca. 2014), and Hall of Famer Richard Dent received enormous amounts of anti-

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                                      - 97

1  inflammatory drugs and painkillers, which he took upon receipt, from head trainer James Collins,

2  who provided no warnings or mention of side effects and for the sole purpose of enabling him to

3  practice and play through pain.  Mr. Dent now suffers from an enlarged heart and nerve damage,

4  particularly in his feet, which he directly attributes to the injuries he suffered in the NFL that were

5  masked by the Medications, or the Medications themselves, provided to him by the Clubs for

6  

7  whom he played.

8       271.   **Pittsburgh Steelers**:  While playing for the Pittsburgh Steelers during the 1997 and

9  1998 seasons, named Plaintiff Troy Sadowski received and consumed enormous quantities of pain-

10 numbing and anti-inflammatory medications at the Steelers' training facility, home stadium and

11 during away games and received Toradol injections before every game in which he played (Mr.

12 Sadowski recalls that before every game he played for the Steelers at home, syringes of Toradol

13 would be lined up in the locker room with players' numbers, not their names, on them), all of

14 which he received from Steelers' doctors and trainers, including from head trainer Rick

15 Burkholder, who failed to provide a prescription when one was necessary; identify the medication

16 by its established name; provide adequate directions for the medications' use, including adequate

17 

18 warnings of uses that have potentially dangerous health consequences; or provide the

19 recommended or usual dosage for the medications.  The medications were provided to him for the

20 sole purpose of enabling him to practice and play through pain.  Mr. Sadowski now suffers from

21 the injuries described above, which he directly attributes to the injuries he suffered in the NFL that

22 were masked by the Medications, or the Medications themselves, provided to him by the Clubs for

23 

24 whom he played.

25       While playing for the Pittsburgh Steelers from 1991 to 1993, named Plaintiff Jeff Graham

26 received and consumed enormous quantities of pain-numbing and anti-inflammatory medications,

27 

28 including but not limited to Naproxen, Vicodin, Indocin, Medrol, Celebrex, Darvocet, Tylenol-

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                    - 98 -

Codeine #3, and Erythromycin, at the Steelers' training facility, home stadium and during away games, all of which he received from Steelers team doctors such as James Bradley or trainers, including but not limited to trainers John Norwig and Ralph Berlin, who failed to provide a prescription when one was necessary; provide adequate warnings of uses that have potentially dangerous health consequences; or provide the recommended or usual dosage for the medications. The medications were provided to him for the sole purpose of enabling him to practice and play through pain.   Mr. Graham testified that the very first time he ever received an anti-inflammatory injection in the NFL, it was from Dr. Bradley who never told him about the potential side effects or long term consequences of taking multiple injections of anti-inflammatories.   Mr. Graham also testified that he received further anti-inflammatories from team trainers.   Mr. Graham testified that if he had been told about the risks and long term consequences, "I would not have [taken] the shot."   Mr. Graham also specifically recalls being pressured by his position coach, Bob Harrison, to play in a playoff game ("we need you to play") during his third season despite a high ankle sprain that was causing him significant pain and limiting his effectiveness.   Mr. Graham now suffers from the injuries described above, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the Pittsburgh Steelers from 1971 to 1978, putative class member Glen Edwards regularly received Novocain and enormous quantities of anti-inflammatory drugs, which he consumed, from head trainer Ralph Berlin, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.   Mr. Edwards now suffers from extreme pain in his toe in which he received weekly pain-numbing injections and other orthopedic injuries that he believes are directly attributable to the injuries he suffered in the

NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the Pittsburgh Steelers from 1974 to 1976, putative class member Marvin Kellum regularly received enormous quantities of anti-inflammatory drugs in a paper cup from head trainer Ralph Berlin and team doctors David H. Huber and Paul Steele, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.   Mr. Kellum now suffers from chronic joint pain, fatigue, and arthritis in his shoulders, all of which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs.

272.   **San Diego Chargers**:   While playing for the San Diego Chargers in the 2014 season, named Plaintiff Reggie Walker sprained his left ankle during a game against the Buffalo Bills on September 21, 2014.   He did not play the next three games.   He did play October 19 against Kansas City; October 23 against Denver and November 2 against Miami.   For each of those games, he was given two Toradol shots (one before the game and one at halftime) by a female doctor so he could play.   The week after Miami was a bye and he did not play the next two games after the bye.   During that time, he remembers pressure to play; in particular, he remembers head coach Mike McCoy saying at a team meeting that "things are not good.   We may need to look at other guys if things don't pick up."   Mr. Walker felt additional pressure because other linebackers were hurt.   He then played in the last games of the season – November 30 at Baltimore, December 7 against New England, December 14 against Denver, December 20 against San Francisco, and December 28 against Kansas City – and for each game received a Toradol shot before the game and at halftime from the same female team doctor.   Since retiring, Mr. Walker suffers from the injuries described above, which he directly attributes to the injuries he suffered in the NFL that

1  were masked by the Medications, or the Medications themselves, provided to him by the Clubs for

2  whom he played.

3        While playing for the San Diego Chargers during the 2000 NFL season, named Plaintiff

4  Jeff Graham suffered a break in the transverse process in his back.  Mr. Graham testified at his

5  deposition that he missed two games and then was cleared to play the remainder of the season.

