1

2

3

4

5

6                           IN THE UNITED STATES DISTRICT COURT

7                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10    ETOPIA EVANS, *et al.*,                          No. C 16-01030 WHA

11              Plaintiffs,

12      v.

13    ARIZONA CARDINALS FOOTBALL                       **ORDER GRANTING MOTION
      CLUB, LLC, *et al.*,                             TO DISMISS AND FOR**
14                                                     **SUMMARY JUDGMENT**
              Defendants.
15    _____/

16

17                                      **INTRODUCTION**

18          Defendants in this putative class action move to dismiss most claims in the second

19    amended complaint and for summary judgment as to most claims surviving dismissal.  The

20    motion is **GRANTED**.

21                                        **STATEMENT**

22          This is an action against the 32 member clubs of the National Football League by twelve

23    retired NFL players and the estate of a thirteenth.  The roster of plaintiffs and array of asserted

24    claims have been refined through both amendments and motion practice.  Although we remain

25    at the pleading stage, substantial discovery has already been taken.  The procedural history of

26    this litigation and plaintiffs' sweeping background allegations about the NFL as a whole that

27    have featured in each iteration of their complaint have been set forth in detail in prior orders

28    (*see* Dkt. Nos. 168 at 1–3; 175 at 1–3) and need not be repeated here.  Recent events directly

      informing the instant motion, however, merit brief summary.

On November 30, 2016, plaintiffs filed their first amended complaint, which totaled approximately one hundred pages and asserted RICO and conspiracy claims in addition to claims for intentional misrepresentation and concealment (Dkt. No. 136).  The clubs moved to dismiss (Dkt. No. 139).  On February 3, 2017, a prior order granted the motion in part.  That order dismissed all RICO and conspiracy claims without leave to amend (*see also* Dkt. No. 175) and dismissed the intentional misrepresentation and concealment claims as to all but eight clubs with leave to amend (Dkt. No. 168 at 19–20).  The order emphasized that "a defendant club should only have to defend against claims pled properly against it.  That the amended complaint is adequate as to some clubs does not somehow make it adequate as to all clubs" (*id.* at 17).  The order also made clear — citing plaintiffs' counsel's statement that they could "amend [the complaint] to any degree of particularity" required (Dkt. No. 169 at 40:6–40:7) — that "this [would] be plaintiffs' last opportunity to amend, so they should plead their best case in all respects" (Dkt. No. 168 at 19–20).

Plaintiffs then filed their second amended complaint, which exceeds its predecessor in length and asserts claims only for intentional misrepresentation and concealment (Dkt. No. 189).  The clubs move to dismiss most claims and for summary judgment as to most claims that survive dismissal (Dkt. No. 212).  This order follows full briefing and oral argument.

**ANALYSIS**

**1.    EXTRANEOUS ALLEGATIONS.**

As a preliminary matter, by a conservative estimate, over half of the second amended complaint consists of allegations inapposite to plaintiffs' actual claims for relief.  Much of the second amended complaint is dedicated to essentially repeating the same sweeping criticisms and accusations, directed against the NFL as a whole, that permeated plaintiffs' prior pleadings. The critical section of the second amended complaint setting forth particularized allegations concerning individual players and clubs consists of less than 50 pages.

Even within that section, only a fraction of the allegations actually pertain to plaintiffs; the rest concern putative class members.  But as the undersigned judge has repeatedly noted, this is not yet a class action (*e.g.*, Dkt. No. 169 at 26:23–27:2).  And as a recent order ruled,

United States District Court

For the Northern District of California

plaintiffs do *not* have leave to patch up weaknesses in their pleadings by expanding their

numbers at this stage (*see* Dkt. No. 175).  Nor can they shore up their *own* claims for relief

against the individual clubs they played for by piling on allegations as to *other* putative class

members.  It is important at the outset to determine whether the named plaintiffs can state

claims for relief before deciding whether or not they can represent a class.

Additionally, the second amended complaint is replete with extensive and incendiary

allegations of conspiracy and general illegality (*e.g.*, that the NFL's handling and distribution of

medication violated the Controlled Substances Act and the Food, Drug, and Cosmetic Act),

openly flouting the parameters set by the February 3 order.  Indeed, the second amended

complaint's very first paragraph states, "Plaintiffs bring this action for redress of injuries

resulting from a *conspiracy* perpetrated by the 32 defendant clubs . . . that comprise the

National Football League" (Dkt. No. 189 at 1 (emphasis added)).  To repeat, plaintiffs do *not*

have leave to re-plead any conspiracy claims (*see* Dkt. Nos. 168, 175).  The *only* claims for

relief asserted here are for intentional misrepresentation and concealment by individual clubs.