6  Mr. Graham further testified that he "knew I wasn't ready to play" but that the Charger coaches

7  pressured him to play by saying "Jeff, you know, we don't have anything else so we want you to

8  – I mean, can you play, can you play for us, can you suit up and play."  Mr. Graham also testified

9  that the only reason he was able to play in those games was because he "took prior injections

10 before the game and then I think maybe at halftime may be took some other medication or injection

11 to continue to play."  Lastly, Mr. Graham testified that his back did not fully heal until after the

12 season concluded.   He was never told of the risks or long term side effects of any of these drugs.

13 He now lives in constant pain, which he believes is directly attributable to various injuries suffered

14 during his NFL career that were masked by painkiller injections and numerous drugs.

15

16

17        273.  **San Francisco 49ers**:  While playing for the San Francisco 49ers during the 2000

18 season, named Plaintiff Cedric Killings received and consumed enormous quantities of pain-

19 numbing and anti-inflammatory medications, including but not limited to Percocet, Vicodin and

20 Toradol, at the 49ers' training facility, home stadium and during away games, all of which he

21 received from 49ers team doctors or trainers, including but not limited to trainer Lindsy McLean,

22 who failed to provide a prescription when one was necessary; identify the medication by its

23 established name; provide adequate directions for the medications' use, including adequate

24 warnings of uses that have potentially dangerous health consequences; or provide the

25 recommended or usual dosage for the medications.  The medications were provided to him for the

26

27 sole purpose of enabling him to practice and play through pain.  Mr. Killings now suffers from the

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA

injuries described above, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the San Francisco 49ers during the 1986 season, putative class member Dennis Harrison regularly received Naprosyn, Butazolidin, and Oxycodone, which he consumed, from team trainer Lindsy McLean, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Harrison currently suffers from hypertension, hypertensive heart disease, and chronic joint pain, all of which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the San Francisco 49ers from 1996 to 1998, putative class member Tyrone Smith received anti-inflammatory drugs from team trainer Lindsy McLean and painkiller injections from team doctor Robert Millard, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Smith currently suffers from acid reflux and pain in both feet, which he directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

While playing for the San Francisco 49ers during the 1994 season, putative class member here, named Plaintiff in the case of *Dent, et al. v. the National Football League*, C-14-2324-WHA (N.D. Ca. 2014), and Hall of Famer Richard Dent received Depo-Medrol, Prednisone, Motrin, Vicodin, Celestone Soulspan and soluble Decadron, Indocin and Azulfidine, which he took upon receipt, from team trainer Lindsy McLean, who provided no warnings or mention of side effects and for the sole purpose of enabling him to practice and play through pain.  Mr. Dent now suffers from an enlarged heart and nerve damage, particularly in his feet, which he directly attributes to

1  the injuries he suffered in the NFL that were masked by the Medications, or the Medications

2  themselves, provided to him by the Clubs for whom he played.

3          While playing for the San Francisco 49ers, Jeremy Newberry, a putative class member here

4  and named Plaintiff in the case of *Dent, et al. v. the National Football League*, C-14-2324-WHA

5  (N.D. Ca. 2014), received Toradol injections before every game in which he played between

6  October 14, 2001 and September 7, 2003 from team doctor James Klint, save for the September

7  22, 2002 game against the Washington Redskins, when he received a Toradol injection from team

8  doctor Barry Bryan.  Mr. Newberry was never provided with warnings about, or an explanation

9  of, the side effects of Toradol, which was provided to him prophylactically for the sole purpose of

10  enabling him to practice and play through pain.  Mr. Newberry, who is only 40 years old, now

11  suffers from Stage 3 renal failure, high blood pressure and violent headaches for which he cannot

12  take any medications that might further deteriorate his already-weakened kidneys, all of which he

13  directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or

14  the Medications themselves, provided to him by the Clubs for whom he played.

15

16

17          274.  **Seattle Seahawks**: On November 22, 2003, the night before an away game in

18  Baltimore, Maryland, trainer Ken Smith gave named Plaintiff Jerry Wunsch an Ambien.  The next

19  day, before the game, Coach Holmgren asked Mr. Wunsch if he could play, despite excruciating

20  pain down the whole right side of his body, to which Mr. Wunsch replied "I can't play, Coach.  I

21  can't play today.  It's my first game.  I just can't do it."  Coach Holmgren then called for Sam

22  Ramsden, the Seahawks' trainer, and asked "what can we do to help Mr. Wunsch play today."  Mr.

23  Ramsden brought the doctors over, who gave him a 750 mg dose of Vicodin and Tylenol-Codeine

24  # 3, saying they would help, even though Mr. Wunsch was already taking anti-inflammatories as

25  prescribed by his doctors.  He played – feeling high – and after half time, the Medications wore

26  off and he told anyone who would listen that he could not play anymore, but Mr. Ramsden, the

27

28

1   head trainer, gave him another 750 mg of Vicodin on the field for the second half, telling Mr.