This order recognizes the possibility that plaintiffs made the deliberate choice to proceed

this way.  The second amended complaint makes this notable comment (Dkt. No. 189 at 4):

> 8.      Plaintiffs agree, and commit now (they would contend they have already done so) to working with the Clubs on this problem [of painkiller abuse in the NFL].  In any event, this should be considered a standing invitation to do so.
>
> 9.      But until Plaintiffs get that call, all they can do (if they are to do anything at all) is proceed with their well-pled allegations that Defendants' actions violate the Controlled Substances Act ("CSA") and/or Food Drug & Cosmetic Act ("FDCA") . . . their implementing regulations, and analogous state laws and that their omissions and concealment as detailed herein harmed Plaintiffs and the proposed class.

So perhaps the bloat of inapposite allegations is the product of some advocacy-based agenda

rather than any attempt to comply with pleading requirements.  For present purposes, however,

this order makes clear at the outset that what matters is not whether plaintiffs have drawn

attention to widespread misconduct in the NFL but whether each plaintiff has properly pled

claims for relief against each individual club and, if so, whether those claims survive summary

United States District Court

For the Northern District of California

1  judgment.  Accordingly, allegations not directed to the issues at hand, no matter how extensive,

2  will not be considered.

3       Having established the foregoing, this order turns to the merits of the clubs' motion.

4  **2.     MOTION TO DISMISS.**

5       **A.     Legal Framework.**

6       As before, there is no dispute that plaintiffs' claims sound in fraud, so Rule 9(b) applies

7  and requires plaintiffs to "state with particularity the circumstances constituting fraud,"

8  although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged

9  generally."  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  Averments of

10  fraud must be accompanied by "the who, what, when, where, and how" of the alleged

11  misconduct.  *Ibid.*  This pleading standard applies to both claims of fraud based on

12  misrepresentation and those based on nondisclosure.  *Id.* at 1126–27.

13       Plaintiffs incorrectly contend Rule 9(b) "does not apply in its full force to . . .

14  concealment claims" (Dkt. No. 216 at 4).  Circumstances constituting fraud by omission or

15  nondisclosure must still be pled with particularity, though they may be less specific or precise

16  insofar as they do not involve affirmative acts.  *See In re Anthem, Inc. Data Breach Litig.*, Case

17  No. 15-MD-02617-LHK, 2016 WL 3029783, at *35 (N.D. Cal. May 27, 2016) (Judge Lucy

18  Koh).  For example, plaintiffs may state that concealment occurred over a particular period of

19  time rather than on a specific date, but they may not simply fail to state "when" the alleged

20  concealment occurred.

21       Although the extensive, disorganized, frequently boilerplate, and sometimes

22  contradictory statements in the second amended complaint and plaintiffs' opposition brief make

23  it difficult to understand specific claims for relief asserted against individual clubs, this order

24  addresses three theories of liability discernible from plaintiffs' allegations.  *First*, each club

25  allegedly concealed facts concerning medication given to plaintiffs.  *Second*, each club

26  allegedly concealed the illegality of their actions, *i.e.*, failed to disclose the fact that they were

27  breaking various laws.  *Third*, each club intentionally misrepresented that they cared about and

28  prioritized plaintiffs' health and safety.

United States District Court

For the Northern District of California

1    As before, it is unclear whether Maryland or California law applies to plaintiffs' claims

2    but the substantive elements for present purposes are the same either way (*see* Dkt. No. 168 at

3    10).  In addition to pleading that each club intentionally misrepresented or concealed

4    something, the second amended complaint must plead that at least one plaintiff justifiably relied

5    on each misrepresentation or concealment and suffered damages as a result.  *See, e.g.*, *Robinson*

6    *Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979, 990 (2004) (elements of fraud); *Lloyd v.*

7    *Gen. Motors Corp.*, 916 A.2d 257, 274 (Md. 2007) (elements of concealment); *Brass Metal*

8    *Prods., Inc. v. E-J Enters., Inc.*, 984 A.2d 361, 386 (Md. Ct. Spec. App. 2009) (elements of

9    intentional misrepresentation).