2   Wunsch, "don't sue me personally for this."   In short, on top of the Indocin he was already taking,

3   Mr. Wunsch was also given 1500 mg of Vicodin and Tylenol-Codeine # 3, within a three hour

4   span, so he could play football.   After the game, the team flew back to Seattle and Mr. Wunsch

5   drove home.   When he woke up the next morning, he had been so high that he had no memory of

6   the flight or drive home.   A friend staying with him, Rob Swaner, told him the next day that the

7   previous night Mr. Wunsch had been completely "out of it" and expressed concerns about Mr.

8   Wunsch's ability to drive home in his impaired state.   In addition, while playing for the Seahawks

9   from 2002 to 2005, Mr. Wunsch received large quantities of pain-numbing and anti-inflammatory

10   medications, including but not limited to Tylenol-Codeine #3, Percocet, Vicodin, Toradol, Indocin,

11   and Prednisone, at the Seahawks' training facility, home stadium and during away games, from

12   Seahawks' team doctors and trainers, including trainers Sam Ramsden, Ken Smith and Donald

13   Rich, who failed to provide a prescription when one was necessary; identify the medication by its

14   established name;   provide adequate directions for the medications' use, including adequate

15   warnings of uses that have potentially dangerous health consequences;   or provide the

16   recommended or usual dosage for the medications.   The medications were provided to him for the

17   sole purpose of enabling him to practice and play through pain.   Mr. Wunsch currently suffers

18   from an enlarged liver, a damaged pituitary gland, stomach problems and other endocrine issues.

19   He has no family history of medical problems with any of these organs.   He is also in constant pain

20   from all of his joints and has shooting nerve pains.   Mr. Wunsch once was told by Club doctor,

21   Merrit K. Auld, that he had torn his labrum.   The doctor stated that, if he had surgery, his career

22   would be over and recommended that he continue playing and manage the problem with

23   Medications.   Mr. Wunsch followed his doctor's advice.   He also received pills and injections to

24   play through various injuries to his ankles.   After the last such injury, Dr. Auld informed him that

1   his ankle was so damaged that it could not move properly and that was why he fractured his fifth

2   metatarsal; specifically, Auld said to him that "[t]he only reason you fractured the tip of your fifth

3   metatarsal is because your ankle won't bend."  He went on to tell Wunsch that he would "notify

4   the team your fracture is healed and you will probably be released."  Mr. Wunsch was released

5   after the appointment and never played again.  Mark Dominic of the Buccaneers asked Mr. Wunsch

6   to become a player/coach and Chris Forester of the Baltimore Ravens asked him to return to be a

7   backup but after learning of the injuries informed him that his return would not be possible.

8   Something Mr. Wunsch already knew.  Mr. Wunsch directly attributes the foregoing current

9   injuries he suffers to the injuries he suffered in the NFL that were masked by the Medications, or

10  the Medications themselves, provided to him by the Clubs for whom he played.

11          275.    **Tampa Bay Buccaneers**:  While playing for the Tampa Bay Buccaneers from 1997

12  to 2001, named Plaintiff Jerry Wunsch received and consumed enormous quantities of pain-

13  numbing and anti-inflammatory medications, including but not limited to Tylenol-Codeine #3,

14  Percocet (oxycodone), Vicodin (hydrocodone), Indocin, Vioxx, and muscle relaxers, at the

15  Buccaneers' training facility, home stadium and during away games, from team doctors Diaco and

16  Janecki and team trainers Todd Toriscelli and Jim Whalen, who failed to provide a prescription

17  when one was necessary; identify the medication by its established name; provide adequate

18  directions for the medications' use, including adequate warnings of uses that have potentially

19  dangerous health consequences; or provide the recommended or usual dosage for the medications.

20  The medications were provided to him for the sole purpose of enabling him to practice and play

21  through pain.   Mr. Wunsch now suffers from the injuries described above, which he directly

22  attributes to the injuries he suffered in the NFL that were masked by the Medications, or the

23  Medications themselves, provided to him by the Clubs for whom he played.

1    While playing for the Tampa Bay Buccaneers from 1998 to 2000, putative class member

2    Shevin Smith received Naprosyn, Flexeril, Tylenol 3, Toradol injections, injections of cortisone

3    and other pain killers, Vicodin and Ibuprofen from team doctor Joe Diaco, who provided no

4    warnings or mention of side effects and for the sole purpose of enabling him to practice and play

5    through pain.  Mr. Smith currently suffers from chronic joint pain, which he attributes directly to

6    the injuries he suffered in the NFL that were masked by the Medications, or the Medications

7    themselves, provided to him by the Clubs for whom he played.

8    276.   **Tennessee Titans**:  While playing for the Tennessee Titans during the 2006 season,

9    named Plaintiff Eric King received muscle relaxers and pain killers on multiple occasions from

10   team trainers Brad Brown and/or Don Moseley, who provided no warnings or mention of side

11   effects and for the sole purpose of enabling him to practice and play through pain.

12   Mr. King testified at his deposition that, while playing for the Tennessee Titans during the

13   2007 season, he suffered a broken forearm, hamstring pulls and problems with his knees.