10    **B.    Concealment (re Medication).**

11    Plaintiffs' first theory of liability is that "the Clubs concealed material facts relating to

12    the Medications" (Dkt. No. 216 at 5).  The second amended complaint alleges at length that the

13    clubs dispensed medication to plaintiffs without making legally required disclosures, *e.g.*, about

14    side effects, risks, or appropriate directions (*see* Dkt. No. 189 at 61–105).  The second amended

15    complaint does not, however, allege that any plaintiff except Jeffrey Graham actually relied on

16    this concealment and would have behaved differently had some legally required disclosure been

17    made.  According to the second amended complaint, Graham received his first anti-

18    inflammatory injection in the NFL from James Bradley, a team doctor with the Pittsburgh

19    Steelers.  Graham said that "if he had been told about the risks and long term consequences," he

20    would not have taken the shot (Dkt. No. 189 at 97).[1]

21    Assuming for the sake of argument that this brief and conclusory statement suffices to

22    plead reliance, the second amended complaint still fails to plead causation as to Graham's

23    concealment claim against the Steelers.  The second amended complaint alleges that Graham

24    has suffered the following damage (*id.* at 72–73 (emphasis added)):

---

26    [1]  During oral argument, plaintiffs' counsel claimed, "If [the clubs] told [plaintiffs] the scheme was
illegal, the plaintiffs would not have taken the drugs in the volume they took them.  We allege that in Paragraph
350" (Dkt. No. 223 at 10:18–10:21).  Paragraph 350 of the second amended complaint contains no such
27    allegation — or, indeed, any allegation specific to the *named plaintiffs*.  It states simply, "The Class Members
reasonably believed the Clubs would not act illegally and, in doing so, injure the Class Members and put them
28    at risk of substantial and continuing future injuries" (Dkt. No. 189 at 120).  This does not even come close to
alleging reliance as described by plaintiffs' counsel.

> Mr. Graham now lives in constant pain.  He has pain in both
> shoulders, neck, hips, lower back, both elbows, both hamstrings,
> his fingers, wrists, left toe and right knee.  He cannot stand for
> long periods and needs special shoes to lessen the pain.  He is stiff
> and sore all day.  He cannot sleep at night, moving from bed to
> floor to couch throughout the night.  Mr. Graham struggles to
> control his weight due to his limited ability to exercise.  *He
> believes his current pain is directly attributable to various injuries
> suffered during his NFL career.*

But the second amended complaint does not even remotely suggest that Graham suffered any of

the foregoing damage *as a result of* the anti-inflammatory injection that he would not have

taken had he been told about "the risks and long term consequences" thereof.  On the contrary,

the second amended complaint expressly alleges that Graham "believes his current pain is

directly attributable to various injuries suffered during his NFL career."

During oral argument, plaintiffs' counsel claimed ten of the named plaintiffs "have

internal organ claims in the complaint, of different kinds," based on the theory that their use of

medication in the NFL caused internal organ failures and other "internal damage" (as opposed

to musculoskeletal injury) (*see* Dkt. No. 223 at 22:2–24:6).  Plaintiffs' counsel proffered the

example of plaintiff Chris Goode, who — according to counsel — "had to remove a seven-

pound tumor" from his kidney in 2005.  (Actually, the second amended complaint says Goode

had to "remove half of his kidney along with [a] malignant tumor" in 2015 (Dkt. No. 189 at

83).)  The undersigned judge then asked plaintiffs' counsel to identify specific allegations

giving rise to any plausible inference that Goode's use of medication in the NFL actually caused

his tumor.  In response, plaintiffs' counsel took aim with birdshot at an entire universe of

speculative medical effects, stating, "An abundance of the drugs can produce harm to certain

organs . . . we have a lot of experts that we are consulting who are talking about the impact of

excessive dosages of drugs on various organs in the human body" (Dkt. No. 223 at 23:4–23:10).