14   Whenever he received one of these injuries during a game, he was given pain medications and

15   anti-inflammatories by team trainers Brad Brown, Don Moseley, Geoff Kaplan, Jason Williams or

16   Jon Takahashi, who told him to get back in the game (and he would).

17   Mr. King further testified at his deposition that, while playing for the Tennessee Titans

18   during the 2008 seasons, he began to have recurring physical problems and began receiving more

19   and more Medications from the team.  During either the Ravens or Chiefs game, he re-aggravated

20   a forearm injury.  Rather than rest or sit out, team trainers Brad Brown, Don Moseley, Geoff

21   Kaplan, Jason Williams and/or Jon Takahashi would give him oral Toradol on a daily basis and

22   pain medications to mask the pain so he would not complain about it to ensure that he would be

23   able to play.  At first, Mr. King was receiving multiple vials of 10-30 Toradol pills but, as the

24   season progressed, he began receiving Toradol injections.

1    Throughout his time with the Titans, Mr. King was never given warnings or told of side

2  effects of the Medications he was taking.  Mr. King now suffers from injuries described herein,

3  which he directly attributes to the injuries he suffered in the NFL that were masked by the

4  Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

5    277.    **Washington Redskins**:  While playing for the Washington Redskins from 1996 to

6  1997, named Plaintiff Darryl Ashmore received and consumed enormous quantities of pain-

7  numbing and anti-inflammatory medications at the Redskins' training facility, home stadium and

8  during away games, all of which he received from Redskins' team doctors or trainers, including

9  but not limited to trainer Lamar "Bubba" Taylor, who failed to provide a prescription when one

10  was necessary; identify the medication by its established name; provide adequate directions for the

11  medications' use, including adequate warnings of uses that have potentially dangerous health

12  consequences; or provide the recommended or usual dosage for the medications.  The medications

13  were provided to him for the sole purpose of enabling him to practice and play through pain.   In

14  particular, in November 1997, Mr. Ashmore herniated discs in his back.  Three days after

15  sustaining that injury, he was back out playing because of muscle relaxers and pain pills provided

16  to him by Mr. Taylor.  Mr. Ashmore now suffers from the injuries described above, which he

17  directly attributes to the injuries he suffered in the NFL that were masked by the Medications, or

18  the Medications themselves, provided to him by the Clubs for whom he played.

19    While playing for the Washington Redskins from 1984 to 1988, putative class member

20  Anthony Jones received copious amounts of anti-inflammatory drugs from team trainers Lamar

21  "Bubba" Taylor and Keoki Kamau and team doctor Robert Collins, who provided no warnings or

22  mention of side effects and for the sole purpose of enabling him to practice and play through pain.

23  Mr. Jones now suffers from pain in his right foot, ankle and big toe and in both knees, headaches,

24  back pain on his left side and high blood pressure, all of which he directly attributes to the injuries

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA

he suffered in the NFL that were masked by the Medications, or the Medications themselves, provided to him by the Clubs for whom he played.

## V. **DEFENDANTS DELIBERATELY CONCEALED THEIR ILLEGAL SCHEME.**

278. Numerous documents obtained during discovery show how the Clubs and their doctors and trainers concealed their illegal activities for years. Examples include the following:

[redacted]

[redacted]

[redacted]

[redacted]

1

2

3

4

5

6

7

8

9

10

11

12    279.

13

14

15

16    280.

17

18

19

20

21

22    281.

23

24

25

26    282.

27

28

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ███████████████████████████████████

8     283.   ████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ██████████████████████████████

18 **VI.**     **THE CLUB PHYSICIANS ARE INHERENTLY CONFLICTED.**

19     284.   In November 2016, the Football Players Health Study at Harvard University, which

20 received its funding pursuant to the 2011 collective bargaining agreement between the League and

21 the NFLPA, published a 500-page plus report titled "Protecting and Promoting the Health of NFL

22 Players: Legal and Ethical Analysis and Recommendations."

23

24     285.   The top recommendation of that study was as follows: "The current arrangement in

25 which club (*i.e.*, team) medical staff, including doctors, athletic trainers, and others, have

26 responsibilities both to players and to the club presents an inherent conflict of interest. To address

27 this problem and help ensure that players receive medical care that is as free from conflict as

28

possible, division of responsibilities between two distinct groups of medical professionals is needed.  Player care and treatment should be provided by one set of medical professionals … appointed by a joint committee with representation from the NFL and NFLPA, and evaluation of players for business purposes should be done by separate medical personnel."

286.   Indeed, the conflict is written ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████

287.   And folks around the NFL have known this for years.  Gay Culverhouse, who was president of the Tampa Bay Buccaneers from 1991 to 1994, testified at a Congressional hearing in 2009 on football head injuries that the Committee needed "to understand very clearly … that the [Club] doctor is hired by the coach and paid by the front office.  This team doctor is not a medical advocate for the players.  This team doctor's role is to get that player back on the field, even if that means injecting the player on the field.  I have seen a wall of players surround a player, a particular player, and seen his knees injected, seen his hip injected between plays and him back on the field.  This is inexcusable."

288.   ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

1

2

3

## CLASS ACTION ALLEGATIONS

289.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth herein.

290.    Plaintiffs bring this action on behalf of themselves and all other similarly-situated individuals pursuant to Fed. R. Civ. P. 23, consisting of all Players, which for class purposes shall mean anyone listed on one of the Clubs' rosters from the point in a season where a final roster decision is announced (for the 2016 season, this would have been when the 53 man roster was announced on September 3, 2016) through the completion of that season, who received Medications, which for class purposes shall mean any drug ever listed as a controlled substance, Naprosyn, Indocin, Vioxx, Prednisone, and Toradol, from a Club and excluding Defendants, their employees and affiliates, and Judge Alsup.