This nebulous and wholly speculative statement is, of course, useless as an allegation of

medical causation.  The undersigned judge pressed the question, asking, "does the complaint

say that they took the tumor out; they did a biopsy . . . the doctors concluded that the tumor was

the result of too many drugs?  Or was that just the lawyer speculating . . . ?"  Plaintiffs' counsel

replied, "The doctors have not said that."  The undersigned judge then asked how plaintiffs

United States District Court

For the Northern District of California

1   could "just arbitrarily blame the drugs."  Plaintiffs' counsel — misleadingly — replied, "Your

2   Honor, these are tumors that are appearing in 30- and 40-year-olds.  These are highly unusual

3   cases."  This statement insinuated that plaintiffs had alleged multiple occurrences of unusual

4   tumors when, in fact, Goode is the only one to allege any incidence of cancer.  The undersigned

5   judge then asked, "How many tumor cases do we have in the complaint?"  Instead of answering

6   the question, plaintiffs' counsel deflected, stating, "Your Honor, we have Ashmore with kidney

7   and heart.  We have Wunsch with pituitary problems and liver problems.  We have Killings

8   with gallbladder. . . .  These are just problems with the organ" (*id.* at 23:11–24:6).

9        The foregoing exchange suggests that plaintiffs think they can plead the causation

10  element of their concealment claim simply by pointing to some recent internal organ-related

11  problem — with no allegation whatsoever concerning etiology (even after extensive discovery

12  and consultation with "a lot of experts") — and baldly asserting their belief that it directly

13  resulted from their use of medication in the NFL.  Not so.

14       *First*, even if counsel's misleading insinuation that the lead plaintiffs suffer from an

15  unusual array of such ailments proved true, that alone would mean little.  These lead plaintiffs

16  were carefully chosen from a pool of over a thousand putative class members (*see* Dkt. No. 175

17  (discussing the evolution of plaintiffs' lineup over the history of this litigation)).  That they

18  suffer from certain medical ailments ostensibly informed their selection.  Absent well-pled

19  factual allegations to the contrary, they should not be mistaken for a representative sample

20  indicating some causal nexus between use of medication in the NFL and subsequent "internal

21  organ" problems.

22       *Second*, even assuming (and this has *not* yet been established) that the lead plaintiffs and

23  their various ailments are a representative sample of the overall population of NFL retirees, that

24  alone would still be insufficient to plead causation.  Statistically, in any population as large as

25  NFL retirees, some incidence of tumors and other organ-related ailments is to be expected, so

26  the mere presence of such ailments does not speak to etiology.  Additional factual allegations

27  are required to indicate causation.  Tellingly, the second amended complaint alleges (Dkt. No.

28  189 at 50 (emphasis added)):

United States District Court

For the Northern District of California

197.    The constant pain that Plaintiffs and other players experience *from their injuries while playing for the Clubs* leads directly to a host of health problems.

198.    Leading experts recognize that former professional football players who suffer from permanent *musculoskeletal injuries* often cannot exercise due to pain or other physical limitations, leading to a more sedentary lifestyle and higher rates of obesity.

199.    According to the Centers for Disease Control and Prevention, obesity is linked to:  coronary heart disease, type-2 diabetes, endometrial cancer, colon cancer, hypertension, dyslipidemia, liver disease, gallbladder disease, sleep apnea, respiratory problems and osteoarthritis.

200.    Surveys of former NFL players confirm that they suffer from significantly higher rates of all these disorders when compared to the general population.

In other words, the second amended complaint itself claims that musculoskeletal injuries sustained in the NFL can cause obesity and related "internal" ailments, further undermining any suggestion that the mere presence of such ailments among NFL retirees implies etiology tracing back to excessive use of medication.  At best, the second amended complaint broadly claims that certain drugs are *generally* associated with certain adverse side effects but fails to allege any facts giving rise to a plausible inference that the lead plaintiffs' *particular* ailments resulted from their excessive use of medication in the NFL (*see id.* at 50–52).

In short, the second amended complaint fails to plead allegations showing causation as to any suggested theory of liability based on "internal organ claims."  This order therefore concludes plaintiffs have not properly pled any claim for relief based on a club's alleged concealment of material facts relating to medication.[2]

C.    **Concealment (re Illegality).**

Plaintiffs' second theory of liability is that "the Clubs concealed material facts relating to . . . the illegality of their scheme" (Dkt. No. 216 at 5).  Much of the second amended complaint is dedicated to alleging that the clubs' handling and distribution of controlled

---

[2]  One exception is plaintiff Alphonso Carreker, who — unlike the other named plaintiffs — plausibly pled causation linking his excessive use of medication to recent health problems.  The second amended complaint still fails to allege, however, that Carreker actually relied on any club's concealment and would have behaved differently had some legally required disclosure been given.  His claim is thus sufficiently pled only under plaintiffs' intentional misrepresentation theory, discussed below (*see* Dkt. No. 168 at 14–15).