291.    The Class contains a sufficiently large number of persons that joining all of their claims is impractical.  Named Plaintiffs are but a few of the approximately 17,000 retired NFL players, most if not all of who are within the Class definitions, and over 1,400 retired NFL players who have signed Retention Agreements with undersigned counsel.

292.    Numerous common questions of law and fact exist.  They include, for example:

- Did Defendants conspire or otherwise agree, expressly or tacitly, to engage in the illegal procurement, storage, and/or administration of, and secrecy concerning, the Medications identified herein?

- Did Defendants provide or administer Medications to the Class Members as described above?

- Did Defendants intentionally provide or administer Medications to the Class Members as described above?

- Did Defendants violate the Controlled Substances Act's requirements governing acquisition of controlled substances?

- Did Defendants violate the Controlled Substances Act's requirements governing storage of controlled substances?

- Did Defendants violate the Controlled Substances Act's requirements governing distribution of controlled substances?

- Did Defendants violate the Food and Drug Act's requirements governing distribution of prescribed medications?

- Did the provision or administration of Medications to Class Members, as described above, violate state pharmaceutical laws regulating the acquisition, storage and dispensing of Medications?

- Did the Class Members provide informed consent authorizing the provision or administration of Medications?

- Did Defendants intentionally mislead Class Members about the dangers of health risks associated with provision and administration of Medications as described above?

- Did Defendants intentionally fail to disclose to Class Members the dangers of the health risks associated with provision and administration of Medications as described above?

- Did the Defendants' provision or administration of Medications as described above cause, in whole or in part, other injuries, illnesses, or disabilities of the Class Members?

- Did the Defendants' provision or administration of Medications as described above increase Class Member's risk of developing physical and mental health problems, injuries, disabilities, limitations and other problems in the future?

- Did the Defendants' provision or administration of Medications as described above proximately cause Class Members' economic losses, harms, lost earning potential, reduced earning capacity and other economic damages?

293.     Plaintiffs and their claims are typical of the absent Class Members and their claims. Plaintiffs have the same incentives as the absent Class Members in this case, ensuring the proper representation of and advocacy for the absent Class Members' interests.  Plaintiffs' claims arise from the same wrongful conduct the Defendants engaged in toward the absent Class Members.

294.     Plaintiffs will adequately represent the Class Members.  Plaintiffs have no conflicts of interest with the absent Class Members who Plaintiffs seek to represent.  To the contrary, Plaintiffs' interests are fully aligned with the absent Class Members' interests in this action, in seeking redress for the Clubs' common wrongful conduct to both Plaintiffs and absent Class Members.  Plaintiffs will fairly and adequately protect the interests of the absent Class Members.

295.     Plaintiffs' counsel will properly and vigorously represent the Class Members. Plaintiffs' counsel have no conflicts of interest with the Plaintiffs and Class Members.  Plaintiffs' counsel are experienced trial lawyers and litigators, with substantial experience in complex and class action litigation.  Reflecting their commitment to this case and the protection of the absent Class Members, Plaintiffs' counsel have invested a great deal of time, money, legal research and factual investigative effort in developing and understanding the facts set forth in this Complaint and analyzing the best expression of those facts in legal theories and causes of action.  Further underscoring Plaintiffs' counsel's qualifications and satisfaction of the adequacy of representation requirements, Plaintiffs' counsel have met with and received signed Retainer Agreements from over 1,400 Class Members.

296.     The members of the Class are readily ascertainable and identifiable from reference to existing, objective criteria that are administratively practical, including records maintained by Defendants.  Defendants have and maintain records reflecting the names of all of the Clubs' players, their games played, injuries sustained, medical and injury reports on the Class Members

1   and certain reports and records of the provision of medical, pharmacological, and other therapeutic

2   treatments to the Class Members.

3        297.   Common questions, such as those listed above, predominate over any questions

4   affecting only individual members.  As described above, and in light of the Defendants' common

5   misconduct toward all of the Class Members, the Class is sufficiently cohesive to warrant class

6   treatment.  Plaintiffs, on behalf of the Class, allege a common body of operative facts and common

7   legal claims relevant to each Class Member's condition and claims.  Moreover, if necessary, Due

8   Process compliant trial plans can be developed, at the appropriate time, to ensure the most efficient,

9

10  practical and just resolution of the claims alleged herein.

11       298.   A class action here is superior to other adjudicatory methods possibly available for

12  resolving the Class's claim.  First, Defendants are a $9 billion business annually and continuously

13  growing, with virtually limitless resources to litigate against individual plaintiffs who have

14  nowhere near the financial and legal firepower that Defendants can immediately muster.  Second,

15  those vast financial and economic resource disparities between individual Class Members and

16  Defendants mean that many, if not most, of the claims of individual Class Members would languish

17  un-redressed absent class action treatment.  Third, the Class Members have not expressed interest

18  in individually controlling the prosecution of separate actions.  Judicial economy, economic

19

20  efficiency, and the goal of avoiding inconsistent rulings and conflicting adjudications reflect the

21  desirability of concentrating the litigation of the claims in this Complaint in the single forum this

22  Court provides.  With an appropriate trial plan, adjudicating the claims of the clearly defined Class

23  above will not present undue difficulties for case management.