United States District Court

For the Northern District of California

substances violated various laws and regulations.  The second amended complaint also alleges that the clubs knew their actions were illegal and took steps to conceal said illegal actions (*e.g.*, Dkt. No. 189 at 106–08).  The second amended complaint does not, however, allege that any plaintiff relied on this concealment and would have behaved differently had they known that a club's actions violated some law or regulation.  Even if it did, as the February 3 order noted, it would strain credulity to further suggest that any plaintiff suffered damages as a result of a club's failure to disclose the technical illegality of its actions (*see* Dkt. No. 168 at 11–12).

In short, plaintiffs have also not properly pled any claim for relief based on a club's alleged concealment of "the illegality of their scheme."

**D.     Intentional Misrepresentation.**

Plaintiffs' third theory of liability is taken from the February 3 order.  That order, construing the first amended complaint in plaintiffs' favor, interpreted its allegations as potentially pleading that (1) the clubs represented that they cared about and prioritized players' health and safety but acted to the contrary, (2) plaintiffs took medication and continued playing while injured (or, in Carreker's case, regularly used excessive amounts of medication) in reliance on the clubs' fraudulent conduct, and (3) plaintiffs suffered their alleged damages as a result (*see* Dkt. No. 216 at 8–9).  Plaintiffs have expressly adopted this theory as the sole basis for the second amended complaint's intentional misrepresentation claims (*id.* at 8).

Before proceeding further, however, this order rejects plaintiffs' attempt to interpret the February 3 order as obviating any need to plead proximate causation.  According to plaintiffs, the February 3 order found claims properly pled as to Jerry Wunsch and Jeffrey Graham even though those claims did not tie the plaintiffs' damages to any club's actions.  Thus, plaintiffs contend, the second amended complaint can properly plead intentional misrepresentation simply by identifying specific injuries from which they currently suffer, even if said injuries are not tied to any club's actions (Dkt. No. 216 at 10–11).  This order disagrees.

The first amended complaint alleged the Seattle Seahawks gave Wunsch medication to get him through a game in 2003 even though he repeatedly said he could not play (it did not further describe why Wunsch felt unable to play that particular game but mentioned elsewhere

United States District Court

For the Northern District of California

that he had ankle problems).  It further alleged Wunsch now suffers from "pain from all of his joints" and "shooting nerve pains," which could plausibly encompass damage sustained or exacerbated as a result of that game.  Similarly, the first amended complaint alleged the San Diego Chargers gave Graham medication to get through most of the 2000 season with a broken transverse process in his back.  It further alleged Graham "now lives in constant pain," which could plausibly encompass damage sustained or exacerbated as a result of that season.

In short, the first amended complaint's allegations as to Wunsch and Graham did not, as plaintiffs suggest, feature damages wholly divorced from the clubs' alleged misconduct.  True, specific factual allegations in different claims may permit stronger or weaker showings of proximate causation, but this does not support plaintiffs' position that proper pleading requires no plausible nexus whatsoever between their alleged damages and the clubs' alleged misconduct.  Nothing in the February 3 order or controlling law supports such an untenable standard.  Indeed, plaintiffs' own "plain reading" of the theory of liability articulated in the February 3 order requires that "a Club 'acted contrary to their representations by driving players to return to play *at the cost of* their health and safety'" (Dkt. No. 216 at 9 (emphasis added)).

The scope of plaintiffs' intentional misrepresentation theory also requires clarification.  During oral argument, plaintiffs' counsel stated, "There are 14 clubs that we are not alleging this affirmative-misappropriation [*sic*] claim against.  It's only 18 total clubs, nine of which have already been adjudicated, and nine more which we have said — we have conformed with the particularity requirement.  But as to 14 others, there is no claim under affirmative misrepresentation as to them" (Dkt. No. 223 at 7:14–7:19).  This statement contradicts the second amended complaint itself, which asserts intentional misrepresentation claims by "All Plaintiffs Against All Defendants" (Dkt. No. 189 at 114).[3]

---

[3]  Additional inaccuracies in counsel's statement require clarification.  The February 3 order declined to dismiss *nine claims* against *eight clubs* — Massey/Lions, Ashmore/Raiders, Carreker/Packers, Carreker/Broncos, Wunsch/Seahawks, Harris/Dolphins, Graham/Chargers, Killings/Vikings, and Walker/Chargers (Dkt. No. 168 at 14–16).  According to plaintiffs' opposition brief, the second amended complaint adds *eleven claims* — Ashmore/Rams, Ashmore/Redskins, Graham/Bears, Graham/Jets, Graham/Eagles, Harris/Browns, King/Bills, King/Lions, King/Titans, Sadowski/Bengals, and Massey/Saints — that extend plaintiffs' intentional misrepresentation allegations to *ten more clubs* (Dkt. No. 216 at 1–2 n.1, 11).