24

25       299.   This action is properly maintainable as a class action under Fed. R. Civ. P. 23(b)(3).

26  As described above, Defendants have acted or refused to act on grounds generally applicable to

27  the Class such that questions of law or fact common to the Class predominate over any questions

28

affecting only individual members, making a class action superior to other available methods for fairly and efficiently adjudicating the controversy.

300.     This action is also properly maintainable as a class action under Fed. R. Civ. P. 23(c)(4) in light of the nature and extent of the predominant common particular issues, exemplified in the common questions set forth above, generated by Defendants' consistent agreement, and consequent consistent policy, of promoting and facilitating the use of the Medications.

## CAUSES OF ACTION

### COUNT I – INTENTIONAL MISREPRESENTATION

### (All Plaintiffs Against All Defendants)

301.     Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth herein.

302.     The Clubs continuously and systematically made intentional misrepresentations to Class Members as documented herein about the Medications that they provided.

303.     The Clubs continuously and systematically misrepresented the increased risk of latent injuries resulting from the Medications.

304.     The Clubs continuously and systematically misrepresented to the Class Members the dangers of playing while the pain of injuries was masked by the Medications, including the risk of further and permanent damage to affected body parts.

305.     The Clubs misrepresented material facts, extremely important to understanding the dangers of the Medications, to the Class Members.

306.     The Clubs knew that the representations were false or made the representations with such reckless disregard for the truth that knowledge of the falsity of the statement can be imputed to the Clubs.

307.    The Clubs intended to deceive the Class Members through their knowing and intentional misrepresentations.

308.    The Clubs knew that Class Members would rely on what they said about the Medications that kept the Class Members on the field.

309.    The Class Members reasonably relied on what the Clubs did say – "here you go, take this and get out there." That message did not include: disclosure of the numerous and serious risks associated with the Medications; the need for informed consent; the need for independent medical evaluation, diagnoses and prescription; the need for monitoring for toxicity, potentially serious or even fatal drug interactions; and any recognition of, let alone adherence to, limitations on frequency and duration of the Class Member's exposure to these Medications.

310.    The Class Members reasonably believed the Clubs were taking their best interests into consideration when they provided and administered Medications.

311.    The atmosphere of trust inherent in locker rooms, in which players become friendly with their Clubs' medical and training staffs, inured the Class Members to any suspicion that the Medications they were given and administered might be dangerous.

312.    The Class Members reasonably believed the Clubs would not act illegally and, in doing so, injure the Class Members and put them at risk of substantial and continuing future injuries.

313.    The Class Members were in fact deceived by the Club's misrepresentations, and justifiably acted and detrimentally relied on those intentional misrepresentations.

314.    The Clubs are liable for their intentional misrepresentations to the Class Members.

315.    The Clubs' intentional misrepresentations were a cause in fact of the Class Members' damages, injuries and losses, both economic and otherwise, alleged in this Complaint.

316.     The Clubs' intentional misrepresentations proximately caused the Class Members' damages, injuries and losses, both economic and otherwise, alleged in this Complaint, all of which are ongoing and will continue for the foreseeable future.

317.     The Class Members suffered damages and losses factually and proximately caused by their reasonable and justifiable reliance on the Clubs' intentional misrepresentations and omissions about the Medications.

318.     The Clubs are liable to the Class Members for all categories of damages, in the greatest amounts permissible under applicable law.

319.     As a result of the foregoing uniform, agreement-based misrepresentations, Plaintiffs and the Class Members ingested vast amounts of opioids, anti-inflammatories and other analgesics, and local anesthetics during their NFL careers that they otherwise would not have, all of which occurred without proper medical diagnosis, supervision and monitoring; in quantities exceeding recommended dosages; and for periods far longer than recommended treatment intervals.

320.     As a result of Defendants' provision and administration of Medications, the Class Members are currently suffering from, or at a substantially-increased risk of developing, physical and/or internal injuries resulting from the provision and administration of the Medications.

321.     Such injuries, and the substantially-increased risks thereof, are latent injuries.  They develop over time, often undetected at first because the absence, paucity or modest nature of early symptoms are readily explained away as "old age" or caused by some other factor independent of Defendants' provision and administration of Medications.

322.     Such latent injuries include, without limitation, musculoskeletal deterioration, arthritic and osteoarthritic progression, and damage to internal organs.

323.    Defendants had superior knowledge to that of the Class Members concerning the current use, and latent injuries, associated with the provision and administration of the Medications to the Class Members.

324.    Despite that knowledge, Defendants systematically misrepresented to the Class Members that Defendants' administration of the Medications would have no adverse impact on their health or concealed the scope of injuries from which the Class Members might suffer.

325.    The Class Members' latent injuries, and substantially increased risks of developing physical maladies later in their lives, necessitate specialized medical investigation, monitoring, testing and treatment not generally required by or given to the public at large.

326.    The testing and medical monitoring regime required for the Class Members is specific to their experience with the Clubs' provision and administration of the Medications.

327.    Persons not exposed to the Medications that the Clubs provided and administered to the Class Members would not require a testing and medical monitoring regime like that necessary to protect the Class Members.