United States District Court
For the Northern District of California

1    Although the foregoing blip in the second amended complaint technically says

2   otherwise, this order accepts plaintiffs' more substantive representations, both in briefing and

3   during oral argument, that they now assert intentional misrepresentation claims against only

4   eighteen clubs — the Lions, Raiders, Packers, Broncos, Seahawks, Dolphins, Chargers,

5   Vikings, Rams, Redskins, Bears, Jets, Eagles, Browns, Bills, Titans, Bengals, and Saints.  The

6   other fourteen clubs are off the hook for intentional misrepresentation.

7    With that clarification, this order turns back to the substance of plaintiffs' intentional

8   misrepresentation theory.  The second amended complaint carries over most of the first

9   amended complaint's allegations that the February 3 order cited as showing (1) the clubs

10   represented that they cared about and prioritized players' health and safety, and (2) plaintiffs

11   believed such representations (*see* Dkt. No. 168 at 12–13; 189 at 18, 21, 115, 119–20).  The

12   nine claims sufficiently pled in the first amended complaint are pled with equal or greater

13   particularity in the second amended complaint.  This order therefore concludes those nine

14   claims survive dismissal.

15    The second amended complaint also pleads the following allegations with particularity:

16    •  While playing for the Los Angeles/St. Louis Rams on September

17      17, 1995, plaintiff Darryl Ashmore ruptured a disc in his neck.

18      Club doctors and trainers, including Jim Anderson, kept Ashmore

19      on the field for that game and the remainder of the season by giving

20      him medication.  Ashmore now suffers from "constant pain in his

21      neck" (*id.* at 85-86).

22    •  While playing for the Tennessee Titans in 2007, plaintiff Eric King

23      sustained numerous injuries, including breaking his forearm.  When

24      an injury occurred during a game, club trainers Brad Brown, Don

25      Moseley, Geoff Kaplan, Jason Williams, or Jon Takahashi gave

26      King painkillers and anti-inflammatory drugs and told him to "get

27      back in the game."  After King aggravated his forearm injury in

28      2008, the aforementioned club trainers gave him daily doses of

11

United States District Court

For the Northern District of California

Toradol and other painkillers so he could keep playing.  He had two

surgeries on his forearm during his NFL career and now suffers

from "constant pain," including in his forearm (*id.* at 70, 104).

• While playing for the New Orleans Saints in the middle of the 1989

season, plaintiff Robert Massey rolled his ankle during a game.  He

got a Toradol injection from club trainers Dean Kleinschmidt and

Kevin Mangum, then finished the game.  He now suffers constant

pain from, among other things, his ankles (Dkt. No. 189 at 81, 90).

In summary, the second amended complaint sufficiently pleads intentional

misrepresentation claims between Ashmore/Raiders, Ashmore/Rams, Carreker/Packers,

Carreker/Broncos, Harris/Dolphins, Graham/Chargers, Killings/Vikings, King/Titans,

Massey/Lions, Massey/Saints, Walker/Chargers, and Wunsch/Seahawks.

**3.      MOTION FOR SUMMARY JUDGMENT.**

The clubs also move for summary judgment as to most claims surviving dismissal on the

basis that said claims are time-barred.  Both sides agree that Maryland law applies, and that the

applicable limitations period is three years (Dkt. Nos. 212 at 15; 216 at 13).

Maryland follows the discovery rule, under which the limitations period starts running

"when the plaintiff has knowledge of circumstances which would cause a reasonable person in

the position of the plaintiff to undertake an investigation which, if pursued with reasonable

diligence, would have led to knowledge of the alleged tort." *Lumsden v. Design Tech Builders,

Inc.*, 749 A.2d 796, 802 (Md. 2000) (quotation omitted).  Importantly, "[k]nowledge of *facts* . . .

not actual knowledge of their legal significance, starts the statute of limitations running . . . .