328.    The testing and medical monitoring regime will include baseline testing of each Class Member, with diagnostic examinations, to determine whether the Class Member is currently suffering from any of the physical injuries associated with the Medications.

329.    This testing and medical monitoring regime will also include evaluations of the non-currently symptomatic Class Members to determine whether, and, if so, by how much, they are at increased risk for developing the injuries at issue in the future.

330.    This testing and medical monitoring regime will help to prevent, or mitigate, the numerous adverse health effects the Class Members suffered and will suffer from Defendants' provision and administration of the Medications.

331.    Scientifically-sound and well-recognized medical and scientific principles and observations support the efficacy of the testing and medical monitoring regime the Class Members require.

332.    Testing and monitoring the Class Members will help prevent or mitigate the development of the injuries at issue.

333.    Testing and monitoring the Class Members will help to ensure that they do not go without adequate treatment that could either prevent, or mitigate, the occurrence of the injuries at issue.

334.    In addition to compensatory and punitive damages against Defendants, Plaintiffs seek a mandatory continuing injunction creating and imposing a Court-ordered, Defendants-funded testing and medical monitoring program to help prevent the occurrence of Medication-caused injuries and disabilities, to help ensure the prompt diagnosis and early treatment necessary to reduce the degree or slow the progression of such Medication-caused problems, and otherwise to facilitate the treatment of such problems.

335.    This testing and medical monitoring program should include a trust fund, under the supervision of the Court or Court-appointed Special Master who makes regular reports to the Court about the fund.

336.    This trust fund is required to pay for the testing and medical monitoring and treatment the Class Members require as a matter of sound medical practice, regardless of the frequency, cost or duration of such testing, monitoring and treatments.

337.    Plaintiffs have no adequate legal remedy with regard to the latent injuries described herein.  Money damages are by themselves insufficient to compensate the Plaintiffs and Class Members for the continuing risks associated with such injuries.

338.    Absent the testing and medical monitoring program described in the preceding paragraphs, the Plaintiffs will remain unprotected against the continuing risk, created by Defendants' misconduct, of subsequent development and manifestation of physical injuries that are now latent.

### COUNT II – CONCEALMENT

### (All Plaintiffs Against All Defendants)

339.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth herein.

340.    The Clubs continuously and systematically failed to provide Class Members with prescriptions, as illustrated by examples provided herein.

341.    The Clubs continuously and systematically failed to identify Medications they provided to Class Members by their established name, as illustrated by examples provided herein.

342.    The Clubs continuously and systematically failed to provide adequate directions for the use of Medications they provided the Class Members, as illustrated by examples provided herein.

343.    The Clubs continuously and systematically failed to include adequate warnings of uses of the Medications they provided the Class Members that have potentially dangerous health consequences, as illustrated by examples provided herein.

344.    The Clubs continuously and systematically failed to provide the recommended or usual dosage for the Medications they provided the Class Members, as illustrated by examples provided herein.

345.    The foregoing omissions relate to material facts that the Clubs were required to provide to the Class Members under federal and state law as detailed herein.

346.    The Clubs intended to deceive the Class Members through their intentional omissions.

347.    The Clubs know that, had they made these disclosures to the Class Members, the Class Members would not have ingested Medications in the manner described herein.

348.    The Class Members reasonably believed the Clubs were taking their best interests into consideration when they provided and administered Medications.

349.    The atmosphere of trust inherent in locker rooms, in which players become friendly with their Clubs' medical and training staffs, inured the Class Members to any suspicion that the Medications they were given and administered might be dangerous.

350.    The Class Members reasonably believed the Clubs would not act illegally and, in doing so, injure the Class Members and put them at risk of substantial and continuing future injuries.

351.    The Class Members were in fact deceived by the Club's intentional omissions, and justifiably acted and detrimentally relied on those intentional omissions.

352.    The Clubs are liable for their omissions to the Class Members.

353.    The Clubs' omissions were a cause in fact of the Class Members' damages, injuries and losses, both economic and otherwise, alleged in this Complaint.

354.    The Clubs' omissions proximately caused the Class Members' damages, injuries and losses, both economic and otherwise, alleged in this Complaint, all of which are ongoing and will continue for the foreseeable future.

355.    The Class Members suffered damages and losses factually and proximately caused by their reasonable and justifiable reliance on the Clubs' omissions relating to the Medications.

356.    As a result of the foregoing uniform, agreement-based omissions, Plaintiffs and the Class Members ingested vast amounts of Medications during their NFL careers that they otherwise

would not have, all of which occurred without proper medical diagnosis, supervision and monitoring; in quantities exceeding recommended dosages; and for periods far longer than recommended treatment intervals.

357.    As a result of Defendants' provision and administration of Medications, the Class Members are currently suffering from, or at a substantially-increased risk of developing, physical and/or internal injuries resulting from the provision and administration of the Medications.

358.    Such injuries, and the substantially-increased risks thereof, are latent injuries.  They develop over time, often undetected at first because the absence, paucity or modest nature of early symptoms are readily explained away as "old age" or caused by some other factor independent of Defendants' provision and administration of Medications.

359.    Such latent injuries include, without limitation, musculoskeletal deterioration, arthritic and osteoarthritic progression, and damage to internal organs.