The discovery rule, in other words, applies to discovery of *facts*, not to discovery of *law*.

Knowledge of the law is presumed." *Moreland v. Aetna U.S. Healthcare, Inc.*, 831 A.2d 1091,

1096 (Md. Ct. Spec. App. 2003) (citing *Doe v. Archdiocese of Wash.*, 689 A.2d 634, 641–43

(Md. Ct. Spec. App. 1997), for the proposition that "a cause of action in tort generally accrues

at the same time the act that constitutes the tort occurs — regardless whether the victim

United States District Court

For the Northern District of California

1    recognizes the act as legally wrong or comprehends the full extent of the harm").  Plaintiffs

2    filed this action in May 2015, so their claims are time-barred unless accrued *after* May 2012.

3         Applying the foregoing principles here, almost all of plaintiffs' surviving claims are

4    clearly time-barred.  With only two exceptions, those claims are predicated on damages

5    supposedly attributable to musculoskeletal injuries sustained prior to 2012.  The two exceptions

6    are Walker's claim against the Chargers, which is based on an ankle sprain sustained in 2014,

7    and Carreker's claims against the Packers and the Broncos, which are based on continuous

8    excessive use of medication instead of musculoskeletal injuries sustained in the NFL and also

9    may have accrued after May 2012.

10        In addition to noting the dated nature of plaintiffs' musculoskeletal injuries, the clubs

11   point out that, prior to May 2012, most of the plaintiffs also filed workers' compensation claims

12   for the very same injuries they assert here.  Both arguments are well-taken — so much so, in

13   fact, that plaintiffs' opposition brief responds by attempting to altogether disavow the second

14   amended complaint's boilerplate but insistently repeated allegations that each plaintiff believes

15   their current injuries are "directly attributable" to past injuries sustained in the NFL and covered

16   up by medication (Dkt. No. 216 at 19–20 (bold and italics in original, footnote omitted)):

> Plaintiffs' causes of action seek recovery for later-in-life injuries
> they sustained **as a result of Defendants' misrepresentations and
> concealment in connection with the provision and administration
> of the dangerous Medications.**  They are not seeking recovery for
> injuries they may have sustained as a result of any other cause.  In
> other words, the injuries at issue in this case are not the injuries
> that Plaintiffs sustained on the field **as a result of playing football**,
> and thus, are not the injuries that were at issue in Plaintiffs'
> workers compensation or disability claims.  The injuries for which
> Plaintiffs seek compensation fall into two discrete categories: (1)
> internal organ injuries; and (2) musculoskeletal injuries . . . the
> **cause** of those injuries — the exorbitant amount of often illegally
> dispensed Medications — were not and could not have [been]
> discovered in the exercise of reasonable diligence until shortly
> before Plaintiffs filed this lawsuit, after conferring with counsel.

25        Even if this order accepted the foregoing position, it would be of no help to plaintiffs.  If

26   the injuries underlying plaintiffs' claims were attributable to excessive use of medication, rather

27   than to musculoskeletal damage sustained as a result of playing with injuries, that would

28   eviscerate the theory of liability identified in the February 3 order and adopted as the sole basis

of plaintiffs' intentional misrepresentation claims in the second amended complaint.  In that case, plaintiffs' intentional misrepresentation claims (with the exception of Carreker's) would simply be dismissed rather than disposed of via summary judgment.

## CONCLUSION

For the foregoing reasons, the clubs' motion is **GRANTED**.  All claims save and except those for intentional misrepresentation between Ashmore/Raiders, Ashmore/Rams, Carreker/Packers, Carreker/Broncos, Graham/Chargers, Harris/Dolphins, Killings/Vikings, King/Titans, Massey/Saints, Massey/Lions, Walker/Chargers, and Wunsch/Seahawks are **DISMISSED**.  For the reasons previously stated in the February 3 order, this dismissal is without further leave to amend.  Plaintiffs' counsel have had ample opportunity to plead and the time has come to deem the pleadings settled.

Summary judgment is **GRANTED** in favor of the clubs as to all claims that survive dismissal save and except those for intentional misrepresentation between Carreker/Packers, Carreker/Broncos, and Walker/Chargers.

The deadline for plaintiffs to file their class certification motion, to be heard on a 49-day briefing schedule, is continued from May 18 to **JUNE 1**.

**IT IS SO ORDERED.**

Dated:  May 15, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

14