360.    Defendants had superior knowledge to that of the Class Members concerning the current use, and latent injuries, associated with the provision and administration of the Medications to the Class Members.

361.    Despite that knowledge, Defendants systematically misrepresented to the Class Members that Defendants' administration of the Medications would have no adverse impact on their health or concealed the scope of injuries from which the Class Members might suffer.

362.    The Class Members' latent injuries, and substantially increased risks of developing physical maladies later in their lives, necessitate specialized medical investigation, monitoring, testing and treatment not generally required by or given to the public at large.

363.    The testing and medical monitoring regime required for the Class Members is specific to their experience with the Clubs' provision and administration of the Medications.

364.    Persons not exposed to the Medications that the Clubs provided and administered to the Class Members would not require a testing and medical monitoring regime like that necessary to protect the Class Members.

365.    The testing and medical monitoring regime will include baseline testing of each Class Member, with diagnostic examinations, to determine whether the Class Member is currently suffering from any of the physical injuries associated with the Medications.

366.    This testing and medical monitoring regime will also include evaluations of the non-currently symptomatic Class Members to determine whether, and, if so, by how much, they are at increased risk for developing the injuries at issue in the future.

367.    This testing and medical monitoring regime will help to prevent, or mitigate, the numerous adverse health effects the Class Members suffered and will suffer from Defendants' provision and administration of the Medications.

368.    Scientifically-sound and well-recognized medical and scientific principles and observations support the efficacy of the testing and medical monitoring regime the Class Members require.

369.    Testing and monitoring the Class Members will help prevent or mitigate the development of the injuries at issue.

370.    Testing and monitoring the Class Members will help to ensure that they do not go without adequate treatment that could either prevent, or mitigate, the occurrence of the injuries at issue.

371.    In addition to compensatory and punitive damages against Defendants, Plaintiffs seek a mandatory continuing injunction creating and imposing a Court-ordered, Defendants-funded testing and medical monitoring program to help prevent the occurrence of Medication-caused injuries and disabilities, to help ensure the prompt diagnosis and early treatment necessary

1   to reduce the degree or slow the progression of such Medication-caused problems, and otherwise

2   to facilitate the treatment of such problems.

3          372.    This testing and medical monitoring program should include a trust fund, under the

4   supervision of the Court or Court-appointed Special Master who makes regular reports to the Court

5   about the fund.

6          373.    This trust fund is required to pay for the testing and medical monitoring and

7

8   treatment the Class Members require as a matter of sound medical practice, regardless of the

9   frequency, cost or duration of such testing, monitoring and treatments.

10         374.    Plaintiffs have no adequate legal remedy with regard to the latent injuries described

11  herein.  Money damages are by themselves insufficient to compensate the Plaintiffs and Class

12
    Members for the continuing risks associated with such injuries.
13

14         375.    Absent the testing and medical monitoring program described in the preceding

15  paragraphs, the Plaintiffs will remain unprotected against the continuing risk, created by

16  Defendants' misconduct, of subsequent development and manifestation of physical injuries that

17  are now latent.

18                                    **PRAYER FOR RELIEF**

19  WHEREFORE, Plaintiffs pray for judgment as follows:

20
    a.      Granting such equitable relief against Defendants and in favor of Plaintiffs as is
21
    appropriate, including but not limited to medical monitoring;
22

23  b.      Awarding Plaintiffs compensatory damages against Defendants;

24  c.      Awarding Plaintiffs punitive damages against Defendants;

25  d.      Awarding Plaintiffs such other relief as may be appropriate; and

26  e.      Granting Plaintiffs their prejudgment interest, costs and attorneys' fees.

27

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA                                    - 125 -

1   DATED:  February 22, 2017       William N. Sinclair
Steven D. Silverman
2                                   Stephen G. Grygiel
Phillip J. Closius
3                                   Alexander Williams
**SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC**

4

5

                                        /s/ William N. Sinclair
6                                        William N. Sinclair

7                               201 N. Charles Street, Suite 2600
Baltimore, MD  21201
8                               Telephone:  (410) 385-2225
Facsimile:  (410) 547-2432
9

10                           Thomas J. Byrne
Mel T. Owens
11                           **NAMANNY BYRNE & OWENS, P.C.**
2 South Pointe Drive, Suite 245
12                           Lake Forest, CA  92630
Telephone:  (949) 452-0700
13                           Facsimile:  (949) 452-0707

14                           Stuart A. Davidson
Mark J. Dearman
15                           Janine D. Arno
**ROBBINS GELLER RUDMAN**
16                              **& DOWD LLP**
120 East Palmetto Park Road, Suite 500
17                           Boca Raton, FL  33432
Telephone:  (561) 750-3000
18                           Facsimile:  (561) 750-3364

19                           Rachel L. Jensen (SBN 211456)
**ROBBINS GELLER RUDMAN**
20                           **& DOWD LLP**
655 West Broadway, Suite 1900
21                           San Diego, CA  92101
Telephone:  (619) 231-1058
22                           Facsimile:  (619) 231-7423

23                           Attorneys for Plaintiffs

24

25

26

27

28

SECOND AMENDED COMPLAINT - 3:16-cv-01030-WHA            - 126